# Exhibit 1

# Deposition Transcript

Case Number: 4:24-cv-5106
Date: September 29, 2025

In the matter of:

# IMANI CHINDA v HSA ST. JOSEPH LLC.

# JAMIE MALVEAUX

## Individually & 30(b)(6)



**CERTIFIED COPY**

Reported by:
Diana Flores Nuchurch

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                 HOUSTON DIVISION

 3
    IMANI CHINDA,            )CASE NO. 4:24-cv-5106
 4                          )
    v.                      )
 5                          )
    HSA ST. JOSEPH LLC.      )
 6  _____)

 7

 8

 9

10          VOLUME I OF I - PAGES 1 - 110

11

12      REMOTE VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

13  OF JAMIE MALVEAUX, INDIVIDUALLY, AND 30(B)(6), located

14  in Port Arthur, Texas, commencing at 9:35 a.m. Central

15  Time to 12:37 p.m. Central time on Monday,

16  September 29, 2025, before Diana Flores Nuchurch,

17  Certified Shorthand Reporter 12885, in and for the State

18  of Texas.

19

20

21

22

23

24  STENO
    Concierge@Steno.com
25  (888) 707-8366
```

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

---

**Page 2**

```
1  APPEARANCES VIA VIDEOCONFERENCE:
2  FOR THE PLAINTIFF, IMANI CHINDA:
3         FITZ LAW PLLC
          BY:  CARL A. FITZ, ESQ.
4         3730 Kirby Drive
          Suite 1200
5         Houston, Texas 77-09
          Phone: 713-766-4000
6         Carl@Fitz.Legal
7
   FOR THE DEFENDANT, HSA ST. JOSEPH LLC:
8
          HSA REGIONAL COUNSEL
9         BY:  ASIM GHAFOOR, ESQ.
          1401 St. Joseph Parkway
10        Houston, Texas 77002
          Phone: 202-330 1469
11        AGhafoor@hsahospitals.com
12
13
14
15
   OTHER APPEARANCES:
16
   HOLLIE METRICK, VIDEOGRAPHER
17
   JOSEPH SARDON, PARALEGAL
18
   LILY ALCAZAR, HSA PARALEGAL
19
20
21
22
23
24
25
```

---

**Page 3**

```
1              I N D E X
2
   DEPONENT:          EXAMINED BY:          PAGE
3
   JAMIE MALVEAUX, INDIVIDUALLY, AND 30(B)(6)
4
          MR. FITZ:                           6
5
6
7       INFORMATION TO BE SUPPLIED
8            (None.)
9
10
       QUESTIONS INSTRUCTED NOT TO ANSWER
11
            (None.)
12
13
14   QUESTIONS RE VIDEO INSTRUCTED NOT TO ANSWER
15            (None.)
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1         I N D E X (continued):
2  EXHIBITS      E X H I B I T S
3
                 DESCRIPTION              PAGE
4
   Exhibit 1   Chinda's Fed. R. CIV. P. 30(b)(6)   28
5              Deposition Notice to HSA St. Joseph
               LLC
6
   Exhibit 2   Job Title, RFP2-038 - RFP2-041      29
7
   Exhibit 3   Defendant HSA St. Joseph LLC's      32
8              Supplemental Responses to
               Plaintiff's First Set of Discovery,
9              Interrogatories 1-7
10 Exhibit 4   Email Tuesday, 11/5/2024 RFP2-002 - 42
               RFP2-003
11
   Exhibit 5   Steward National Traveler Network   51
12             Assignment Agreement, 2/21/2023
               RFP2-010 - RFP2-013
13
   Exhibit 6   Steward National Traveler Network   54
14             Assignment Agreement, 08/03/2024,
               RFP2-004 - RFP2-006
15
   Exhibit 7   St. Joseph's Standards of           59
16             Performance, Disciplinary Action
               Policy, Last Revised 6/26/2023,
17             RFP2-098 - RFP2-101
18 Exhibit 8   Defendant HSA St. Joseph LLC's      75
               Responses to Plaintiff's First Set
19             of Discovery, Interrogatories
20 Exhibit 9   Email Re:  Imani Chinda, 12/31/2024 87
21 Exhibit 10  Email Re:  Missing Hours Pay,       89
               11/2/2024
22
   Exhibit 11  Email Re:  Pending Candidates,      91
23             11/13/2024
24 Exhibit 12  Defendant's Answer, Affirmative     97
               Defense an Counterclaims, Filed
25             5/27/2015
```

---

**Page 5**

```
1       SEPTEMBER 29, 2025, 9:35 A.M. CENTRAL TIME
2              P R O C E E D I N G S
3       THE VIDEOGRAPHER:  Good morning.  We are on
4  the record at 9:35 a.m. Central time; September 29,
5  2025; to begin the deposition of Jamie Malveaux,
6  individually, and as a corporate representative for HSA
7  St. Joseph LLC, in the matter of Imani Chinda versus HSA
8  St. Joseph LLC.
9       The venue of this case is United States
10 District Court, Southern District of Texas, Houston
11 Division.  The Case Number is 4:24-cv-5106.
12      This deposition is taking place via Zoom.
13 The Legal Videographer is Holly Metrick here on behalf
14 of Steno whose business address is 315 West 9th Street,
15 Suite 807, Los Angeles, California 90015.
16      Would Counsel please identify yourselves
17 and state whom you represent.
18      MR. FITZ:  Carl Fitz on behalf of
19 plaintiff.
20      MR. GHAFOOR:  Asim Ghafoor, that's A-S-I-M,
21 G-H-A-F, like Frank, -O-O-R on behalf of Jamie Malveaux
22 and HSA St. Joseph LLC.
23      THE VIDEOGRAPHER:  Thank you, Counsel.
24      Will the Court Reporter please identify
25 yourself and swear in the witness.
```

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 6

1    THE COURT REPORTER:  Good morning, my name
2  is Diana Flores Nuchurch.  I am a California -- sorry
3  Texas Shorthand Reporter Number 12665.
4    Ma'am, would you please raise your right
5  hand so I could minister the oath.
6    Do you swear or affirm that the testimony
7  you're about to give will be the truth, the whole truth,
8  and nothing but the truth?
9    **THE WITNESS:  I do.**
10    THE COURT REPORTER:  Thank you.
11    And if Counsels would please state what
12  locate -- what their location is.
13    Thank you.
14    MR. FITZ:  All right.  Carl Fitz for
15  plaintiff, located in Houston, Texas.
16    MR. GHAFOOR:  This is Asim Ghafoor, counsel
17  for HSA St. Joseph and Jamie Malveaux, based out of
18  Houston, Texas.  I'm currently in Port Arthur, Texas at
19  our sister hospital.
20    JAMIE MALVEAUX, INDIVIDUALLY, AND 30(B)(6),
21   having first been duly sworn or affirmed, was examined
22    and testified as follows:
23    EXAMINATION
24  BY MR. FITZ:
25    Q.  Good morning, Ms. Malveaux.  My name is Carl

Page 7

1  Fitz and I'm the attorney for plaintiff Imani Chinda.
2    Can you please state and spell your name
3  for the record?
4    **A.  Jamie Malveaux.  My first name is spelled**
5  **J-A-I-M-E.  My last name Malveaux, M-A-L-V-E-A-U-X.**
6    Q.  And, Ms. Malveaux, have you ever appeared for a
7  deposition before?
8    **A.  Yes.**
9    Q.  Can you identify the circumstances of the prior
10  deposition?
11    **A.  It was many, many, many, many, many years ago**
12  **related to a human resource case several employers ago.**
13    Q.  Did it concern an allegation of unlawful
14  retaliation?
15    **A.  No, it did not.**
16    Q.  What was the general circumstance of that
17  human-resource case?
18    **A.  It was related in -- to a discrimination**
19  **lawsuit that a former employee of the company that I was**
20  **working for at the time felt as though they were**
21  **discriminated.**
22    Q.  Do you remember the name of your employer at
23  that time?
24    **A.  It would have been Franciscan Missionaries of**
25  **Our Lady Health System.  I am not sure, at that time,**

Page 8

1  **what corporate arm I was under whether it was**
2  **St. Elizabeth Physicians or Our Lady of the Lake**
3  **Physician Group, but it was all under the corporate arm**
4  **or Franciscan Missionaries of our Lady Health System.**
5    Q.  And do you remember approximately what year
6  that deposition was?
7    **A.  I don't.**
8    Q.  Well, since it has been a while since you've
9  given a deposition, I will remind you of few background
10  rules:
11    You are under oath, and so the expectation
12  is that you testify honestly.
13    We are appearing for this deposition
14  remotely, via Zoom.  Sometimes technical difficulties do
15  arise.  If you are ever unable to understand my
16  question, will you let me know?
17    **A.  Sure.**
18    Q.  Great.  And you're represented by counsel
19  today; correct?
20    **A.  I am.**
21    Q.  Is -- is there anybody else in the room with
22  you?
23    **A.  No, sir.**
24    Q.  Okay.  And is there any reason why you will not
25  be able to give complete and honest answers today?

Page 9

1    **A.  No, sir.**
2    Q.  And this is just a standard question that's
3  typically asked in depositions, so please do not take it
4  personally, but are you under the influence of any
5  medication or alcohol that would inhibit your ability to
6  testify completely and truthfully today?
7    **A.  No, sir.**
8    Q.  Do you have any questions for me about the
9  ground rules for depositions?
10    **A.  No, sir.**
11    Q.  Great.  And do you understand that you are
12  testifying both in your individual capacity and on
13  behalf of HSA St. Joseph LLC; correct?
14    **A.  Yes, sir.**
15    Q.  What did you do to prepare for your deposition
16  today?
17    **A.  I previously spoke to Asim and reviewed the**
18  **documentation that is part of the record.**
19    Q.  Okay.  And when did you speak to Mr. Ghafoor?
20    **A.  Last Thursday.  I'm unsure of the date at this**
21  **very moment.**
22    Q.  The conversation you had with Mr. Ghafoor last
23  week, was that the only time you spoke with Mr. Ghafoor
24  about your deposition?
25    **A.  Yes.**

Page 10

1  Q.  Okay.  How long was that conversation?
2  A.  One hour.
3  Q.  And was that via telephone or Zoom?
4  A.  Zoom.
5  Q.  Okay.  Which documents did you review to
6  prepare for your deposition?
7  A.  It was the actual documentation that included
8  the -- that I was gonna be named as part of the
9  deposition and also the documents that were submitted as
10 part of the lawsuit.
11 Q.  Okay.
12 A.  Such as the employment application, everything
13 in the HR file, and the paycheck reconciliation, and
14 more documents that were submitted to the court.
15 Q.  Are these all documents that HSA submitted in
16 this case?
17 A.  Yes, sir.
18 Q.  Did you review any emails to prepare for your
19 deposition?
20 A.  Not in depth.
21 Q.  Okay.  Did you skim any emails?
22 A.  Yes, sir.
23 Q.  Did you review any policies to prepare for your
24 deposition?
25 A.  The policies that were part of the

Page 11

1  documentation that was submitted to the court, yes.
2  Q.  Do you remember which policies those were?
3  A.  I do not remember the policy name, but it was
4  related to the workplace rules as well as the
5  timekeeping policy.
6  Q.  Thank you.
7      Are you familiar with HSA's policies,
8  generally?
9  A.  The human resource ones, yes, sir.
10 Q.  Okay.  When did you start working for HSA?
11 A.  On the transition, which on HR -- for HR
12 purposes, it was on October 13th.  I began working with
13 HSA during the transition which was on or about
14 September 11th of '24.
15 Q.  Okay.  So let's take a step back and discuss
16 when you started working for St. Joseph.
17      Was that when St. Joseph was owned by
18 Steward?
19 A.  Yes, sir.
20 Q.  How did that opportunity come about?
21 A.  I was recruited by their corporate recruiter to
22 join Steward Healthcare as the HR Director for
23 St. Joseph the last quarter of '23.
24      And I joined St. Joseph in January of '24.
25 Q.  And what was your title when you joined?

Page 12

1  A.  Human Resources Director.
2  Q.  And what were your job duties at the time?
3  A.  I was a member of the senior leadership team
4  for the hospital responsible for all human resource
5  day-to-day operational things including ensuring that we
6  are fair and just with our hiring, firing, policy and
7  procedure, administration, employee relations.
8      When we were Steward, it was -- my
9  responsibility was to interface with corporate human
10 resource departments such as HRIS, such as payroll, such
11 as leave administration, such as the benefits team,
12 things as such.
13 Q.  Did you draft any policies at that time?
14 A.  I did not.
15 Q.  Did you revise any policies at that time?
16 A.  I did not.
17 Q.  Was the scope of your role at that time limited
18 to human resources?
19 A.  Yes.
20 Q.  Does that include timekeeping policies?
21 A.  That included ensuring adherence to the
22 timekeeping policies and ensuring that our corporate --
23 well, ensuring that our local leaders adhere to
24 corporate deadlines for payroll processing.
25 Q.  Does that include job descriptions?

Page 13

1  A.  There were a stock of standard job descriptions
2  available from Steward Healthcare, yes.
3  Q.  And are you familiar with those job
4  descriptions?
5  A.  I am.
6  Q.  Did your role include responding to employee
7  complaints?
8  A.  Yes.
9  Q.  Did your role include termination of employees?
10 A.  Once appropriate approval was granted, yes, I
11 assisted with them.
12 Q.  And did your role include disciplining
13 employees?
14 A.  I assisted from a human resource standpoint.
15      I did not myself discipline another
16 employee unless it was an employee in my department.
17 Q.  Did you supervise the discipline imposed by
18 other individuals upon employees?
19 A.  I partnered with them and gave them a
20 recommendation.
21 Q.  Do you give the recommendation every time an
22 employee is disciplined?
23 A.  If it is a higher level of discipline such as a
24 final written warning or a termination or a separation
25 of employment, yes.

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 14

1    Q.  Under what circumstances would you not be
2  involved in an employee's discipline?
3    A.  If it was a lesser offense, if the leader is
4  off of probation and are able to adequately give
5  discipline, those that are deemed verbal warnings or
6  those that are written warnings would not always have to
7  go through human resource.
8        Those that were more serious, would come
9  through human resources.
10    Q.  Are more serious violations of policies
11  documented in writing?
12    A.  Would you mind repeating your question?
13    Q.  Sure.  So you mentioned verbal warnings; right?
14    A.  Correct.
15    Q.  Is vernal -- verbal warnings the lowest on the
16  hierarchy of discipline --
17    A.  Yes, sir.
18    Q.  Okay.  And the next level would be a written
19  warning; right?
20    A.  Yes, sir.
21    Q.  And the policy is that when an employee
22  receives a written warning, the employee receives that
23  warning in writing; right?
24    A.  That is the procedure that we used, yes.
25    Q.  Okay.  And what is the next level of discipline

Page 15

1  above a written warning?
2    A.  A final written warning.
3    Q.  And the employee receives that in writing as
4  well; right?
5    A.  Correct.
6    Q.  And --
7    A.  Every --
8    Q.  Continue, please.
9    A.  And we ask, for final written warnings, that a
10  member of human resources is available during the
11  administration of the final written warning.
12    Q.  And what is the next level on the hierarchy?
13    A.  Termination of employment.
14    Q.  Does the employee receive notice of that in
15  writing?
16    A.  Yes, sir.
17    Q.  Okay.
18    A.  When possible.
19    Q.  Okay.  And this hierarchy applied when
20  St. Joseph was owned by Steward; right?
21    A.  Yes, sir.
22    Q.  This hierarchy applies when St. Joseph is
23  currently owned by HSA; right?
24    A.  They are similar, yes, sir.
25    Q.  Are there any differences?

Page 16

1    A.  Not that I can recall.
2    Q.  Okay.  And when did you first learn about the
3  transition from Steward to HSA?
4    A.  Around September.
5    Q.  Of 2024?
6    A.  Of 2024.
7    Q.  What do you remember hearing about that?
8    A.  That St. Joseph had found a new owner and it
9  was going to be -- at that time, it was American
10  Healthcare Systems, and then when the transition
11  occurred, we found out it was gonna be called HSA
12  Healthcare Systems of America.
13    Q.  When did you become an employee of HSA?
14    A.  On October 13, 2024, at the same time as
15  everyone transitioned.
16    Q.  And how did your role change during that
17  transition?
18    A.  HSA did not, at that time, have a corporate
19  structure, so upon transition, the departments that
20  would typically be at a corporate level, the local human
21  resources department, absorbed it.
22        For example, we no longer had a centralized
23  benefits department, we no longer had a central HRIS
24  department, we no longer had a centralized leave of
25  absence, so we took all of that on internally.

Page 17

1    Q.  And when you say, "we took all that on
2  internally," what do you mean?
3    A.  We no longer had a corporate department that we
4  could call with issues.  We all absorbed it all.
5    Q.  Where was the Steward corporate department
6  located?
7    A.  It was primarily in Dallas, and I interfaced
8  with some people that were in Massachusetts.
9    Q.  And what types of issues would you send to the
10  Dallas corporate department while Steward owned
11  St. Joseph?
12    A.  A wide variety of them.  My reporting structure
13  was to local leadership, meaning the CEO for the
14  hospital.  But I also had a corporate HR director that I
15  would interface with day to day for things such as
16  recommendations on final written warnings, if there was
17  suspension, if there was a termination.  All
18  terminations had to go through corporate.  If there were
19  positions that were being requested, if we needed to get
20  an additional internal traveler due to staffing
21  opportunities, all that went to corporate.
22        If there was someone requesting FMLA, we
23  had a third-party administrator which was FMLA Source
24  that would take care of that for us.  If there was a
25  benefits question, we would call our benefits department

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 18

1  to be able to work through whatever the benefit issue
2  is.  If there was an HR system issue with Kronos, we
3  would partner with the HRIS department to fix whatever
4  the issue is or partner on something system-related that
5  needed to be fixed.
6             Payroll:  If there was a past pay period
7  adjustment that was needed, ensuring that the document
8  was filled out accurately and submitting that to payroll
9  for processing.
10     Q.  And so these issues that you just listed that
11 used to be sent to Steward corporate, how were those
12 dealt with after September 11th of 2024?
13     A.  Between September 11th and October 13th, we
14 still partnered with Steward for things until the HR
15 transition occurred on October 13th.
16     Q.  And so what happened with the HR transition on
17 October 13th?
18     A.  We had to set up the infrastructure to be able
19 to maintain continuity within HR things that were
20 necessary such as transition to a new HRIS system, which
21 is called iSolved, we internally set up an FMLA process
22 so if someone needed to apply for an FMLA leave of
23 absence, we had a vessel in which to do so.
24             Myself and several colleagues became
25 subject matter experts on iSolved which was our -- which

Page 19

1  is our HRIS system because there was no one to call.  We
2  were HRIS, so we became subject matter experts in the
3  system.  And we continued to use Steward policies and
4  procedures as well as some Steward -- well, Steward
5  policies and procedures because we had not, at that
6  time, set up HSA specific ones.
7      Q.  Did you make any --
8      A.  We --
9      Q.  Oh, I apologize.  Please continue.
10     A.  We set up a process for position requests
11 similar to Steward so that they would all be funneled
12 through us and that we had a procedure to go through
13 senior leadership to request new positions, replacement
14 positions, and if we needed to start advertising for an
15 internal traveler.
16     Q.  Did you make any changes to the Steward policy
17 during this transitionary period?
18     A.  No.
19     Q.  Generally speaking, did you implement Steward's
20 policies at HSA St. Joseph during the transitionary
21 period?
22     A.  I did not implement them, they just continued.
23             And we continued referencing them.
24     Q.  Did you have access to those policies during
25 this transitionary period?

Page 20

1      A.  Yes.
2      Q.  At any time, did you lose access to the
3  policies?
4      A.  No.
5      Q.  Okay.  During the transitionary period from
6  Steward to HSA, did you review Fair Labor Standards Act
7  compliance?
8      A.  Did I review it word for word, no.  Do I have a
9  working knowledge of it, yes.
10             I don't recall reviewing the policy during
11 the transition.
12     Q.  Did anybody at HSA St. Joseph review Fair Labor
13 Standards Act compliance policies during the transition?
14     A.  I am unsure.
15     Q.  Did anybody at HSA St. Joseph review the
16 classification of workers as exempt or nonexempt during
17 the transitionary period?
18     A.  I don't recall.  I can say, during the
19 transition time, human resources did review, you know,
20 employee lists to ensure that their categorization, as
21 far as we can recall, was correct such as full-time PRN
22 to ensure that our records were accurate when we
23 transitioned from Kronos to iSolved.
24     Q.  Do you understand what I mean when I say
25 "exemption classification"?

Page 21

1      A.  I do.
2      Q.  And so your answer that you don't recall,
3  you've testified that you're not sure whether HSA
4  reviewed the exemption classification of those full-time
5  or PRN employees; correct?
6      A.  I -- I can't say what everyone did during the
7  transition, I can only speak to what I did.
8             I have a good working knowledge of FLSA, I
9  don't recall if I read the policy last year.
10     Q.  You are testifying on behalf of the company;
11 correct?
12     A.  I am.
13     Q.  And you reviewed HSA's policies to prepare to
14 testify on behalf of the company; correct?
15     A.  I did.
16     Q.  Okay.  And in your review of the --
17     A.  I -- I read over them.  I didn't study them or
18 know them word for word.
19     Q.  Who else was involved in reviewing Fair Labor
20 Standards Act policies during the transitionary period
21 other than yourself?
22     A.  We had the transition team from HSA corporate
23 who worked; Rob Boyd, assisted with the transition.
24 There was also Reba Wiens who assisted with the
25 transition, and there were others that were part of the

JAMIE MALVEAUX
SEPTEMBER 29, 2025                  Individually & 30(b)(6)                  JOB NO. 2028526

Page 22

1  transition team.
2             I don't remember all who were involved, but
3  there were several.
4      Q.  Do you know if any of those other individuals
5  involved with the transition team reviewed Fair Labor
6  Standards Act policies?
7      A.  I don't recall.
8      Q.  During the transitionary period, was there a
9  review of timekeeping policies?
10     A.  I'm certain that there were.  I can't speak to
11 who did what when.
12     Q.  Why are you certain then somebody reviewed the
13 timekeeping policies?
14     A.  Because we were transitioning from a different
15 platform, from Kronos to iSolved.  So there had to be
16 stark changes in how we time kept.
17     Q.  Got it.
18             So there was a change in the platform used
19 to report time by employees; correct?
20     A.  Correct.
21     Q.  How did that transition affect how an hourly
22 employee clocks in?
23     A.  At the transition start, unfortunately, we
24 would no longer be using electronic clocking, we went
25 paper.

Page 23

1  Before the transition, everyone that were
2  not exempt would clock in and out via a time clock.
3  When we initially transitioned, we did have to go
4  manually on paper until we were able to deploy clocking
5  via our iSolved platform.
6      Q.  And how do workers clock in via Isolved?
7      A.  They use the app that is downloaded, and
8  recently time clocks were deployed at our HSA hospitals.
9      Q.  Okay.  And how do workers clock out with
10 Isolved?
11     A.  The same way:  They would go to the app to
12 clock out or to the time clock, enter their employee
13 number, and then clock.
14     Q.  Okay.  How are meal breaks handled?
15     A.  They are auto deducted after working 6 hours.
16     Q.  And that's true from when Steward was the owner
17 of St. Joseph; correct?
18     A.  Correct.
19     Q.  And that's true from after HSA purchased
20 St. Joseph; correct?
21     A.  Correct.
22     Q.  There was no change to the automatic deduction
23 policy from the Steward to HSA transition; right?
24     A.  Correct.
25     Q.  What is the automatic deduction policy of HSA?

Page 24

1      A.  After working 6 hours, you are automatically
2  deducted by 30 minutes, and it is the responsibility of
3  the employee to partner with their leadership if they
4  are unable to break away from their work area to
5  complete what's known as a missed-punch form -- I'm
6  sorry, a missing lunch break form.
7             Otherwise it is the expectation of all that
8  have worked over 6 hours to ensure that during their
9  shift, that they are relieved from their work area and
10 are able to take advantage of the meal break.
11     Q.  And HSA's policy is to pay the nurses when they
12 complete a missed lunch form; right?
13     A.  Correct.
14     Q.  And the nurse is expected to complete the
15 missed lunch form when they miss their lunch; right?
16     A.  Correct.  However, every -- we should have
17 tried every technique to ensure that the nurses are
18 given a bona fide meal period.
19     Q.  And what do you say -- what do you mean when
20 you say "we should have"?
21     A.  Before a -- miss -- missing meal breaks should
22 be an exception, it should be -- it should not be the
23 automatic.  It is the expectation that people are able
24 to be relieved from their work area for a minimum of
25 30 minutes to ensure that they have a peaceful time away

Page 25

1  from their work area.
2             Whenever someone misses a -- a lunch
3  period, that should not be the expectation ongoing that
4  people can just fill out missed lunch punches, and it's
5  okay.  There needs to be a bona fide reason why there
6  was a missed meal.
7      Q.  And if somebody fills too -- fills out too many
8  lunch punches, then that indicates that there's an
9  issue; right?
10     A.  Perhaps.
11     Q.  And the issue could be that the individual is
12 taking advantage of the policy; right?
13     A.  Not necessarily.
14     Q.  Okay.  Then what could the issue be?
15     A.  It could be -- or are they staffed
16 appropriately?  What was the situation that was
17 occurring during that time?  Was there a high census?
18 Was -- there a lot of different variables because we
19 work in healthcare.
20     Q.  And HSA controls the staffing; right?
21     A.  There's a collaboration between HSA and the
22 senior leaders at the hospital.
23     Q.  Who also work for HSA; right?
24     A.  Correct.
25     Q.  Okay.  So HSA and HSA's senior leaders

Page 26

1  determine staffing; right?
2      A.  Can you give me more depth to your question,
3  please?
4      Q.  Sure.  For example, HSA monitors the
5  patient-staff ratios; right?
6      A.  Yes.
7      Q.  And HSA monitors patient-nurse ratios; right?
8      A.  Yeah, I would assume.
9      Q.  And HSA is aware of which units are busy;
10  right?
11      A.  Yes.
12      Q.  And HSA is aware of which units are less busy;
13  right?
14      A.  I would assume, yes.
15      Q.  The busy units are more prone to interrupting
16  nurses during their meal breaks; right?
17      A.  The busy units are more prone to -- I'm sorry?
18      Q.  So a nurse is more likely to be interrupted
19  during their meal break at a busy unit; right?
20      A.  Perhaps.  It's not just nurses, it could be
21  radiology, it could be respiratory.  I mean, we're a
22  hospital, so it really depends on the circumstance and
23  what constitutes "busy."
24      Q.  Right.  If the nurse sees a patient code during
25  their meal break, they're expected to help; right?

Page 27

1      A.  The nurse would actually be away from the work
2  area.  So unless there weren't enough nurses at the
3  time, the nurse was away from their meal area, or if
4  there was a code overhead announced and they were a part
5  of the code team, it could be their meal break may be
6  interrupted, but it shouldn't be an automatic.  It
7  really depends on what's going on with the unit.
8          If the nurse went away for her lunch break,
9  his or her lunch break, then there's probably a charge
10  nurse or someone else watching patients while the nurse
11  is away.  It would really be circumstantial.
12      Q.  So the nurse can be interrupted during their
13  meal break when a patient codes and they're away from
14  the unit; right?
15      A.  It would -- it would depend on the
16  circumstance, perhaps.
17      Q.  Okay.
18      A.  Not always, but it could happen.
19      Q.  Okay.  And you mentioned previously that nurses
20  are provided with missed meal punch forms; right?
21      A.  Every unit has them, yes.
22      Q.  Have you seen an example of this missed meal
23  punch form?
24      A.  Yes, sir.
25      Q.  What does it say?

Page 28

1      A.  Basically, it states at the top that there is a
2  policy that states if you work over 6 hours, you will
3  automatically have a lunch deduction, please complete
4  this form when you are not able to take your lunch.
5          The form asks for the date and the reasons
6  why the person missed their meal break.  So they have to
7  write the reasons why the missed meal break occurred,
8  and then it has to be signed off by their leader.
9      Q.  Okay.  And are nurses given training on when to
10  complete a missed meal period form?
11      A.  Yes.
12      Q.  What does that training consist of?
13      A.  It consists of the policy, the procedure that
14  the lunch break will be automatically deducted, and then
15  what the form looks like.
16      Q.  And when are nurses told that they should fill
17  out this form?
18      A.  If they missed a meal break, and it should be
19  completed at the end of their shift or shortly
20  thereafter.
21      Q.  Okay.  I'm going to show you what's been marked
22  as Exhibit 1 to your deposition.
23          (Exhibit No. 1, Chinda's Fed. R. CIV. P.
24          30(b)(6) Deposition Notice to HSA St.
25          Joseph LLC, was marked for

Page 29

1          identification.)
2  BY MR. FITZ:
3      Q.  I am sharing my screen, Ms. Malveaux.
4          Do you see my shared screen?
5      A.  Yes.
6      Q.  Okay.  And I'm just going to scroll through
7  this 4-page document slowly, and then my next question
8  will be:  Does it look familiar?
9      A.  (Reading.)
10      Q.  And, Ms. Malveaux, does Exhibit 1 look
11  familiar?
12      A.  Yes.
13      Q.  And did you prepare to testify on all of the
14  topics identified on Exhibit 1 today?
15      A.  We used this document on last Thursday to
16  discuss what I was to expect this morning.
17      Q.  Okay.  And then next I'm going to share
18  Exhibit 2 to your deposition.
19          (Exhibit No. 2, Job Title, RFP2-038 -
20          RFP2-041, was marked for identification.)
21  BY MR. FITZ:
22      Q.  And for the record, Exhibit 2 is Bates labeled
23  RFP2-038 through RFP2-041.
24          Ms. Malveaux, I'm going to scroll slowly
25  through the document, and then my next question will be:

Page 30

1  Does it look familiar?
2      A.  Do you mind -- okay, keep going.
3      Q.  Yeah, please let me know if I need to go
4  slower?
5      A.  Okay.
6      Q.  Ms. Malveaux, did you have an opportunity to
7  review Exhibit 2?
8      A.  Yes.
9      Q.  Does exhibit 2 look familiar?
10     A.  It does.
11     Q.  What is Exhibit 2?
12     A.  It looks like a job description as an RN for an
13  internal traveler.
14     Q.  And on the last page of Exhibit 2, who signed
15  this exhibit?
16     A.  It looks like Imani Chinda assigned it.
17     Q.  And are you familiar with -- well, I guess my
18  first question is:
19             Did this job description apply to
20  Ms. Chinda?
21     A.  Yes, she worked as an RN as part of the Steward
22  National Travel Network, so it would be applicable.
23     Q.  And are you familiar with the principal duties
24  and responsibilities of Ms. Chinda?
25     A.  Yes.

Page 31

1      Q.  Did Ms. Chinda perform these principal duties
2  and responsibilities?
3      A.  As far as I know, yes.
4      Q.  Are you aware of any principal duty or
5  responsibility on Exhibit 2 that Ms. Chinda did not
6  perform?
7      A.  Do you mind scrolling down?
8      Q.  I'm happy to.
9      A.  Next page.
10            If you could scroll down.
11            Right.
12            The bullet about:  Demonstrates support of
13  mission, values and vision of the hospital in actions
14  with employees, patients, through STAR, Service
15  Teamwork, Accountability, and Respect.
16            At the end, I understand there may have
17  been a concern regarding that.
18            However, as far as I know, she did
19  everything else.
20     Q.  Okay.  So your testimony is that on Exhibit 2,
21  the only job requirement that Ms. Chinda may have
22  violated is this third-from-last bullet point on
23  page 039 regarding the STAR keywords?
24     A.  Correct.
25     Q.  Okay.  What are the STAR keywords?

Page 32

1      A.  It is our -- one of our customer service
2  initiatives that was used while we were with STAR -- of
3  Steward.  Basically, it has to do with how people are to
4  act.
5      Q.  And how are people supposed to act?
6      A.  Provide superior service to all of our
7  patients, coworkers, and all of our customers who's
8  basically everyone.
9            You should be providing service.  You
10  should make sure that you're always doing the right
11  thing because it's the right thing to do.
12            THE WITNESS:  Can I --
13     A.  So STAR stands for Service, Teamwork,
14  Accountability and Respect.
15  BY MR. FITZ:
16     Q.  And what are you reviewing in front of you?
17     A.  I'm reviewing what you just showed me, which
18  was the job description.
19     Q.  Okay.  And is there anything else required
20  under this STAR expectation?
21     A.  No.
22     Q.  Okay.  I am going to show you what has been
23  marked as Exhibit 3.
24            (Exhibit No. 3, Defendant HSA St. Joseph
25            LLC's Supplemental Responses to

Page 33

1            Plaintiff's First Set of Discovery,
2            Interrogatories 1-7, was marked for
3            identification.)
4  BY MR. FITZ:
5      Q.  There we go.
6            And I'm going to scroll through Exhibit 3
7  slowly, and then my question will be:  Does this look
8  familiar?
9      A.  (Reading.)
10     Q.  And does Exhibit 3 look familiar?
11     A.  It does.
12     Q.  What is Exhibit 3?
13     A.  It is the interrogatories -- that's a hard word
14  for me to say, I apologize.
15            That includes my name and Michelle Ziakas
16  who was the former Chief Nursing Officer as well as some
17  questions that was answered on behalf of the company.
18     Q.  And you've reviewed these before; correct?
19     A.  Yes.
20     Q.  And you see that the answers are certified
21  under penalty of perjury by Mr. Ghafoor; correct?
22     A.  Yes.
23     Q.  Did you assist with the preparation of these
24  responses?
25     A.  I'm sure Asim and I had a conversation about

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 34

1    this.
2        Q.  Okay.  For example, did you assist with
3    identifying the individuals responsive to Interrogatory
4    Number 1?
5        A.  I remember when this situation occurred and
6    those that were involved, I know that Asim had a good
7    working knowledge of that.  Now, did I submit those
8    names right before Asim submitted this document, I'm not
9    sure, but yes.
10       Q.  Did you assist with the response to
11   Interrogatory Number 2?
12       A.  Yes.  During the course of the time, as far as
13   necessarily on or around August 19th of '25, I don't
14   recall, but Asim had a good working knowledge of it,
15   yes.
16       Q.  Okay.  And do you see Interrogatory Number 6?
17       A.  Yes.
18       Q.  And this indicates that Ms. Chinda was placed
19   on administrative leave, not terminated, due to concerns
20   over disrupted conduct in the Family Birthing Center;
21   correct?
22       A.  Correct.
23       Q.  Did you provide that information?
24       A.  Asim was aware that Ms. Chinda was placed on an
25   admin leave.  As far as providing it specifically for

Page 35

1    this document around the time the document was
2    submitted, I don't recall.
3            But yes, I was aware that she was placed on
4    admin leave.
5        Q.  And what is admin leave?
6        A.  It is basically time for an administrative
7    investigation to occur based off of some type of
8    disruption or based off of some concern that was voiced
9    that needed additional investigation.
10       Q.  And is administrative leave paid?
11       A.  It depends on the circumstance.
12           Our timekeeping policies states that if
13   after the investigation is completed, if a person is
14   brought back and without penalty, they are able to use
15   paid time off if balances are available.
16       Q.  Was Ms. Chinda's administrative leave paid?
17       A.  It was not.
18       Q.  Okay.  Was PTO paid to Ms. Chinda?
19       A.  Ms. Chinda was not eligible for paid time off
20   as a Steward traveler, so she did not have paid time off
21   balances available to be paid.
22       Q.  Okay.  Was Ms. Chinda overpaid?
23       A.  Reconciliation of her paychecks does show that
24   she -- at the end of every reconciliation that was done
25   for her, it does appear that there was an overpayment.

Page 36

1        Q.  And what is the basis for that statement?
2        A.  And the basis is a reconciliation of all of the
3    manual time sheets along with a review of the check
4    stub.
5            I don't have it in front of me at this
6    moment, but basically, it looks like she received a PTO
7    payment that was not due.
8        Q.  How did that happen?
9        A.  The transition from Kronos to iSolved caused
10   manual time sheets and there were many people from both
11   iSolved and locally that worked on the payroll.
12           I'm not sure how in-depth you want me to go
13   on this right now, but we definitely can, which is the
14   causes of the paycheck issue.
15       Q.  Okay.
16       A.  Do you want me to go ahead and answer that to
17   have -- so that --
18       Q.  We --
19       A.  -- up?
20       Q.  Let -- let's get there in -- in a moment.
21           So, you know, I want to ask about this
22   administrative leave due to disruptive conduct in the
23   Family Birthing Center.
24           The interrogatory answers states that
25   that's the reason why Ms. Chinda was placed on

Page 37

1    administrative leave; right?
2        A.  Correct.
3        Q.  When did this disruptive conduct occur?
4        A.  It was either -- from what I can recall, it was
5    either the Friday night or the Saturday night, which
6    would have been either November 1st or November 2nd.
7        Q.  And it was at night because Ms. Chinda was on
8    the night shift; right?
9        A.  Correct.
10       Q.  And what happened?
11       A.  From what I understand, there was a disruption
12   at the nursing station.  I also understand there were
13   several other employees and patients that were nearby.
14   And I understand she was asked to leave on
15   administrative leave.
16       Q.  What was the nature of this disruption?
17       A.  From what I can recall, it was very loud.  From
18   what I could recall, there was some foul language, and
19   things just, kind of, got out of hand in a patient care
20   area.
21       Q.  Who witnessed this?
22       A.  That would have been nurses that were working
23   in the work area.  I know that Emily Manning sent
24   documentation regarding what occurred at the time.  I'm
25   unsure right now of the actual names and the witness

Page 38

1  statements that was received regarding the incident.
2      Q.  And you just looked at a document to your
3  right; correct?
4      A.  He's flipping through some pages, I'm not -- I
5  mean, if I can take a moment, I can look at those emails
6  that came; is that okay with you?
7      Q.  Well, my next question is:  Your attorney is
8  showing you documents on how to answer my questions;
9  right?
10     A.  No, sir, he's not showing me documents; he's
11 showing me an email that was sent because I can't recall
12 what Emily said in the email.
13     Q.  Okay.  So your attorney showed you an email to
14 prompt an answer to my questions; right?
15     A.  No, sir, I can answer questions myself.
16     Q.  Okay.  I'd ask that you refrain from looking at
17 notes or documents that your attorney passes you to
18 answer my questions; okay?
19     A.  I do have a question though:  If I'm
20 referencing an email that I'm not sure I can remember,
21 how can I look at the email?
22     Q.  Tell me what it is that you believe would help
23 you testify, and I'll do my best to pull it and mark it
24 as an exhibit.
25     A.  Will do.

Page 39

1      Q.  Okay.  So --
2      A.  If we can look at the email that Emily Manning
3  sent, there is documentation related to what happened
4  that night.
5      Q.  Got it.  We'll look at that email in a moment.
6  But just sitting here today with the preparation that
7  you've done for your deposition, you're aware that Emily
8  Manning observed the disruptive conduct; right?
9      A.  I would assume that she did or she had a good
10 working knowledge of it.
11     Q.  Do you know if Emily Manning was on the
12 receiving end of this disruptive conduct?
13     A.  I am not aware.  I think that the -- the
14 disruption was just as a result of, you know,
15 dissatisfaction with what was going on with everyone.
16         As far as being on a receiving end, I know
17 there was a disruption and I know that it was in a
18 patient care area, which when things get loud,
19 especially in a birthing center, that's not good.
20     Q.  Okay.  So I -- I just want to understand a
21 little more specifically what this disruption was.
22         Did Ms. Chinda get physical?
23     A.  She didn't.  From what I can remember and
24 understand, I don't remember there getting -- any
25 physical things occurring, no.

Page 40

1      Q.  You're not aware that Ms. Chinda ever touched
2  anyone; right?
3      A.  I'm not aware of that.
4      Q.  You believe that Ms. Chinda raised her voice;
5  is that fair?
6      A.  I do understand there was a loud disruption at
7  the nurses station.
8      Q.  Do you believe that Ms. Chinda cursed at
9  anyone?
10     A.  I am not aware.  I would need to look at the
11 email to see what Emily stated.
12     Q.  Okay.  Do you know what Ms. Chinda said?
13     A.  I don't remember at this time, no.
14     Q.  Okay.  And at the time that this happened, did
15 Emily Manning report the disruption to you?
16     A.  No.  If I can recall, the situation was
17 escalated to her director at the time, who was Lori
18 Tolopka, who escalated the situation to Michelle Ziakas
19 who's Chief Nursing Officer.
20         Michelle is who told me that there was a
21 disruption in the work area and that they placed Imani
22 on administrative leave.
23     Q.  And did you provide any advice about that
24 decision?
25     A.  I asked for an email regarding what occurred.

Page 41

1      Q.  Got it.
2          You did not interview anybody; right?
3      A.  I did not.
4      Q.  You never spoke to Emily Manning directly;
5  right?
6      A.  Not at that time, no.
7      Q.  And you never spoke to Imani Chinda; right?
8      A.  The only time I spoke to Imani was via email
9  about her paycheck around the same time, but not about
10 this situation.
11     Q.  You've never spoken to Ms. Chinda about being
12 placed on administrative leave; right?
13     A.  No, sir, I did not.
14     Q.  And you've never spoken to Ms. Chinda about
15 employee discipline; correct?
16     A.  No, sir.
17     Q.  And you've never spoken to Ms. Chinda about the
18 decision to not renew her contract; right?
19     A.  I did not verbally spoke -- speak to her, I
20 mailed a letter.
21     Q.  What letter did you mail?
22     A.  It was a letter that indicated that we have
23 decided that she was no longer going to be a traveler
24 because employment is at will.
25     Q.  Has that letter been produced in this case?

JAMIE MALVEAUX
SEPTEMBER 29, 2025                  Individually & 30(b)(6)                  JOB NO. 2028526

Page 42

1    A.  Can I ask Asim?
2    Q.  I mean, did you review the letter in
3  preparation for your deposition?
4    A.  No, but I remember it.
5        I remember crafting it and mailing it.
6    Q.  Okay.
7        MR. FITZ:  Yeah, Counsel, has that letter
8  been produced in this case?
9        MR. GHAFOOR:  (Whispering.)
10       MR. FITZ:  Okay.  And --
11       THE COURT REPORTER:  I'm sorry, could you
12  repeat that, Counselor?  I did not get that at all,
13  sorry.
14       MR. GHAFOOR:  I do not recall if that
15  letter was produced.
16       MR. FITZ:  Okay.  Thank you.
17  BY MR. FITZ:
18    Q.  I'm going to try to find that email that you
19  asked for so that we can discuss it further, Ms.
20  Malveaux.  Just give me one moment.
21       Okay.  I am marking this as Exhibit 4 to
22  your deposition.
23            (Exhibit No. 4, Email Tuesday, 11/5/2024
24            RFP2-002 - RFP2-003, was marked for
25            identification.)

Page 43

1  BY MR. FITZ:
2    Q.  Let me share my screen.
3        And, Ms. Malveaux, I am going to scroll
4  through the 2-page exhibit marked as Exhibit 4.
5    A.  Okay.  Is there any way that I can read the
6  Emily email so that if you ask me another question, I
7  can reference it?
8    Q.  Yes.  My first question is -- since I marked
9  this as an exhibit, I want to make sure that we get it
10  in the record:
11       Were you able to review Exhibit 4 on the
12  share screen?
13    A.  Yes.
14    Q.  And does Exhibit 4 look familiar?
15    A.  It does.
16    Q.  And what is Exhibit 4?
17    A.  It is an email that Emily sent to Lori
18  regarding the situation that occurred --
19    Q.  Okay.
20    A.  -- with Imani.
21    Q.  Okay.  And then now I'm in the middle of the
22  exhibit with the email from Emily Manning.  Is that what
23  you're requesting to review?
24    A.  Yes.
25    Q.  Okay.  Please take your time to review, and let

Page 44

1  me know when you're ready to proceed.
2    A.  Is there any way you can make it bigger again?
3    Q.  Absolutely.
4    A.  Okay.
5    Q.  And please let me know when you would like for
6  me to scroll down.
7    A.  Scroll down, please.
8    Q.  Yes, ma'am.
9    A.  Okay.  I'm finished reviewing it.
10    Q.  Great.
11       And a moment ago, we looked at the
12  interrogatory answer regarding the reason why HSA placed
13  Ms. Chinda on administrative leave; right?
14    A.  Correct.
15    Q.  And that indicates that Ms. Chinda was placed
16  on administrative leave because of disruptive conduct in
17  the birthing center; right?
18    A.  There was some type of disruption that
19  occurred.
20    Q.  And HSA maintains that that's the reason;
21  right?
22    A.  Correct.  Correct.
23    Q.  And you asked to review the email from Emily
24  Manning.  You have just reviewed that email; correct?
25    A.  I did.

Page 45

1    Q.  Is there anything else that you would like to
2  clarify about your prior testimony after having reviewed
3  that email?
4    A.  There is nothing that I would like to clarify
5  other than unprofessional behavior on our unit.  It
6  looks like the email does not go in depth regarding what
7  the disruptive behavior was that occurred on the unit.
8        Like I said, from what I can recall, there
9  was some type of disruption either the Friday night or
10  the Saturday night, I don't know the details of that,
11  but it looks like this email does not indicate the
12  specifics.
13    Q.  And you reviewed Ms. Chinda's personnel file;
14  right?
15    A.  Not recently, but at some point, I'm sure I've
16  seen it.
17    Q.  Ms. Chinda's personnel file has been produced
18  in this litigation; right?
19    A.  Yes, sir.
20    Q.  And there's no description of what that
21  disruptive conduct actually was in Ms. Chinda's
22  personnel file; right?
23    A.  Not as far as I can recall.
24    Q.  There are no witness interviews; right?
25    A.  Not as far as I can remember.

JAMIE MALVEAUX
SEPTEMBER 29, 2025                Individually & 30(b)(6)

JOB NO. 2028526

Page 46

1        I know that there was an email that we were
2  supposed to get from Lori Tolopka, who was the director
3  at the time, but unfortunately, it does not appear that
4  we were ever able to see what that was.
5        Q.  And tell me more about that.  Why was HSA not
6  able to access the email from Lori Tolopka about
7  Ms. Chinda's administrative leave?
8        A.  Actually, I'm not sure that there was an email
9  regarding it, to be truthful.
10        Like I said, I'm going off of memory as far
11  as what happened with the admin leave.  There was a
12  disruption, it was near a patient care area, so they
13  placed her on admin leave while we looked further into
14  the situation.
15        Q.  Okay.  So you believe that Lori may have sent
16  an email because she says she's going to --
17        A.  Correct.
18        Q.  -- in another email; right?
19        A.  I'm -- I don't show that we received an email
20  though.
21        Q.  Okay.  Did you look for the emails?
22        A.  When this -- when you first sent us
23  documentation, yes, I did at that time; but I haven't
24  recently.
25        Q.  What did you do to look for emails?

Page 47

1        A.  I went to my old Steward email account and
2  typed in her name in a search.
3        Q.  Okay.  Anything else?
4        A.  No.
5        Q.  Did anybody else at HSA help search for emails
6  in this case?
7        A.  I'm sure Asim did.
8        Q.  Anybody else?
9        A.  I am unsure who else did anything else
10  regarding this.
11        Q.  What search terms did you use when you were
12  searching for emails in your Steward email account?
13        A.  From what I can recall, her name.
14        Q.  Did you type in Imani Chinda?
15        A.  I'm sure I did when I looked for it.  I
16  would've looked for it probably around when you first
17  sent us documentation.  So that would've been around
18  April maybe, March, April.
19        Q.  And did you search for emails from Lori
20  Tolopka?
21        A.  I searched for anything with her name, Imani
22  Chinda.
23        Q.  And -- and thank you, I'm not trying to be
24  difficult, I just want to make sure the court reporter
25  is able to write it down who "her" is when you searched.

Page 48

1        A.  Yes, sir.
2        Q.  Okay.
3        A.  Imani Chinda.
4        Q.  Do you know if anybody looked at Lori Tolopka's
5  email account?
6        A.  Outside of Asim, I'm not sure who else would
7  have looked at it.
8        Q.  And you're not sure whether Asim did or did
9  not; right?
10        A.  I would ask him, but I can't even look at him,
11  I'm afraid to at this moment.
12        Q.  Okay.  Do you know what else HSA did to search
13  for responsive emails other than your personal search in
14  your email of the search term "Imani Chinda"?
15        A.  I am not sure.
16        Q.  Okay.  I'm gonna go back to Exhibit 1 to your
17  deposition.
18        And this is the document that was
19  previously marked as Exhibit 1.  And I'm going to scroll
20  down to the topics.
21        And do you see Topic 15?
22        A.  Yeah.
23        Q.  And are you prepared to testify on what the
24  company did to search for documents in this case?
25        A.  I am.

Page 49

1        Q.  Okay.  And so in the search of emails, you
2  searched for Imani Chinda's name in your Steward email
3  account; correct?
4        A.  Correct.
5        Q.  Are you aware of any other steps the company
6  took to ensure that all emails were produced in this
7  case?
8        A.  Asim, who I'm gonna point to 'cause I can't
9  look at him, did a search of Steward emails for anything
10  related to her.
11        Now, as far as the search terms that he put
12  in, I can't tell you what search terms he put in, but I
13  know that he contacted Steward and reviewed emails
14  related to her in that situation.
15        Q.  Okay.  Do you know one way or the other whether
16  Lori Tolopka's email was searched?
17        A.  I would assume that it was searched because
18  Asim has access to be able to search emails.
19        Q.  What were the circumstances of Lori Tolopka's
20  departure?
21        A.  From what I can recall, she tendered her
22  resignation, and the organization chose to accept it a
23  day or two after she submitted her resignation.
24        Q.  Do you know when that was approximately?
25        A.  Around April.  I don't know the exact date.

JAMIE MALVEAUX
SEPTEMBER 29, 2025                                    Individually & 30(b)(6)                                    JOB NO. 2028526

Page 50

1    Q.  April of this year?
2    A.  April of -- yes, April of '25.
3    Q.  Do you know why she resigned?
4    A.  I don't recall.
5            MR. FITZ:  We've been on the record for
6    about an hour.  How about we take a brief break; is that
7    okay?
8            THE WITNESS:  That would be great.
9            MR. FITZ:  Great.
10           How long does everyone need, you know,
11   witness and court reporter, just 10 minutes okay?
12           THE COURT REPORTER:  That works for me.
13           Whatever you agree to is fine.
14           MR. FITZ:  Ms. Malveaux, do you have a
15   preference?
16           THE WITNESS:  10 to 15 minutes would be
17   preferable.
18           MR. FITZ:  10 to 15 is great.  Sounds good.
19           THE WITNESS:  All right.
20           THE VIDEOGRAPHER:  Stand by to go off the
21   record.
22           We are now off the record.  The time is
23   10:40 a.m. Central time.
24           (Recess from 10:40 a.m. to 10:55 a.m.)
25           THE VIDEOGRAPHER:  We are now on the

Page 51

1    record.  The time is 10:55 a.m. Central time.
2    BY MR. FITZ:
3    Q.  Ms. Malveaux, do you understand that you are
4    still under oath?
5    A.  I do.
6    Q.  And is there anything that you would like to
7    add or clarify to your testimony so far today?
8    A.  No, sir.
9    Q.  Okay.  I'm marking Exhibit 5 to your
10   deposition.
11           (Exhibit No. 5, Steward National Traveler
12           Network Assignment Agreement, 2/21/2023
13           RFP2-010 - RFP2-013, was marked for
14           identification.)
15   BY MR. FITZ:
16   Q.  And I will scroll through it slowly, and then
17   my first question will be if you know what it is.
18   A.  (Reading.)
19   Q.  And, Ms. Malveaux, have you had an opportunity
20   to review Exhibit 5?
21   A.  Yes.
22   Q.  What is Exhibit 5?
23   A.  It is her Steward National Travel Network
24   Agreement for her to provide services at St. Joseph
25   Medical Center starting February 24th for '13 weeks.

Page 52

1    Q.  Okay.
2    A.  21st, sorry, February 21st.
3    Q.  Okay.  And when HSA took over St. Joseph, it
4    adopted this agreement; right?
5    A.  It adopted that internal agreement, yes.
6    Q.  Okay.  Are there any terms on this agreement
7    that HSA modified?
8    A.  Yes.  The first difference is -- if you scroll
9    up to the top.
10   Q.  Okay.
11   A.  The Steward National Travel Network Assignment
12   Agreement, around August of '24 the Steward National
13   Travel Network disbanded, and all agency -- well, all
14   travelers that were employed internally by Steward
15   became an internal traveler for the hospital.
16           So where it says "by and between Imani
17   Chinda and Steward Healthcare Services for services to
18   be performed at St. Joseph Medical Center," that changed
19   around August of '24 where the agreement was between
20   Imani and St. Joseph Medical Center.
21   Q.  Okay.  Thank you.
22           And were there any other changes?
23   A.  If you scroll down.  Of course, the dates
24   changed because there -- the agreements were for
25   13 weeks.

Page 53

1            Can you scroll down some more.
2            Keep going.
3            Keep going.
4            That incentive pay, I don't remember there
5    being a $5 incentive of when we took over in August of
6    '24.  I don't remember that.
7            I don't remember C being a part of the
8    agreements that we set forth.  We also -- Number 6,
9    travel and housing, that was no longer part of the
10   agreement.
11           Of course, "initial trip" was taken out.
12           And then that's -- that's it.
13           The signature would not be a Steward
14   National Travel Network, it doesn't mean it would be an
15   internal designee.
16   Q.  And how do you know that the incentive pay
17   changed when HSA took over?
18   A.  It wasn't when HSA took over, it was when -- I
19   don't know at what point the incentive pays were taken
20   out; however, when I came in and had an active part in
21   the transition of -- we called it SNTN.  I don't
22   remember seeing that incentive pay as part of the
23   contracts that we assumed.  That's how I know.
24   Q.  Okay.  And Ms. Chinda, throughout her tenure,
25   received $60 an hour hourly base pay; correct?

JAMIE MALVEAUX
SEPTEMBER 29, 2025                  Individually & 30(b)(6)                  JOB NO. 2028526

Page 54

1    A.  That's the standard internal contract rate for
2  RNs.
3    Q.  And so Steward agreed to pay Ms. Chinda $60 an
4  hour for every hour worked; right?
5    A.  Correct.
6    Q.  And that agreement was adopted by HSA; right?
7    A.  Correct.
8    Q.  Okay.  And other than the items that you just
9  identified that changed whenever there was the change to
10  SNTN, HSA adopted all of the terms on Exhibit 5; right?
11    A.  The only other question I would have would be
12  on-call.  I don't recall the Steward agreements having
13  on-call for $4.  But I do know that the shift diffs were
14  there.
15    Q.  Okay.  Let me Mark Exhibit 6 to your
16  deposition.
17              (Exhibit No. 6, Steward National Traveler
18              Network Assignment Agreement, 08/03/2024,
19              RFP2-004 - RFP2-006, was marked for
20              identification.)
21  BY MR. FITZ:
22    Q.  And I'm going to scroll through this slowly,
23  and then my question will be:  Do you know what
24  Exhibit 6 is?
25    A.  Oh, can you stop?  Oh.  On-call was that --

Page 55

1  okay.
2    Q.  And do you know what Exhibit 6 is?
3    A.  It looks like the agreement when SNTN was
4  disbanding and it was becoming a local agreement.
5              It looks like the top paragraph remained
6  the same except for the date in that it was a short
7  contract for the transition to local.
8              And when I say "transition from local,"
9  I -- I mean SNTN had their own company under Steward in
10  which they would pay travelers, it wasn't at the local
11  level.  And it looks around that time they were
12  transitioning to where travelers were local.
13    Q.  Okay.  And does this refresh your recollection
14  that Ms. Chinda continued to receive a $4 an hour
15  on-call pay?
16    A.  Yes.  Uh-huh.
17    Q.  Okay.  And that is also true when HSA took over
18  the contract; right?
19    A.  Correct.
20    Q.  Before our break, I -- you told me about a
21  letter that was sent to Ms. Chinda stating that her
22  at-will employment was terminated; right?
23    A.  Uh-huh.
24    Q.  Is that a yes?
25    A.  Yes.

Page 56

1    Q.  Okay.  Thank you.  And not to be rude, it's
2  just for the court reporter's purposes.
3              So do you remember when that letter was
4  sent?
5    A.  On or around the middle of November, like
6  around November 18th.
7    Q.  Okay.  And that was a letter that you sent?
8    A.  Yes.
9    Q.  So we were just looking at these contracts and
10  it indicated that -- or you indicated that they were
11  13-week contracts; right?
12    A.  Typically, the contracts were 13 weeks, yes.
13    Q.  When was Ms. Chinda's contract scheduled to
14  expire?
15    A.  I would have to look at a calendar to do some
16  math.  If a new contract started on or around
17  September 1st -- is it okay if I look at a -- a
18  calendar?
19    Q.  Yes, that's fine.  I want to figure this out
20  because Ms. Chinda never received a written contract;
21  right?
22    A.  It appears that, unfortunately, the contract
23  that she should have signed on November 1st, for
24  whatever reason -- sorry, September 1st of '24, for
25  whatever reason, we don't have it in our records.

Page 57

1              So if the contract started on September 1,
2  then the 8th would have been 1, 2, 3, 4, 5, 6, 7, 8, 9,
3  10, 11, 12, 13 -- okay.  So it looks like we ended the
4  agreement that -- unfortunately, we -- it doesn't look
5  like we have, which the 13th week would have been around
6  November 30th.  So we ended it a -- a few weeks early,
7  around the 18th.
8    Q.  How was this 13-week contract communicated to
9  Ms. Chinda?
10    A.  It -- from what I can recall, there was
11  probably conversations between my recruiter at the time,
12  who was Sandra Michelle Ortega, who took care of those
13  agreements with all of the internal travelers that we
14  assumed internally around -- between August and
15  September.
16    Q.  And has Ms. Ortega ever specifically told you
17  that she had this conversation with Ms. Chinda?
18    A.  I don't recall, sir.  It was -- it was a very,
19  very crazy time to transition from a bankrupt healthcare
20  system to a -- a new payroll system and everything else
21  that went along from the transition.
22    Q.  And so, you're basing your testimony on the
23  expectation that Ms. Ortega did her job; right?
24    A.  Correct.
25    Q.  Okay.  There's no other fact or document or

JAMIE MALVEAUX                                                           JOB NO. 2028526
SEPTEMBER 29, 2025                     Individually & 30(b)(6)

Page 58

1  conversation that you're basing your testimony on that
2  Ms. Chinda's 13-week contract was September 1, 2024, to
3  November 30, 2024; correct?
4      A.  No, sir.
5      Q.  Okay.  How is on-call pay handled?
6      A.  I don't know that it would have been used, but
7  basically if our census was low and we decided to send
8  someone home with the expectation that if there was a
9  need for them to return to work, that they would be
10 on-call.
11          The timekeeper would be responsible for
12 keying in the on-call hours onto the timecard so that
13 the on-call payment can be made.  And the employee is
14 responsible for knowing that if they are on-call, that
15 they are to be responsive and return back to the work
16 area if needed during the on-call time.
17     Q.  And Ms. Chinda was sent home in November 2024;
18 correct?
19     A.  She was sent home for admin leave, which is
20 different than on-call.
21     Q.  Is there a policy for administrative leave?
22     A.  There is not a specific policy about
23 administrative leave, it is mentioned in other policies.
24     Q.  Which policies is administrative leave
25 mentioned in?

Page 59

1      A.  It is mentioned in our timekeeping policy
2  because it talks about a payment vessel for those on
3  admin leave.
4      Q.  What was that last word?  "A payment" what?
5      A.  The "payment vessel," when someone is on admin
6  leave.  I spoke about it earlier in my testimony where
7  the timekeeping policy referenced, if someone is
8  returned from administrative leave, they may use paid
9  time off balances if available.
10     Q.  Okay.  I am -- is that the only reason why
11 Ms. Chinda wasn't eligible for on-call pay in
12 November 2024?
13     A.  Yes, because she was not on-call.  On-call is a
14 vessel used when we need people to -- they're basically
15 on-call to report back for their shift.
16          Administrative leave is different.
17 Administrative leave is there is a reason why you are
18 unable to work, and we will contact you with further
19 information or -- or further things that are necessary.
20          It's different from on-call.
21     Q.  Okay.  And I'm marking Exhibit 7 to your
22 deposition.
23          (Exhibit No. 7, St. Joseph's Standards of
24          Performance, Disciplinary Action Policy,
25          Last Revised 6/26/2023, RFP2-098 -

Page 60

1          RFP2-101, was marked for identification.)
2  BY MR. FITZ:
3      Q.  And I am going to scroll through 7 slowly.
4          Does Exhibit 7 look familiar?
5      A.  It does.
6      Q.  What is Exhibit 7?
7      A.  It is the Standards of -- of
8  Performance/Disciplinary Action, St. Joseph policy that
9  was adopted from the Steward policy.
10     Q.  Okay.  And so, when was this document created?
11     A.  Prior to my start at St. Joseph.  The date on
12 it states 5/13/21, and last revised was 6/26 of '23, so
13 would have to assume those were the dates.
14          I did not create this.
15     Q.  And so, when you say that it was adopted by
16 HSA, does that mean that maybe they changed the
17 watermark but they kept the same policy?
18     A.  Correct.
19     Q.  Okay.  Did this policy apply to Ms. Chinda?
20     A.  If you scroll down.
21          To the second page.
22          Actually, this policy was applicable for
23 all employees, so yes.
24     Q.  So --
25     A.  -- all employees that were employed were

Page 61

1  responsible for this policy.
2      Q.  And so, did HSA follow this policy when it
3  disciplined Ms. Chinda?
4      A.  Ms. -- she was not disciplined.  She was placed
5  on admin leave, and then we chose to end her contract
6  early.
7      Q.  So administrative leave is not a disciplinary
8  action?
9      A.  No, it -- it depends on the investigation.
10          Sometimes it could be, sometimes it's not.
11     Q.  Okay.  When does a disciplinary action apply
12 instead of administrative leave?
13     A.  It would depend on what happens after the
14 administrative leave.  For example if there is a
15 narcotic that is missing out of the Pyxis, we may put
16 the nurses that handle the Pyxis, at that time, on
17 administrative leave while we decide where the narcotic
18 is.
19          If the administrative leave lasts for a
20 couple of days before we can bring the person back, they
21 may be asked to use their paid time off balances to
22 cover the time in which they weren't there.  But if they
23 were found not guilty or there was no wrongdoing, they
24 may come back to work without there being discipline
25 that follows it.

JAMIE MALVEAUX
SEPTEMBER 29, 2025                                    JOB NO. 2028526
Individually & 30(b)(6)

Page 62

1    Q.  Okay.  But your testimony is that there is no
2 policy for administrative leave; right?
3    A.  A policy that specifically states this is the
4 procedure for admin leave, no.
5    Q.  There is a reference to it in the timekeeping
6 policy; right?
7    A.  Correct.
8    Q.  Is there any other written policy that relates
9 to administrative leave at St. Joseph?
10    A.  Not that I can recall.
11    Q.  Okay.  Who decides how administrative leave
12 works at St. Joseph?
13    A.  Typically, it would be myself in coordination
14 with the senior leadership team and/or the CEO.
15    Q.  Is senior leadership above or below you?
16    A.  It is at the same level.  I am a member of the
17 senior leadership team and it includes the Chief Nursing
18 Officer, Chief Quality Officer, Chief Financial Officer,
19 and the Chief Executive Officer of the hospital.
20    Q.  And so depending on the circumstances of the
21 administrative leave, it may also involve the CNO, CQO,
22 CFO, or CEO?
23    A.  Yes, the appointing authority is the CEO
24 though.  So my peers and I meet and there is, you know,
25 some concern or whatever, the CEO is the final say.

Page 63

1    Q.  And it depends on the severity of the issue
2 that caused the administrative leave; right?
3    A.  Correct.
4    Q.  Who decides whether an issue is severe enough
5 to loop in the rest of the senior leadership team?
6    A.  I do, or a member of the senior leadership team
7 does.
8    Q.  Okay.
9    A.  It really depends on the situation and how
10 it -- it escalates and what's happening at the time.
11    Q.  Okay.  And if somebody is placed on
12 administrative leave, that decision is made by who?
13    A.  Once again, it depends on the circumstance.  It
14 depends on what has happened and the escalation of the
15 situation.  If a situation is out of hand in the moment,
16 a member of senior leadership can place someone on admin
17 leave if the situation warrants.
18        What typically happens is there is a
19 conversation with human resources who escalates it to
20 the CEO, depending on the timing that is available to
21 make a recommendation.  So it really depends on the
22 situation and the timing.
23        For example, if there is a situation that
24 is disruptive or out of control, the senior leader over
25 the serve -- service area may make the decision to place

Page 64

1 someone on admin leave and then escalate it to human
2 resources and the CEO to let them know.
3        It just really depends on the situation.
4    Q.  Why wasn't Ms. Chinda verbally counseled?
5    A.  Do you mean for the disruptive behavior?
6    Q.  Yes.
7    A.  To be very honest with you, at that time, it
8 was a lot of things happening:
9        We had corporate support personnel flying
10 in to help us because we had over 500 people that did
11 not get paid.  Our main priority at the time was making
12 sure that our staff was taken care of and it was not,
13 I'm sorry, her situation.
14        The -- the primary goal that weekend, and
15 the days following, that situation was ensuring that our
16 team, all of them, were paid.  And all of us worked
17 together to make sure that happened including those
18 support personnel that flew in to help us.
19    Q.  Who all helped?
20    A.  Let's see.  Asim, he -- he came.  He was there
21 that Saturday morning.  Rob flew in from St. Louis.  We
22 had Bianca that flew in from wherever Bianca lives.  We
23 had support personnel on the phone, the payroll partners
24 from another hospital was on the phone.  You had myself.
25 You had Michelle Ziakas who was the CNO.  You had Deb

Page 65

1 Landclose (phonetic), who's the Chief Quality Officer.
2 You had Deb Jones, who was the Chief Financial Officer
3 that helped.  You had Rosland Wyrick who was newly
4 rehired as a member of HR.  She helped virtually.
5        There -- there was a lot of people that
6 assisted.
7    Q.  Can you help me understand the play-by-play
8 timeline of what happened with the delayed payments?
9        So how did you find out about the problem?
10    A.  So on late that Wednesday night, I'm not
11 looking at a calendar, so I -- I don't know the date.
12 Was it the 30th?  I -- I don't know.
13        So the Wednesday, Deb Jones and I received
14 a copy of the payroll register.  It was very, very late.
15 Like, we didn't start looking at it till 9 o'clock that
16 night.  Because remember, we transitioned almost a
17 thousand people.  That's when we noticed that something
18 was wrong.  So we started working with our corporate
19 partners, such as Rob Boyd, Reba Wiens, Gabrielle P.
20 (phonetic), and Carol Cheney, who were part of the
21 payroll team, to say something is wrong, this does not
22 look right.
23        From that time, we met as a senior
24 leadership team to decide how we're gonna communicate to
25 the team that something is wrong.  So Thomas Dunning

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 66

1  (phonetic), who was only the CEO at the time for maybe a
2  week or two, sent a mass email or a mass memorandum out
3  to all staff letting them know that we know that there
4  will be an issue with payroll, but we are committed to
5  ensuring that everyone receives the wages that they're
6  due.  We also had leadership meeting that Thursday, it
7  was like -- it was like 4 p.m., it was late, just
8  letting them know that this memorandum was gonna be out
9  and what our plan was going to be for ensuring that our
10 staff were gonna be paid.
11         So basically, we set up a process where we
12 had a command center in our administrator suite, it was
13 actually in the board room.  We set up four computers,
14 and the director of the area were to walk in with the
15 manual time sheets along with what was wrong with the
16 paychecks individually so that we could try to remedy
17 whatever the situation was.
18         And that went on for days, until Monday
19 when a new process was decided which was the rerunning
20 of all the payroll checks.
21    Q.  So at what point in that timeline was the
22 decision to roll out paper time sheets made?
23    A.  That was around October 13th, 14th, somewhere
24 around that.
25    Q.  So the paper time sheets happened before you

Page 67

1  were aware that there was a problem; is that fair?
2     A.  I knew that we were losing access to Kronos, so
3  we had to have a vessel to ensure that there was a way
4  for us to time keep.  So that the -- the vessel was the
5  time sheets.  It was -- so the end of the pay period --
6  can I look at my calendar; is that okay?
7     Q.  Sure.
8     A.  Okay.  So the end of the pay period was on --
9  the beginning of the pay period was on October 13th,
10 that meant the end of the pay period was the 26th.
11         So payroll processing typically starts the
12 Monday following the pay period just to ensure we have
13 all the manual time sheets and on and on.  So then, the
14 payroll process starts.  We got the -- the ledger, if
15 you will, the payroll register, on late -- on the 30th.
16 And that's how we knew that there was going to be
17 something wrong on November 1st.
18         But on the 30th, we had no idea of the
19 impact.  We didn't have a good understanding of the
20 impact until October 31st.
21    Q.  And when you say "the impact," you mean the
22 scope of individuals who were not paid; right?
23    A.  Correct.
24    Q.  And at what point in that timeline does senior
25 leadership arrive?

Page 68

1     A.  On November -- well, senior leadership knew
2  that this issue was happening because, remember, Deb
3  Jones and I worked diligently to ensure all the time
4  sheets were in.  This was our first time doing payroll
5  without there being a department at corporate that
6  handled it.
7         Remember, with Steward, there was a payroll
8  department.  With our transition to HSA, unfortunately,
9  we were on paper because we hadn't fully integrated
10 iSolved yet for timekeeping.
11         So senior leadership were involved.  Deb
12 Jones and I received the paycheck ledger, the final --
13 I'm calling it a "ledger," but it's really the -- the
14 payroll summary and the payroll register, late on the
15 30th.  And I remember because it was 9 o'clock at night,
16 and we were both sitting at each other's -- we were
17 sitting at our kitchen tables going through the register
18 and identified, oh, wait, something is wrong.
19         And then on the 31st is when we met as a
20 senior leadership team that morning to say something is
21 wrong, let's identify the impact, and then let's get
22 together and figure out how we're gonna deal with it.
23 So the senior leaders were involved the whole time.
24         On November 1st, we took our laptops, and
25 we all had docking stations.  And from November 1st

Page 69

1  probably until the 6th or the 7th, we all, kind of,
2  lived in the -- between our offices and in the board
3  room where we would sit there and go through
4  individually what needed to be done to remedy the
5  paychecks.
6     Q.  And around November 1st, is that when
7  Mr. Ghafoor came and helped as well?
8     A.  Yes, I remember actually seeing Asim -- he -- I
9  don't remember if Asim was there November 1st, but I
10 definitely remember him being there November 2nd.
11         It was a Saturday morning, and there were
12 various and sundry walking in to assist, and I remember
13 Asim working walking in.
14    Q.  Okay.
15    A.  I don't remember if he was there November 1st
16 though.  There were a lot of things that were happening.
17    Q.  What was Mr. Ghafoor's role in assisting with
18 the issue?
19    A.  Just whatever we needed.  Unfortunately, he
20 didn't have access to the system, so there wasn't a lot
21 that he could do.  But, I mean, if it was making copies
22 or -- or whatever we needed, he was there to assist us.
23         And then we had Rob that flew in on
24 November 4th, who was the corporate representative,
25 Isolved, transition team, as far as HSA, and then

JAMIE MALVEAUX
SEPTEMBER 29, 2025                  Individually & 30(b)(6)                  JOB NO. 2028526

Page 70

1 Bianca.  I'm -- I don't remember her last name, but she
2 was another corporate representative that flew in to
3 help decision-making and to drive what we were gonna do
4 to fix the issue.
5      Q.  So Mr. Ghafoor did not provide legal advice
6 during this issue?
7      A.  Oh, no.  Asim was -- basically, if I may call
8 you "Carl"?
9      Q.  Please, that's fine.
10     A.  Carl -- Carl, we had 500 people that did not
11 get paid.  It was a very crazy time.  We were trying to
12 talk to everyone to let them know, we know that this is
13 important and we will fix this -- we will fix it.  And
14 we were working individually, by person, by hand, to do
15 this.
16          Remember, we had a department that had this
17 for us, and this was our first time running it
18 internally with corporate support.
19     Q.  So everybody that flew in to help, including
20 Mr. Ghafoor, was doing everything possible to help the
21 HSA workers, including Ms. Chinda, get paid; right?
22     A.  Correct.  Now, Rob Boyd is -- was the HR
23 member, and he was the subject matter expert, at the
24 time, in Isolved.
25          Rob Boyd is who assisted us with partnering

Page 71

1 with Isolved to reprocess the payments that were already
2 made and setting forth a process for us to help get
3 through this because Rob was part of the transition
4 team.
5      Q.  Okay.  So, you know, before we got into that
6 timeline, we were talking about what -- how Ms. Chinda's
7 administrative leave was handled and what was and was
8 not performed in that process.  And, you know, you
9 testified regarding why HSA did not verbally counsel
10 Ms. Chinda.  My next question is:
11          Why was a formal written warning not
12 provided by Ms. Chinda; is it the same reason?
13     A.  Because we decided, due to the disruption, and
14 that her contract was gonna be ended anyway, just to let
15 the contract end.
16     Q.  But you did terminate her before the contract
17 ended; right?
18     A.  A week, or a week and a couple of days.
19          The contract term states that employment is
20 at will.  And it was -- she's -- she was an internal
21 traveler.  So she was employed and she's, you know, a
22 party to FLSA, but she was on a temporary assignment.
23 While this assignment had lasted a very long time, the
24 goal for all internal travelers is to backfill them with
25 core employees.

Page 72

1      Q.  Okay.
2      A.  The intent of the 13-week traveler is not for
3 them to remain employed forever.
4      Q.  I'm going to show you Exhibit 3 that was
5 previously marked.  And do you see Interrogatory
6 Number 3?
7      A.  Yes.
8      Q.  And the answer is that plaintiff was not
9 terminated; right?
10     A.  Correct, her contract ended.
11     Q.  But you testified earlier this morning that you
12 sent a letter to Ms. Chinda stating that she was
13 terminated; right?
14     A.  We let her know that we were going to end her
15 contract and that her employment was at will.
16     Q.  Did the letter say that her contract was going
17 to end or did it say that she terminated as of
18 November 18th?
19     A.  Is there any way for me to look at the letter
20 so that I can get the language correct?
21     Q.  I don't know, I haven't seen the letter.
22     A.  So can I look at it?
23     Q.  I don't know, can you?
24     A.  Yes, I can if you would allow me to.
25     Q.  Okay.  Why don't we go off the record.

Page 73

1          THE VIDEOGRAPHER:  If there are no
2 objections, please stand by to go off the record.
3          We are now off the record.
4          The time is now 11:28 a.m. Central time.
5          (Recess from 11:28 a.m. to 11:30 a.m.)
6          THE VIDEOGRAPHER:  We are now on the
7 record.  The time is 11:30 a.m. Central time.
8 BY MR. FITZ:
9      Q.  And before we took a break and you asked for
10 the opportunity to review the letter, my question was
11 that you terminated Ms. Chinda; right?
12     A.  She was separated from employment, I guess
13 would be better wording to use.
14     Q.  Okay.  And on what dates did that occur?
15     A.  The date of the letter is November 19th 2024.
16     Q.  Okay.
17     A.  And the subject is Notice of Assignment
18 Cancellation.
19     Q.  Okay.  And so I'm going to refer back to
20 Exhibit 3 where the interrogatory stated that plaintiff
21 was not terminated; is that accurate?
22     A.  She -- she -- her assignment was canceled.
23          I believe we're using the word "terminated"
24 and "separated from employment" interchangeably, and we
25 should probably not do that.

Page 74

1    Q.  What's the difference?
2    A.  Separation from employment means that the
3  person is no longer on the books.  It could be because
4  they were terminated for cause or not.
5        I believe that in the questions, in the
6  line of questioning, that I am perceiving is that we're
7  talking about terminating someone for cause versus them
8  being terminated out the system, which I am referring to
9  as "separation from employment."
10    Q.  So your testimony is that Ms. Chinda was not
11  terminated for cause?
12    A.  She -- correct.  Her assignment was canceled.
13    Q.  But Ms. Chinda was terminated from the system;
14  right?
15    A.  Correct.
16    Q.  Are there any policies at HSA that establish
17  this distinction?
18    A.  No.
19    Q.  Okay.
20        All right.  Before we were talking about
21  why a written warning was not provided to Ms. Chinda, my
22  next question is why documented disciplinary actions did
23  not occur with Ms. Chinda is the same reason as the
24  reasons you provided for why a verbal counseling and a
25  formal written warning was not provided?

Page 75

1    A.  Correct.  There was a disruption in the work
2  area, and we decided to cancel the assignment.
3    Q.  And why was the Performance Improvement Plan
4  not used with Ms. Chinda?  Is the answer the same?
5    A.  A Performance Improvement Plan would have been
6  more appropriate for someone that was in a regular
7  full-time role.  She was working as an internal
8  traveler.
9        While her assignment at St. Joseph had been
10  for a while, we wouldn't have done a Performance
11  Improvement Plan for an internal traveler that was on a
12  13-week assignment.
13    Q.  Thank you.
14        I am marking Exhibit 8 to your deposition.
15        (Exhibit No. 8, Defendant HSA St. Joseph
16        LLC's Responses to Plaintiff's First Set
17        of Discovery, Interrogatories, was marked
18        for identification.)
19  BY MR. FITZ:
20    Q.  And I will scroll through it slowly.
21        Have you seen Exhibit 8 before?
22    A.  Yes.
23    Q.  And what is Exhibit 8?
24    A.  It looks like first set of discovery that we
25  provided, or that Asim provided, regarding this case.

Page 76

1    Q.  And for the record, we previously marked as
2  Exhibit 3 the Amended Interrogatory Answers for
3  Interrogatories 1 through 7.  So I'm not going to ask
4  you about those on this document because Exhibit 3 was
5  the amended version.
6        However, Interrogatories 8 forward apply to
7  this document.  So that's where my questions will focus.
8        Does that make sense?
9    A.  Yes, sir.
10    Q.  Okay.  And do you see Interrogatory Number 9?
11    A.  Yes.
12    Q.  And this is one where we asked for claims,
13  notices of claims, investigations, inquiries, and
14  lawsuits involving you, the company, where an allegation
15  was made that the company failed to provide employees
16  proper wages and overtime pay.
17        Do you see that?
18    A.  I do.
19    Q.  And do you see where there is an email included
20  here regarding that issue?
21    A.  I do.
22    Q.  And this is HSA St. Joseph's full and complete
23  response to this interrogatory; right?
24    A.  Yes, sir.
25    Q.  Okay.  Who is Mindee Rogers?

Page 77

1    A.  She was an RN in the labor and delivery area of
2  St. Joseph Medical Center.
3    Q.  Do you know when Ms. Rogers's employment
4  concluded?
5    A.  I don't.
6    Q.  Okay --
7    A.  I -- I've since transferred from St. Joseph to
8  another HSA hospital.
9    Q.  Okay.  So you don't know the date of the
10  conclusion of Ms. Rogers's employment; correct?
11    A.  Correct.
12    Q.  Do you know if Ms. Rogers was a charge nurse?
13    A.  She was a floor RN that would relieve charge
14  nurse on the units.  As far as her being delegated as a
15  charge nurse a hundred percent of the time, I'm not
16  sure, I would have to look into the system.
17    Q.  Okay.  And so just so I understand what you
18  mean, does that mean that sometimes Ms. Rogers performed
19  the duties of a charge nurse even though she didn't have
20  the formal title?
21    A.  Correct.  There are several people that do
22  that.
23    Q.  What types of duties of a charge nurse would
24  these people, including Ms. Rogers, perform?
25    A.  They would, kind of, be the leader for the

JAMIE MALVEAUX
SEPTEMBER 29, 2025                  Individually & 30(b)(6)                  JOB NO. 2028526

Page 78

1  shift in whatever pod that they're working in.  Meaning,
2  if, you know, there was an emergent situation, they
3  would be the key person that would handle it.  They
4  would be the eyes and ears for the leadership team on
5  the shift.  They would be the person that will ensure
6  that everything flows the way that it should.  They
7  would basically be the key player that works alongside
8  of the other nurses on the unit to make sure that all of
9  our patients are taken care of.  They would be the
10 liaison with other units.
11         Now, there are specific clinical things
12 that they do, I wouldn't be able to speak to it, but
13 that's basically what a charge nurse does.
14    Q.  Anything else?
15    A.  Not that I can recall.
16    Q.  Thank you.
17         I'm going to go back to Exhibit 8.  And
18 previously we were looking at the interrogatory answers,
19 now I'm going to look at the Request for Production
20 section.
21         These are document requests.  I think that
22 we've been talking about them this morning, so I think
23 you understand what these are; right?
24    A.  Yes.
25    Q.  Okay.  Do you see where there's a request for

Page 79

1  all documents containing identifying or referencing any
2  employment policy, protocol, guidance, or requirement as
3  to Ms. Chinda's job duties, compensation, and/or hours
4  worked?
5     A.  I do.
6     Q.  Have all of those been produced in this case?
7     A.  As far as I know, yes.
8     Q.  Okay.  Did you help with identifying and
9  producing those documents?
10    A.  I provided Asim with the -- yes, I did.
11    Q.  Okay.  And do you see where Number 6 indicates
12 handbooks, training programs, and other documents which
13 contain corporate policies and procedures, codes of
14 conduct, safety protocols, meal break protocols, or
15 guidelines of any kind?
16    A.  Yes.
17    Q.  And, in the response, it indicates that there's
18 a list of 1800 policies; right?
19    A.  Yes.
20    Q.  Do you know how HSA decided which policies to
21 produce or not produce in this case?
22    A.  I do not.  I can say that I provided Asim with
23 everything that we had access to.  Imani was employed
24 for a part of the time by Steward National Travel
25 Network, so Steward had some of those employment data as

Page 80

1  well.  And HSA may not have access to those Steward
2  specific things.  So everything that we had that we were
3  able to give to Asim, we did.
4         It looks like the policy number was
5  provided there, and we provided everything that we had
6  access to that was relevant.
7     Q.  So the Steward policies that you had access to
8  were the ones that you used to perform your job; right?
9     A.  Correct, that HSA adopted upon the transition.
10    Q.  Okay.  And if it was not a policy that HSA
11 adopted upon the transition, Steward has that policy not
12 HSA; right?
13    A.  Perhaps.
14    Q.  Are those --
15    A.  Steward should have the -- Steward should have
16 their policy if it was their policy, but I'm not sure
17 what you mean about which policies HSA adopted and
18 didn't adopt.
19    Q.  Well, I'm just trying to understand if there
20 are policies out there that apply during the Steward
21 time period that HSA does not have access to?
22    A.  I am unable to answer that question 'cause I am
23 only aware of HR policies.
24    Q.  Are you aware of any issues accessing policies
25 due to third-party vendor disputes?

Page 81

1     A.  At the time of transition?
2     Q.  Currently?
3     A.  No.
4         Currently?  Perhaps.
5     Q.  What do you know about that?
6     A.  In -- in -- can you clarify your question?
7     Q.  Sure.  There's some policies and some documents
8  that we've received in this case, and it's my
9  understanding that some might be tied up with a
10 third-party vendor dispute.  And my question is whether
11 you know anything about that?
12    A.  I know that there is something currently
13 occurring with our IT systems, but the depth and the
14 details regarding it, I don't know.
15         I know that we have been losing access to
16 things, and I know that sometimes it comes back up and
17 sometimes it doesn't, so the -- the ins and outs or the
18 specifics related to who's handling what and what's
19 actually happening, no, I can't answer.  All I can know
20 is the steps that I take to escalate the situations that
21 are occurring.
22    Q.  Have those IT issues affected HSA's ability to
23 produce documents in Ms. Chinda's case?
24    A.  I do not believe so, not to my knowledge.
25    Q.  Okay.  And do you see Request Number 8?

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 82

1     A.  Yes.
2     Q.  Let me know if you knew me to make it bigger?
3     A.  No, I just read it.  Thank you.
4     Q.  And do you see that Request Number 8 is
5  documents recording, memorializing, containing, or
6  evidencing notices of claims or complaints concerning
7  HSA's failure to pay all wages or overtime to Ms. Chinda
8  or any other employees; correct?
9     A.  Correct.
10    Q.  And the response is the email from Ms. Rogers
11 that we reviewed a moment ago; right?
12    A.  Yes, sir.
13    Q.  And this is HSO's full and complete answer to
14 this request for production; right?
15    A.  Yes, sir.
16    Q.  Okay.  Do you see Request Number 9?
17    A.  I do.
18    Q.  And do you know if Ms. Chinda's complete hiring
19 packet has been produced?
20    A.  The complete hiring packet that we had access
21 to was produced.
22    Q.  Okay.  And so, this gets back to my questions
23 about the vendor before:
24         Is there components of her hiring packet
25 that HSA does not have access to?

Page 83

1     A.  Her specific Steward National Travel Network
2  employment.  The employment file that we assumed when we
3  came on in April is what was provided to Asim, which is
4  what we had access to, upon her employment with us
5  locally.
6     Q.  And the employment file that was provided to
7  Mr. Ghafoor was not provided by Steward; right?
8     A.  No.
9     Q.  It was provided by who?
10    A.  Me.
11    Q.  Okay.  So it's possible that there are some
12 hiring packet documents related to Ms. Chinda that HSA
13 does not have access to; right?
14    A.  Upon her initial hire in February of '23 based
15 off of the contract that you showed me earlier, perhaps.
16    Q.  Okay.  Do you have any idea what those
17 documents are?
18    A.  No.  And it may include what we've already
19 provided.  I have no idea.
20    Q.  Got it.  Do you see Request Number 10?
21    A.  Yes.
22    Q.  And this is Ms. Chinda's payroll records;
23 right?
24    A.  Okay.
25    Q.  And HSA does not have access to Ms. Chinda's

Page 84

1  Steward payroll records; right?
2     A.  Correct.
3     Q.  Do you know if HSA could take any steps to try
4  to obtain them from Steward?
5     A.  No, sir.  I don't believe we can.
6     Q.  And why do you say that?
7     A.  Because Steward is a separate company.
8         Right now, for employment verifications,
9  our staff are having to go to what's called the "work
10 number" to receive their own payroll records.
11    Q.  Oh.
12    A.  The whole system is bankrupt.  They don't have
13 departments like -- like they used to, and I'm not sure
14 where we would go to help get those documents to be very
15 honest with you.
16    Q.  Got it?
17         Do you see Request Number 11?
18    A.  Yes, sir.
19    Q.  HSA does not have access to Ms. Chinda's time
20 sheets during the Steward time period; right?
21    A.  Correct.
22    Q.  And just for the record, when I'm saying
23 "Steward time period" on these questions, that means
24 before October 13, 2024; right?
25    A.  Yes, sir.

Page 85

1     Q.  Okay.  Has HSA produced all of Ms. Chinda's
2  time sheets for the time period after October 13, 2024?
3     A.  Yes, sir.
4     Q.  Did HSA automatically deduct 30 minutes from
5  the meal breaks on the paper time sheets?
6     A.  Yes, sir.  As far as I'm aware.
7     Q.  Okay.  Are there documents from Ms. Chinda's
8  personnel file from the Steward period that HSA does not
9  have access to?
10    A.  We spoke about that earlier.
11         I -- perhaps when Ms. Chinda was employed
12 by Steward National Travel Network, February '23 perhaps
13 there are.
14         When we assumed the contract in August of
15 '24, that became her employment record and that's what
16 we provided to Asim as part of this litigation.
17         I can't speak to what Steward had access to
18 when it was a part of SNTN.  And I don't have access to
19 those records.
20    Q.  Thank you.
21         Did Ms. Chinda have a Steward email
22 address?
23    A.  I would assume, but I'm not sure.
24    Q.  Okay.
25    A.  I remember her sending me an email, but I'm not

JAMIE MALVEAUX
SEPTEMBER 29, 2025 — Individually & 30(b)(6)
JOB NO. 2028526

Page 86

1  sure if it came from her Steward address or her personal
2  address.
3      Q.  Do you know if a search has been performed on
4  Ms. Chinda's Steward email address?
5      A.  I would have to ask Asim, and I know I can't
6  ask him a question, but I would assume that one was
7  done.
8      Q.  Okay.  Are you able to still access your
9  Steward email?
10      A.  On a limited basis.
11      Q.  What is the limitation?
12      A.  I can only review emails that were sent less
13  than a year ago.  And sometimes, I can get into the
14  actual Outlook button and that -- save the @Steward.org
15  emails, and sometimes it does not work.
16          It just really depends.
17      Q.  Got it.
18          And do you see Request Number 14?
19      A.  Correct.
20      Q.  Are there documents related to Steward's FLSA
21  compliance that applied to the time that Ms. Chinda
22  worked for Steward that HSA does not have access to?
23      A.  Not that I'm aware.
24      Q.  Okay.  Have all documents related to the
25  October 2024 Kronos' failure been produced?

Page 87

1      A.  As far as I'm aware.
2      Q.  Okay.  I'm going to mark Exhibit 9 to your
3  deposition.
4          (Exhibit No. 9, Email Re:  Imani Chinda,
5          12/31/2024, was marked for
6          identification.)
7  BY MR. FITZ:
8      Q.  And this is an email that was produced by HSA.
9  The Bates label is RFP2-090.
10          It looks a little strange.  I'm happy to
11  try to walk you through it, but my question is:
12          Does Exhibit 9 look familiar?
13      A.  It does.
14      Q.  And it looks like that it might be two
15  different emails, an email and a reply; do you see that?
16      A.  It does.
17      Q.  And I can represent to you that when I open the
18  email in Outlook, that's how it looks.  And so I'm just
19  going to share my screen to show you what that looks
20  like.
21          I can't mark it because it hasn't been
22  produced by y'all in this format really, but I will show
23  you this and then we can talk about it.
24      A.  Yes.
25      Q.  Okay.  And so I'm going to go back to

Page 88

1  Exhibit 9.
2          Are you prepared to answer questions about
3  Exhibit 9?
4      A.  Sure.
5      Q.  So who is Rosland Wyrick?
6      A.  Rosland Wyrick is basic -- was, basically, my
7  number two in human resources.
8          It looks like she's sending this email that
9  is saying, "Has her contract ended?  If so, please send
10  term par."
11      Q.  What is term par?
12      A.  It is basically a Personal Action Request.
13  It's basically a form that states the status of an
14  employee.
15          For example, if someone is going from
16  full-time to PRN, if someone is changing call centers,
17  if it's a -- basically a personal change, you would send
18  it on that document.
19          If you're requesting a replacement position
20  for someone that has tendered their resignation, you
21  would send in what we call a term PAR, which basically
22  indicates that the person is leaving so that we can
23  update our records, our HR records, and take care of
24  whatever else needs to be done on the back end.
25          It looks like she sent this -- Rosland sent

Page 89

1  this email as a follow-up.
2      Q.  Okay.  And do you remember if you prepared or
3  sent a term PAR for Ms. Chinda?
4      A.  No, it looks like Rosland was following up with
5  her leaders and she cc'd me on it.
6          And it looks like, from the other view that
7  you showed, it says, "I have everything, I'll take care
8  of it," where I probably should've said, "I have
9  everything, I took care of.  Thanks for following up
10  though."
11      Q.  And this email exchange occurred at the end of
12  the year; right?
13      A.  Correct.
14      Q.  So it's probably just an example of --
15      A.  A cleanup.
16      Q.  A cleanup; right.
17      A.  Right.
18      Q.  Yeah.  It's been a busy year, I bet.
19      A.  Yes.
20      Q.  Okay.  I'm going to mark Exhibit 10 to your
21  deposition.
22          (Exhibit No. 10, Email Re:  Missing Hours
23          Pay, 11/2/2024, was marked for
24          identification.)
25          //////////////////////////

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

Page 90

1  BY MR. FITZ:
2      Q.  Does Exhibit 10 look familiar?
3      A.  It does.  It looks like I sent that email.
4      Q.  And do you dispute that Ms. Chinda complained
5  about not being paid minimum wage?
6      A.  No.
7      Q.  HSA agrees that Ms. Chinda complained about not
8  being paid minimum wage; right?
9      A.  Correct.
10     Q.  And Exhibit 10 confirms that yourself and other
11 members of HR were aware of this complaint; right?
12     A.  Actually, I was the only HR member of HSA that
13 was on there.
14             Candace Wright was formerly my leader, that
15 I discussed earlier during this deposition, but she was
16 an employee of Steward.
17     Q.  All right.
18     A.  So everyone else on this email was leadership
19 or the CNO and the CFO.
20     Q.  Okay.  I -- I appreciate that clarification.
21 Let me ask a better question:
22             This email confirms that HSA, HR, and
23 leadership was aware that Ms. Chinda complained about
24 the failure to pay her minimum wage; right?
25     A.  Correct.

Page 91

1      Q.  Okay.
2             MR. FITZ:  It's about noon, so I'd like to
3  take at least a brief break right now.
4             Can we go off the record and discuss?
5             THE WITNESS:  Can I ask him?  Is that okay?
6             MR. FITZ:  Yeah, if you all are okay with
7  going off the record, yeah.
8             MR. GHAFOOR:  (Indicating.)
9             THE WITNESS:  Okay.
10            THE VIDEOGRAPHER:  Okay.  If there are no
11 objections, stand by to go off the record.
12            We are now off the record.
13            The time is 11:58 a.m. Central time.
14            (Recess taken at 11:58 a.m. to 12:13 p.m.)
15            THE VIDEOGRAPHER:  We are now back on the
16 record.  The time is 12:14 p.m. Central time.
17 BY MR. FITZ:
18     Q.  Ms. Malveaux, is there anything that you'd like
19 to add or clarify to your testimony so far today?
20     A.  No, sir.
21     Q.  Okay.  I'm going to share what has been marked
22 as Exhibit 11 to your deposition.
23            (Exhibit No. 11, Email Re:  Pending
24            Candidates, 11/13/2024, was marked for
25            identification.)

Page 92

1  BY MR. FITZ:
2      Q.  I will scroll through the one page slowly.
3             Does Exhibit 11 look familiar?
4      A.  Yes.
5      Q.  And what is Exhibit 11?
6      A.  It appears to be an email requesting backfills
7  and replacement for agency workers.
8             And when I say "agency," I mean internal
9  travelers with core staff members.
10     Q.  And so on the sentence that begins with "These
11 positions would replace...,"  there's four individuals
12 listed; correct?
13     A.  Correct.
14     Q.  Are all four of those individuals former HSA
15 travelers?
16     A.  Based off of her email, it -- it appears as
17 Milo and Imani were SNTN Travelers.  I'm unsure if
18 Castillo and Maria, whether they were employees that
19 left employment that needed a backfill, or if they were
20 travelers.
21             I don't have enough information in this
22 email to be able to determine the first two names, but
23 the last two names, it looks like Milo and Chinda were
24 both travelers that we needed to replace.
25     Q.  Do you know what the circumstances were of Milo

Page 93

1  Mansaray's departure?
2      A.  I don't.  But keep in mind, all of the internal
3  travelers were at an elevated rate.  So our goal,
4  always, is to backfill travelers with internal core
5  employees that are full-time that are not on a travel
6  assignment.
7      Q.  Do you know if Milo Mansaray was given the
8  opportunity to stay on but not as a traveler?
9      A.  Perhaps.  I don't have that information in
10 front of me.
11     Q.  How long did it take for Stew -- or for HSA --
12 let me ask that in a better way.
13            How long did it take for HSA to phase out
14 the Steward-era travelers?
15     A.  I would have to look, honestly.  Our goal was
16 to always get rid of the higher-rate employees.
17            I do know at one time, at Steward we had --
18 sorry -- at HSA, we had phased out all internal
19 travelers and they were all core employees.  I'm not
20 sure how long that lasted though.
21            I would have to go back and look at my
22 records and do some looking in the system to give you an
23 exact date.  But it's always our goal to backfill
24 internal travelers with core employees.
25     Q.  And so, currently, there are no more travelers

JAMIE MALVEAUX
SEPTEMBER 29, 2025                          Individually & 30(b)(6)                          JOB NO. 2028526

Page 94

1  who work for HSA; is that right?
2      A.  No, there -- there are travelers that currently
3  work there.  Whenever we have a staffing shortfall, that
4  is one of our techniques, to try to avoid using an
5  external agency to ensure that our patients are taken
6  care of.
7              So there may be times where we'll have an
8  internal traveler.  There may be times where,
9  unfortunately, we have to knock on the door of an
10  external travel agency to get our ends or whatever job
11  is needed at that time to ensure that patient care is
12  not disrupted.
13      Q.  Got it.
14              You testified earlier this morning about
15  PTO overpayment.  Do you remember that?
16      A.  I do.
17      Q.  Were the other travelers overpaid their PTO?
18      A.  Travelers don't receive paid time off, so if
19  they received payment coded to paid time off, then yes
20  that was an overpayment.
21      Q.  Yeah, and so, my question is whether that
22  happened to anybody else other than Ms. Chinda?
23      A.  Perhaps.  Honestly, I have not looked at the
24  full reconciliation of what happened on November 1st,
25  and I'm unable to tell you at this moment who was

Page 95

1  overpaid PTO and who wasn't --
2      Q.  Were there --
3      A.  -- that --
4      Q.  I -- I apologize.  Please continue.
5      A.  No, I was just gonna say those that were
6  classified as internal travelers.
7      Q.  Setting aside the PTO specific question, were
8  there any other HSA outwardly employees who were
9  overpaid in November of 2024?
10      A.  Yes, sir.
11      Q.  And what was the nature of those overpayments?
12      A.  It could have been paid time off.  It could
13  have been a shift diff, it could have been a lot of
14  different factors.
15      Q.  Got it.
16              Are you familiar with the Kronos outage
17  from a few years ago?
18      A.  Can you be more specific, which Kronos outage?
19      Q.  A few years ago, Kronos had nationwide outage
20  that affected timekeeping systems at various
21  locations --
22      A.  -- no, sir, I'm not familiar --
23      Q.  -- are you familiar with that?
24      A.  I was not employed at that time and don't
25  have -- wherever I was working at that moment,

Page 96

1  apparently didn't use Kronos, 'cause I -- I don't know
2  what you're talking about.
3      Q.  Fair enough.
4              So regardless of the reason why an hourly
5  employee was overpaid in November of 2024, my question
6  is:
7              Did HSA seek reimbursement for those
8  overpayments from the other individuals who were
9  overpaid?
10      A.  Not that I am aware at this moment.
11      Q.  Okay.  So just so -- to be clear for the
12  record, you're not aware of anybody from HSA that HSA
13  has sought overpayment for that occurred in
14  November 2024?
15      A.  Not that I'm aware.
16      Q.  Okay.  Do you know if HSA intends to seek
17  overpayment from any individuals who are overpaid in
18  November of 2024?
19      A.  I'm not aware at this moment if they are.
20      Q.  Do you know why HSA sued Ms. Chinda?
21      A.  Not off of the top of my head, no.
22              I -- I do know that there was some back and
23  forth between Asim and I, believe, you Carl, about this
24  case, and I believe that there was some litigation on
25  the HSA behalf related to countersuing her.

Page 97

1              But the -- the details of that is fuzzy.  I
2  would have to look at it.
3      Q.  Okay.  So sitting here, you're not aware of why
4  HSA countersued Ms. Chinda; right?
5      A.  I know that there was a countersuit, but that
6  specific reason, I would have to look at.
7      Q.  Okay.  And you don't know what the basis was
8  for HSA's countersuit against Ms. Chinda; right?
9      A.  I would have to look at the documentation.  I'm
10  sure that Asim showed it to me, but to quote it to you
11  right now at this moment, I am unable to do so.
12      Q.  Okay.  Thank you.
13              And I'm marking Exhibit 12 to your
14  deposition.
15              (Exhibit No. 12, Defendant's Answer,
16              Affirmative Defense an Counterclaims,
17              Filed 5/27/2015, was marked for
18              identification.)
19  BY MR. FITZ:
20      Q.  And I will scroll through it slowly.
21              Did you have an opportunity to review
22  Exhibit 12?
23      A.  I remember seeing it.  Reading the ins and outs
24  of it, in depth and setting it -- no.
25      Q.  And I'm -- I'm not going to ask you any legal

JAMIE MALVEAUX
SEPTEMBER 29, 2025

Individually & 30(b)(6)

JOB NO. 2028526

Page 98

1 questions about Exhibit 12.  My question is just:
2                 Do you know what this document is?
3      A.  Yes, it looks like when we countersued.
4      Q.  Okay.  And I'm going to scroll to a section at
5 the end called Damages.  Do you see this?
6      A.  I do.
7      Q.  And do you have just a general familiarity
8 about what the concept of damages means?
9      A.  I do.
10      Q.  Okay.  And here, HSA was seeking damages
11 against Ms. Chinda; right?
12      A.  Yes, I see that.
13      Q.  Do you know what economic loss HSA suffered as
14 a result of anything done by Ms. Chinda?
15      A.  Well, I can say us -- and excuse my frankness,
16 Carl, "us" being in this room and having to provide
17 several documents related to the case, it would be a
18 loss in that we're unable to devote our time and
19 resources to other things.
20                 Now, as the cost of the actual economic
21 loss, I -- I can't put a dollar figure to it because
22 there are several people that are involved with this,
23 but I would assume that's what it has to do with.
24      Q.  So the economic loss that HSA suffered as a
25 result of Ms. Chinda is the time and expense of

Page 99

1 defending this litigation; is that fair?
2      A.  Yes, and I would assume that there are other
3 economic loss that could be party to that.
4      Q.  What other economic losses?
5      A.  Well, it -- I mean, the situation from start to
6 finish.  I would assume this wasn't the intent when they
7 listed economic loss, but what about the patients that
8 heard the disruption in the area whenever it happened?
9                 Now, I don't know how we would put a dollar
10 figure to that, but I'm sure that there was some
11 customer service that needed to be done regarding that.
12      Q.  Anything else?
13      A.  As far as what's categorized for economic loss
14 in that specific thing, I wouldn't be the subject matter
15 expert on that, but that would be my perception and my
16 interpretation of it.
17      Q.  Are you aware of any reputational harm that HSA
18 has suffered as a result of Ms. Chinda other than what
19 you already answered with respect to economic loss?
20      A.  I do know that there were some things that was
21 said as far as the news.  I am unsure if she is who went
22 to the news regarding the paycheck or who went, but
23 there was some harm to our reputation.
24                 I know there was a Facebook post that she
25 did.  But as far as the dollar figure or as far as the

Page 100

1 harm related to that, I would assume that there is some
2 there.
3      Q.  Okay.  Anything else?
4      A.  No.  But once again, he would be the subject
5 matter expert on that and -- meaning Asim, and I can't
6 ask, so...
7      Q.  Okay.  And are there any other special damages
8 for business loss and increased compliance legal costs
9 that HSA has suffered other than what you've already
10 identified for economic loss of reputational harm?
11      A.  Once again, I would have to ask my legal
12 counsel regarding the specifics related to the business
13 loss and increased compliance legal costs.
14      Q.  Okay.  I mean, here on Exhibit 1, you are
15 designated to testify about the affirmative defenses in
16 this case; right?
17      A.  I am.
18      Q.  Okay.  What did you do to prepare to testify
19 but HSA's affirmative defenses in this case?
20      A.  I met with Asim for an hour on last Thursday.
21      Q.  Okay.  Are you prepared to testify on HSA's
22 claims for economic loss or reputational loss as a
23 result of Ms. Chinda?
24      A.  What I -- the answer I just provided, yes.
25      Q.  Okay.  Whenever you found out about the

Page 101

1 allegation that there was a disruption in the Family
2 Birthing Center, did you conduct any investigation into
3 that?
4      A.  Honestly, an in-depth investigation was not
5 done.
6      Q.  Okay.  Did anybody at HSA conduct an
7 investigation into that incident?
8      A.  Lori Tolopka was supposed to.
9      Q.  Do you know if she did?
10      A.  I don't, when -- like we said earlier, we've
11 reviewed emails looking for what she sent.  It appeared
12 as though there was not one sent.  So we decided, since
13 she was an internal traveler, to cancel the travel
14 assignment.
15      Q.  There's no documents in Ms. Chinda's personnel
16 file indicating that investigation was done regarding
17 the disruption at the Family Birthing Center; right?
18      A.  Correct.
19      Q.  You've never seen any documents that suggests
20 that an investigation was done by anybody into the
21 allegedly disruptive conduct at the Family Birthing
22 Center; right?
23      A.  Outside of the email that Emily sent, no.
24      Q.  And Ms. Tolopka asked her to send that email;
25 right?

JAMIE MALVEAUX
SEPTEMBER 29, 2025                Individually & 30(b)(6)                JOB NO. 2028526

Page 102

1    A.  Correct.
2    Q.  Is Emily Manning still with the company?
3    A.  As far as I know, she is.
4    Q.  Did you speak with her in preparation for your
deposition today?
6    A.  No, sir, I haven't spoke to Emily in weeks.
7    Q.  Why not?
8    A.  I no longer work at St. Joseph Medical Center.
9  I work at Medical Center of Southeast Texas in Port
10 Arthur.
11    Q.  You didn't think it would be relevant to speak
12 to Emily Manning, who witnessed the reason why
13 Ms. Chinda was placed on administrative leave, to
14 prepare for your deposition today?
15    A.  No, sir, I didn't.
16    Q.  Why not?
17    A.  Because there are other priorities that are
18 occurring at this very moment, and I did not take the
19 time to contact Emily regarding this.
20    Q.  If you had spoken to Emily Manning, do you
21 think you would have been better prepared to answer
22 questions about what actually happened with Ms. Chinda?
23    A.  No, sir, I don't because this happened in
24 November of '24, it is almost a year later.
25    Q.  You don't know what Ms. Chinda said; right?

Page 103

1    A.  I don't.
2    Q.  You don't know who she said it to; right?
3    A.  I know that it was in the nurses station.
4    Q.  But you don't know who she said it to; right?
5    A.  I know -- I don't, not at this moment.
6    Q.  You know she said something; right?
7    A.  I know that there was a disruption.
8    Q.  And you know that Emily Manning said that she
9  said it loudly; right?
10    A.  Correct.
11    Q.  You've never asked Emily Manning what
12 Ms. Chinda said; right?
13    A.  I may have in November, but I can't recall what
14 happened around that time.
15        Remember, I had over 500 people that did
16 not get paid.  That was our priority at the time.
17    Q.  You've been in HR a long time; right?
18    A.  I have.
19    Q.  And usually you take pretty good notes when you
20 conduct an investigation; right?
21    A.  I do.
22    Q.  You don't have any notes of any conversations
23 with Emily Manning from November 2024; right?
24    A.  No, sir, not that I can recall.
25    Q.  So it's pretty safe to conclude that you had

Page 104

1  never spoken to Emily Manning about what actually
2  happened at the Family Birthing Center; right?
3    A.  I wouldn't say that, because why would we have
4  made the decision to end her assignment had there not
5  been a conversation regarding it with my senior leaders
6  who were my partners.
7    Q.  Do you know why there was never any written
8  documentation given to Ms. Chinda telling her that the
9  Family Birthing Center incident is why she was
10 terminated?
11    A.  Because we canceled her assignment.  It wasn't
12 related to the disruption.  It wasn't related to
13 anything else.  She was an internal traveler on
14 assignment.
15        Now, while her assignment was a very long
16 time, she was still an internal traveler under a 13-week
17 agreement.
18    Q.  But it was canceled early; correct?
19    A.  A -- a week and a couple of days.
20    Q.  And Ms. Chinda never received anything in
21 writing indicating that the incident at the Family
22 Birthing Center is why she was placed on administrative
23 leave; right?
24    A.  Outside of what was mailed to her, unless her
25 leadership team provided her with something, I did not.

Page 105

1    Q.  But that is the reason why she was placed on
2  administrative leave; right?
3    A.  Because of the disruption.
4    Q.  Okay.  Is there anything else that you'd like
5  to add or clarify to your testimony today?
6    A.  No.
7    Q.  Okay.
8        MR. FITZ:  I'll pass the witness.
9        Thank you for your time, Ms. Malveaux.
10       Should we go off the record?
11       MR. GHAFOOR:  Yes.
12       MR. FITZ:  Okay.
13       THE VIDEOGRAPHER:  Okay.  Standby.
14       We are now off the record.
15       The time is 12:33 p.m. Central time.
16       (Recess from 12:33 p.m. to 12:36 p.m.)
17       THE VIDEOGRAPHER:  We are now on the
18 record.  The time is 12:36 p.m. Central Time.
19       THE COURT REPORTER:  Counsel --
20       MR. FITZ:  And I --
21       THE COURT REPORTER:  Go ahead.
22       MR. FITZ:  I ordered a -- I ordered a
23 rough.
24       THE COURT REPORTER:  And you -- yes, sir.
25 And you wanted that in a regular turnaround time?

JAMIE MALVEAUX
SEPTEMBER 29, 2025 — Individually & 30(b)(6)

JOB NO. 2028526

**Page 106**

1    MR. FITZ:  Yes.
2        THE COURT REPORTER:  And, Mr. Ghafoor, you
3    want your electronic transcript also just on a regular
4    turnaround time, you don't need it expedited?
5        MR. GHAFOOR:  Regular turnaround time is
6    fine.  Thank you.
7        THE COURT REPORTER:  Thank you so much.
8        THE VIDEOGRAPHER:  Okay.  And to clarify
9    video orders, Mr. Fitz, you'll just be getting the
10   standard video order and no orders for Mr. Ghafoor; is
11   that correct?
12       MR. FITZ:  Correct.
13       THE VIDEOGRAPHER:  Okay.  All right.
14   Standby for the official readout.
15       This concludes the deposition of Jamie
16   Malveaux, individually, and as corporate representative
17   for HSA St. Joseph LLC for Imani Chinda versus HSA
18   St. Joseph LLC.
19       We are now off the record.
20       The time is 12:37 p.m. Central time.
21       (Proceedings concluded at 12:37 p.m.
22        Central time.)
23
24
25

**Page 107**

1        WITNESS CORRECTIONS AND SIGNATURE
2    Please indicate changes on this sheet of paper,
3    giving the change, page number, line number and reason
4    for the change.  Please sign each page of changes.
5    PAGE/LINE    CORRECTION    REASON FOR CHANGE
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
         Jamie Malveaux, individually, and 30(b)(6)
25

**Page 108**

1        S I G N A T U R E   O F   W I T N E S S
2
3        I, Jamie Malveaux, individually, and 30(b)(6),
4    solemnly swear or affirm under the pains and penalties
5    of perjury that the foregoing pages contain a true and
6    correct transcript of the testimony given by me at the
7    time and place stated with the corrections, if any, and
8    the reasons therefor noted on the foregoing correction
9    page(s), and that I am signing this before a Notary
10   Public.
11
12           NOT REQUESTED
     _____
13       Jamie Malveaux, individually, and 30(b)(6)
14
15
16   STATE OF T E X A S     *
17   COUNTY OF _____   *
18   SUBSCRIBED AND SWORN TO BEFORE ME BY Jamie Malveaux,
19   individually, and 30(b)(6) on this, the _____ day of
20   _____, 2025.
21
22
     _____
23       Notary Public, State of Texas
24
     My Commission Expires: _____
25

**Page 109**

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF TEXAS
2           HOUSTON DIVISION
3
     IMANI CHINDA,        )CASE NO. 4:24-cv-5106
4                         )
     v.                   )
5                         )
     HSA ST. JOSEPH LLC.  )
6    _____)
7
         REPORTER CERTIFICATION
8
9    THE STATE OF TEXAS:
10
11   I, DIANA FLORES NUCHURCH, a Certified Shorthand Reporter
12   and Notary Public in and for the State of Texas, do
13   hereby certify that the facts as stated by me in the
14   caption hereto are true; that the above and foregoing
15   answers of the witness, Jamie Malveaux, individually,
16   and 30(b)(6), to the interrogatories as indicated were
17   made before me by the said witness after being first
18   duly sworn to testify the truth, and same were reduced
19   to typewriting under my direction; that the above and
20   foregoing deposition as set forth in typewriting is a
21   full, true, and correct transcript of the proceedings
22   had at the time of taking of said deposition:
23
24   That the original deposition was delivered to MR. FITZ;
25       That a copy of this certificate was served on all

Page 110

```
 1  parties and/or the witness shown herein on
 2  _____.
 3
 4  I further certify that pursuant to FRCP No. 30(f)(i)
 5  that the signature of the deponent was not requested by
 6  the deponent or a party before the completion of the
 7  deposition.
 8      I further certify that I am not, in any
 9  capacity, a regular employee of the party in whose
10  behalf this deposition is taken, nor in the regular
11  employ of this attorney; and I certify that I am not
12  interested in the cause, nor of kin or counsel to either
13  of the parties.
14
15      That the amount of time used by each party at
16  the deposition is as follows:
17      MR. GHAFOOR  - 00:01
        MR. FITZ   - 2:25
18
        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
19  this, the 1st day of October, 2025
20
21      _____
        Diana Flores Nuchurch, TX CSR 12885
22      Expiration: 07-31-2026
        STENO
23      CDF-11909
        Expiration 11/30/2026
24      315 West 9th Street, Suite 807
        Los Angeles, California 90015
25      310-573-8380
```

## Exhibits

**Exhibit 1** 4:4 28:22,23 29:10,14 48:16,19 100:14

**Exhibit 2** 4:6 29:18,19, 22 30:7,9,11,14 31:5,20

**Exhibit 3** 4:7 32:23,24 33:6,10,12 72:4 73:20 76:2,4

**Exhibit 4** 4:10 42:21,23 43:4,11,14,16

**Exhibit 5** 4:11 51:9,11, 20,22 54:10

**Exhibit 6** 4:13 54:15,17, 24 55:2

**Exhibit 7** 4:15 59:21,23 60:4,6

**Exhibit 8** 4:18 75:14,15, 21,23 78:17

**Exhibit 9** 4:20 87:2,4,12 88:1,3

**Exhibit 10** 4:21 89:20, 22 90:2,10

**Exhibit 11** 4:22 91:22, 23 92:3,5

**Exhibit 12** 4:24 97:13, 15,22 98:1

## $

**$4** 54:13 55:14
**$5** 53:5
**$60** 53:25 54:3

## -

**-O-O-R** 5:21

## 0

**039** 31:23
**08/03/2024** 54:18

## 1

**1** 28:22,23 29:10,14 34:4 48:16,19 57:1,2 58:2 72:6 76:3 100:14

**1-7** 33:2

**10** 50:11,16,18 57:3 83:20 89:20,22 90:2,10

**10:40** 50:23,24
**10:55** 50:24 51:1
**11** 57:3 84:17 91:22,23 92:3,5
**11/13/2024** 91:24
**11/2/2024** 89:23
**11/5/2024** 42:23
**11:28** 73:4,5
**11:30** 73:5,7
**11:58** 91:13,14
**11th** 11:14 18:12,13
**12** 57:3 97:13,15,22 98:1
**12/31/2024** 87:5
**12665** 6:3
**12:13** 91:14
**12:14** 91:16
**12:33** 105:15,16
**12:36** 105:16,18
**12:37** 106:20,21
**13** 16:14 51:25 52:25 56:12 57:3 84:24 85:2
**13-week** 56:11 57:8 58:2 72:2 75:12 104:16
**13th** 11:12 18:13,15,17 57:5 66:23 67:9
**14** 86:18
**14th** 66:23
**15** 48:21 50:16,18
**1800** 79:18
**18th** 56:6 57:7 72:18

## 2

**19th** 34:13 73:15
**1st** 37:6 56:17,23,24 67:17 68:24,25 69:6,9,15 94:24

**2** 29:18,19,22 30:7,9,11,14 31:5,20 34:11 57:2
**2-page** 43:4
**2/21/2023** 51:12
**2024** 16:5,6,14 18:12 58:2,3,17 59:12 73:15 84:24 85:2 86:25 95:9 96:5,14,18 103:23
**2025** 5:1,5
**21st** 52:2
**23** 11:23 60:12 83:14 85:12
**24** 11:14,24 52:12,19 53:6 56:24 85:15 102:24
**24th** 51:25
**25** 34:13 50:2
**26th** 67:10
**29** 5:1,4
**2nd** 37:6 69:10

## 3

**3** 32:23,24 33:6,10,12 57:2 72:4 73:20 76:2,4
**30** 24:2,25 58:3 85:4
**30(b)(6)** 6:20 28:24
**30th** 57:6 65:12 67:15,18 68:15
**315** 5:14
**31st** 67:20 68:19

## 4

**4** 42:21,23 43:4,11,14,16 57:2 66:7
**4-page** 29:7

**19th** 34:13 73:15
**4:24-cv-5106** 5:11
**4th** 69:24

## 5

**5** 51:9,11,20,22 54:10 57:2
**5/13/21** 60:12
**5/27/2015** 97:17
**500** 64:10 70:10 103:15

## 6

**6** 23:15 24:1,8 28:2 34:16 53:8 54:15,17,24 55:2 57:2 79:11
**6/26** 60:12
**6/26/2023** 59:25
**6th** 69:1

## 7

**7** 57:2 59:21,23 60:3,4,6 76:3
**7th** 69:1

## 8

**8** 57:2 75:14,15,21,23 76:6 78:17 81:25 82:4
**807** 5:15
**8th** 57:2

## 9

**9** 57:2 65:15 68:15 76:10 82:16 87:2,4,12 88:1,3
**90015** 5:15
**9:35** 5:1,4
**9th** 5:14

JAMIE MALVEAUX
SEPTEMBER 29, 2025

Individually & 30(b)(6)

JOB NO. 2028526

**@**

**@steward.org** 86:14

**A**

**A-S-I-M** 5:20

**a.m.** 5:1,4 50:23,24 51:1 73:4,5,7 91:13,14

**ability** 9:5 81:22

**absence** 16:25 18:23

**Absolutely** 44:3

**absorbed** 16:21 17:4

**accept** 49:22

**access** 19:24 20:2 46:6 49:18 67:2 69:20 79:23 80:1,6,7,21 81:15 82:20,25 83:4,13,25 84:19 85:9,17, 18 86:8,22

**accessing** 80:24

**account** 47:1,12 48:5 49:3

**Accountability** 31:15 32:14

**accurate** 20:22 73:21

**accurately** 18:8

**act** 20:6,13 21:20 22:6 32:4,5

**action** 59:24 60:8 61:8, 11 88:12

**actions** 31:13 74:22

**active** 53:20

**actual** 10:7 37:25 86:14 98:20

**add** 51:7 91:19 105:5

**additional** 17:20 35:9

**address** 5:14 85:22 86:1,2,4

**adequately** 14:4

**adhere** 12:23

**adherence** 12:21

**adjustment** 18:7

**admin** 34:25 35:4,5 46:11,13 58:19 59:3,5 61:5 62:4 63:16 64:1

**administration** 12:7, 11 15:11

**administrative** 34:19 35:6,10,16 36:22 37:1,15 40:22 41:12 44:13,16 46:7 58:21,23,24 59:8,16,17 61:7,12,14,17,19 62:2,9, 11,21 63:2,12 71:7 102:13 104:22 105:2

**administrator** 17:23 66:12

**adopt** 80:18

**adopted** 52:4,5 54:6,10 60:9,15 80:9,11,17

**advantage** 24:10 25:12

**advertising** 19:14

**advice** 40:23 70:5

**affect** 22:21

**affected** 81:22 95:20

**affirm** 6:6

**affirmative** 97:16 100:15,19

**affirmed** 6:21

**afraid** 48:11

**agency** 52:13 92:7,8 94:5,10

**agree** 50:13

**agreed** 54:3

**agreement** 51:12,24 52:4,5,6,12,19 53:10 54:6, 18 55:3,4 57:4 104:17

**agreements** 52:24 53:8 54:12 57:13

**agrees** 90:7

**ahead** 36:16 105:21

**alcohol** 9:5

**allegation** 7:13 76:14 101:1

**allegedly** 101:21

**alongside** 78:7

**amended** 76:2,5

**America** 16:12

**American** 16:9

**and/or** 62:14 79:3

**Angeles** 5:15

**announced** 27:4

**answers** 8:25 33:20 36:24 76:2 78:18

**apologize** 19:9 33:14 95:4

**app** 23:7,11

**apparently** 96:1

**appeared** 7:6 101:11

**appearing** 8:13

**appears** 56:22 92:6,16

**applicable** 30:22 60:22

**application** 10:12

**applied** 15:19 86:21

**applies** 15:22

**apply** 18:22 30:19 60:19 61:11 76:6 80:20

**appointing** 62:23

**appropriately** 25:16

**approval** 13:10

**approximately** 8:5 49:24

**April** 47:18 49:25 50:1,2 83:3

**area** 24:4,9,24 25:1 27:2,3 37:20,23 39:18 40:21 46:12 58:16 63:25 66:14 75:2 77:1 99:8

**arise** 8:15

**arm** 8:1,3

**arrive** 67:25

**Arthur** 6:18 102:10

**Asim** 5:20 6:16 9:17 33:25 34:6,8,14,24 42:1

47:7 48:6,8 49:8,18 64:20 69:8,9,13 70:7 75:25 79:10,22 80:3 83:3 85:16 86:5 96:23 97:10 100:5,20

**asks** 28:5

**assigned** 30:16

**assignment** 51:12 52:11 54:18 71:22,23 73:17,22 74:12 75:2,9,12 93:6 101:14 104:4,11,14, 15

**assist** 33:23 34:2,10 69:12,22

**assisted** 13:11,14 21:23,24 65:6 70:25

**assisting** 69:17

**assume** 26:8,14 39:9 49:17 60:13 85:23 86:6 98:23 99:2,6 100:1

**assumed** 53:23 57:14 83:2 85:14

**at-will** 55:22

**attorney** 7:1 38:7,13,17

**August** 34:13 52:12,19 53:5 57:14 85:14

**authority** 62:23

**auto** 23:15

**automatic** 23:22,25 24:23 27:6

**automatically** 24:1 28:3,14 85:4

**avoid** 94:4

**aware** 26:9,12 31:4 34:24 35:3 39:7,13 40:1,3,10 49:5 67:1 80:23,24 85:6 86:23 87:1 90:11,23 96:10, 12,15,19 97:3 99:17

**B**

**back** 11:15 35:14 48:16 58:15 59:15 61:20,24 73:19 78:17 81:16 82:22 87:25 88:24 91:15 93:21 96:22

JAMIE MALVEAUX
SEPTEMBER 29, 2025                          Individually & 30(b)(6)                          JOB NO. 2028526

**backfill** 71:24 92:19
93:4,23

**backfills** 92:6

**background** 8:9

**balances** 35:15,21 59:9
61:21

**bankrupt** 57:19 84:12

**base** 53:25

**based** 6:17 35:7,8 83:14
92:16

**basic** 88:6

**basically** 28:1 32:3,8
35:6 36:6 58:7 59:14 66:11
70:7 78:7,13 88:6,12,13,
17,21

**basing** 57:22 58:1

**basis** 36:1,2 86:10 97:7

**Bates** 29:22 87:9

**began** 11:12

**begin** 5:5

**beginning** 67:9

**begins** 92:10

**behalf** 5:13,18,21 9:13
21:10,14 33:17 96:25

**behavior** 45:5,7 64:5

**benefit** 18:1

**benefits** 12:11 16:23
17:25

**bet** 89:18

**Bianca** 64:22 70:1

**bigger** 44:2 82:2

**birthing** 34:20 36:23
39:19 44:17 101:2,17,21
104:2,9,22

**board** 66:13 69:2

**bona** 24:18 25:5

**books** 74:3

**Boyd** 21:23 65:19 70:22,
25

**break** 24:4,6,10 26:19,25
27:5,8,9,13 28:6,7,14,18

50:6 55:20 73:9 79:14 91:3

**breaks** 23:14 24:21
26:16 85:5

**bring** 61:20

**brought** 35:14

**bullet** 31:12,22

**business** 5:14 100:8,12

**busy** 26:9,12,15,17,19,23
89:18

**button** 86:14

## C

**calendar** 56:15,18 65:11
67:6

**California** 5:15 6:2

**call** 17:4,25 19:1 70:7
88:16,21

**called** 16:11 18:21 53:21
84:9 98:5

**calling** 68:13

**cancel** 75:2 101:13

**canceled** 73:22 74:12
104:11,18

**Cancellation** 73:18

**Candace** 90:14

**Candidates** 91:24

**capacity** 9:12

**care** 17:24 37:19 39:18
46:12 57:12 64:12 78:9
88:23 89:7,9 94:6,11

**Carl** 5:18 6:14,25 70:8,10
96:23 98:16

**Carol** 65:20

**case** 5:9,11 7:12,17 10:16
41:25 42:8 47:6 48:24 49:7
75:25 79:6,21 81:8,23
96:24 98:17 100:16,19

**Castillo** 92:18

**categorization** 20:20

**categorized** 99:13

**caused** 36:9 63:2

**cc'd** 89:5

**census** 25:17 58:7

**center** 34:20 36:23 39:19
44:17 51:25 52:18,20
66:12 77:2 101:2,17,22
102:8,9 104:2,9,22

**centers** 88:16

**central** 5:1,4 16:23 50:23
51:1 73:4,7 91:13,16
105:15,18 106:20,22

**centralized** 16:22,24

**CEO** 17:13 62:14,22,23,
25 63:20 64:2 66:1

**certified** 33:20

**CFO** 62:22 90:19

**change** 16:16 22:18
23:22 54:9 88:17

**changed** 52:18,24 53:17
54:9 60:16

**changing** 88:16

**charge** 27:9 77:12,13,15,
19,23 78:13

**check** 36:3

**checks** 66:20

**Cheney** 65:20

**Chief** 33:16 40:19 62:17,
18,19 65:1,2

**Chinda** 5:7 7:1 30:16,20,
24 31:1,5,21 34:18,24
35:18,19,22 36:25 37:7
39:22 40:1,4,8,12 41:7,11,
14,17 44:13,15 47:14,22
48:3,14 52:17 53:24 54:3
55:14,21 56:20 57:9,17
58:17 59:11 60:19 61:3
64:4 70:21 71:10,12 72:12
73:11 74:10,13,21,23 75:4
82:7 83:12 85:11,21 86:21
87:4 89:3 90:4,7,23 92:23
94:22 96:20 97:4,8 98:11,
14,25 99:18 100:23
102:13,22,25 103:12
104:8,20 106:17

**Chinda's** 28:23 35:16
45:13,17,21 46:7 49:2

56:13 58:2 71:6 79:3 81:23
82:18 83:22,25 84:19 85:1,
7 86:4 101:15

**chose** 49:22 61:5

**circumstance** 7:16
26:22 27:16 35:11 63:13

**circumstances** 7:9
14:1 49:19 62:20 92:25

**circumstantial** 27:11

**CIV** 28:23

**claims** 76:12,13 82:6
100:22

**clarification** 90:20

**clarify** 45:2,4 51:7 81:6
91:19 105:5 106:8

**classification** 20:16,
25 21:4

**classified** 95:6

**cleanup** 89:15,16

**clear** 96:11

**clinical** 78:11

**clock** 23:2,6,9,12,13

**clocking** 22:24 23:4

**clocks** 22:22 23:8

**CNO** 62:21 64:25 90:19

**code** 26:24 27:4,5

**coded** 94:19

**codes** 27:13 79:13

**collaboration** 25:21

**colleagues** 18:24

**command** 66:12

**committed** 66:4

**communicate** 65:24

**communicated** 57:8

**company** 7:19 21:10,14
33:17 48:24 49:5 55:9
76:14,15 84:7 102:2

**compensation** 79:3

**complained** 90:4,7,23

**complaint** 90:11

**complaints** 13:7 82:6

**complete** 8:25 24:5,12, 14 28:3,10 76:22 82:13,18, 20

**completed** 28:19 35:13

**completely** 9:6

**compliance** 20:7,13 86:21 100:8,13

**components** 82:24

**computers** 66:13

**concept** 98:8

**concern** 7:13 31:17 35:8 62:25

**concerns** 34:19

**conclude** 103:25

**concluded** 77:4 106:21

**concludes** 106:15

**conclusion** 77:10

**conduct** 34:20 36:22 37:3 39:8,12 44:16 45:21 79:14 101:2,6,21 103:20

**confirms** 90:10,22

**consist** 28:12

**consists** 28:13

**constitutes** 26:23

**contact** 59:18 102:19

**contacted** 49:13

**continue** 15:8 19:9 95:4

**continued** 19:3,22,23 55:14

**continuity** 18:19

**contract** 41:18 54:1 55:7,18 56:13,16,20,22 57:1,8 58:2 61:5 71:14,15, 16,19 72:10,15,16 83:15 85:14 88:9

**contracts** 53:23 56:9, 11,12

**control** 63:24

**controls** 25:20

**conversation** 9:22 10:1 33:25 57:17 58:1 63:19 104:5

**conversations** 57:11 103:22

**coordination** 62:13

**copies** 69:21

**copy** 65:14

**core** 71:25 92:9 93:4,19, 24

**corporate** 5:6 8:1,3 11:21 12:9,22,24 16:18,20 17:3,5,10,14,18,21 18:11 21:22 64:9 65:18 68:5 69:24 70:2,18 79:13 106:16

**correct** 8:19 9:13 14:14 15:5 20:21 21:5,11,14 22:19,20 23:17,18,20,21, 24 24:13,16 25:24 31:24 33:18,21 34:21,22 37:2,9 38:3 41:15 44:14,22,24 46:17 49:3,4 53:25 54:5,7 55:19 57:24 58:3,18 60:18 62:7 63:3 67:23 70:22 72:10,20 74:12,15 75:1 77:10,11,21 80:9 82:8,9 84:2,21 86:19 89:13 90:9, 25 92:12,13 101:18 102:1 103:10 104:18 106:11,12

**cost** 98:20

**costs** 100:8,13

**counsel** 5:16,23 6:16 8:18 42:7 71:9 100:12 105:19

**counseled** 64:4

**counseling** 74:24

**Counselor** 42:12

**Counsels** 6:11

**Counterclaims** 97:16

**countersued** 97:4 98:3

**countersuing** 96:25

**countersuit** 97:5,8

**couple** 61:20 71:18 104:19

**court** 5:10,24 6:1,10 10:14 11:1 42:11 47:24 50:11,12 56:2 105:19,21, 24 106:2,7

**cover** 61:22

**coworkers** 32:7

**CQO** 62:21

**crafting** 42:5

**crazy** 57:19 70:11

**create** 60:14

**created** 60:10

**cursed** 40:8

**customer** 32:1 99:11

**customers** 32:7

---

**D**

**Dallas** 17:7,10

**damages** 98:5,8,10 100:7

**data** 79:25

**date** 9:20 28:5 49:25 55:6 60:11 65:11 73:15 77:9 93:23

**dates** 52:23 60:13 73:14

**day** 17:15 49:23

**day-to-day** 12:5

**days** 61:20 64:15 66:18 71:18 104:19

**deadlines** 12:24

**deal** 68:22

**dealt** 18:12

**Deb** 64:25 65:2,13 68:2,11

**decide** 61:17 65:24

**decided** 41:23 58:7 66:19 71:13 75:2 79:20 101:12

**decides** 62:11 63:4

**decision** 40:24 41:18 63:12,25 66:22 104:4

**decision-making** 70:3

**deduct** 85:4

**deducted** 23:15 24:2 28:14

**deduction** 23:22,25 28:3

**deemed** 14:5

**Defendant** 32:24 75:15

**Defendant's** 97:15

**defending** 99:1

**Defense** 97:16

**defenses** 100:15,19

**delayed** 65:8

**delegated** 77:14

**delivery** 77:1

**Demonstrates** 31:12

**department** 13:16 16:21,23,24 17:3,5,10,25 18:3 68:5,8 70:16

**departments** 12:10 16:19 84:13

**departure** 49:20 93:1

**depend** 27:15 61:13

**depending** 62:20 63:20

**depends** 26:22 27:7 35:11 61:9 63:1,9,13,14,21 64:3 86:16

**deploy** 23:4

**deployed** 23:8

**deposition** 5:5,12 7:7, 10 8:6,9,13 9:15,24 10:6,9, 19,24 28:22,24 29:18 39:7 42:3,22 48:17 51:10 54:16 59:22 75:14 87:3 89:21 90:15 91:22 97:14 102:5, 14 106:15

**depositions** 9:3,9

**depth** 10:20 26:2 45:6 81:13 97:24

**description** 30:12,19 32:18 45:20

**descriptions** 12:25 13:1,4

**designated** 100:15

**designee** 53:15

**details** 45:10 81:14 97:1

**determine** 26:1 92:22

**devote** 98:18

**Diana** 6:2

**diff** 95:13

**difference** 52:8 74:1

**differences** 15:25

**difficult** 47:24

**difficulties** 8:14

**diffs** 54:13

**diligently** 68:3

**directly** 41:4

**director** 11:22 12:1 17:14 40:17 46:2 66:14

**disbanded** 52:13

**disbanding** 55:4

**disciplinary** 59:24 61:7,11 74:22

**discipline** 13:15,17,23 14:2,5,16,25 41:15 61:24

**disciplined** 13:22 61:3, 4

**disciplining** 13:12

**discovery** 33:1 75:17, 24

**discriminated** 7:21

**discrimination** 7:18

**discuss** 11:15 29:16 42:19 91:4

**discussed** 90:15

**dispute** 81:10 90:4

**disputes** 80:25

**disrupted** 34:20 94:12

**disruption** 35:8 37:11, 16 39:14,17,21 40:6,15,21 44:18 45:9 46:12 71:13

75:1 99:8 101:1,17 103:7 104:12 105:3

**disruptive** 36:22 37:3 39:8,12 44:16 45:7,21 63:24 64:5 101:21

**dissatisfaction** 39:15

**distinction** 74:17

**District** 5:10

**Division** 5:11

**docking** 68:25

**document** 18:7 29:7,15, 25 34:8 35:1 38:2 48:18 57:25 60:10 76:4,7 78:21 88:18 98:2

**documentation** 9:18 10:7 11:1 37:24 39:3 46:23 47:17 97:9 104:8

**documented** 14:11 74:22

**documents** 10:5,9,14, 15 38:8,10,17 48:24 79:1, 9,12 81:7,23 82:5 83:12,17 84:14 85:7 86:20,24 98:17 101:15,19

**dollar** 98:21 99:9,25

**door** 94:9

**downloaded** 23:7

**draft** 12:13

**drive** 70:3

**due** 17:20 34:19 36:7,22 66:6 71:13 80:25

**duly** 6:21

**Dunning** 65:25

**duties** 12:2 30:23 31:1 77:19,23 79:3

**duty** 31:4

_____

**E**

_____

**earlier** 59:6 72:11 83:15 85:10 90:15 94:14 101:10

**early** 57:6 61:6 104:18

**ears** 78:4

**economic** 98:13,20,24 99:3,4,7,13,19 100:10,22

**electronic** 22:24 106:3

**elevated** 93:3

**eligible** 35:19 59:11

**Elizabeth** 8:2

**email** 38:11,12,13,20,21 39:2,5 40:11,25 41:8 42:18,23 43:6,17,22 44:23, 24 45:3,6,11 46:1,6,8,16, 18,19 47:1,12 48:5,14 49:2,16 66:2 76:19 82:10 85:21,25 86:4,9 87:4,8,15, 18 88:8 89:1,11,22 90:3, 18,22 91:23 92:6,16,22 101:23,24

**emails** 10:18,21 38:5 46:21,25 47:5,12,19 48:13 49:1,6,9,13,18 86:12,15 87:15 101:11

**emergent** 78:2

**Emily** 37:23 38:12 39:2,7, 11 40:11,15 41:4 43:6,17, 22 44:23 101:23 102:2,6, 12,19,20 103:8,11,23 104:1

**employed** 52:14 60:25 71:21 72:3 79:23 85:11 95:24

**employee** 7:19 12:7 13:6,16,22 14:21,22 15:3, 14 16:13 20:20 22:22 23:12 24:3 41:15 58:13 88:14 90:16 96:5

**employee's** 14:2

**employees** 13:9,13,18 21:5 22:19 31:14 37:13 60:23,25 71:25 76:15 82:8 92:18 93:5,16,19,24 95:8

**employer** 7:22

**employers** 7:12

**employment** 10:12 13:25 15:13 41:24 55:22 71:19 72:15 73:12,24 74:2, 9 77:3,10 79:2,25 83:2,4,6 84:8 85:15 92:19

**end** 28:19 31:16 35:24 39:12,16 61:5 67:5,8,10 71:15 72:14,17 88:24 89:11 98:5 104:4

**ended** 57:3,6 71:14,17 72:10 88:9

**ends** 94:10

**ensure** 20:20,22 24:8,17, 25 49:6 67:3,12 68:3 78:5 94:5,11

**ensuring** 12:5,21,22,23 18:7 64:15 66:5,9

**enter** 23:12

**escalate** 64:1 81:20

**escalated** 40:17,18

**escalates** 63:10,19

**escalation** 63:14

**establish** 74:16

**evidencing** 82:6

**exact** 49:25 93:23

**EXAMINATION** 6:23

**examined** 6:21

**exception** 24:22

**exchange** 89:11

**excuse** 98:15

**Executive** 62:19

**exempt** 20:16 23:2

**exemption** 20:25 21:4

**exhibit** 28:22,23 29:10, 14,18,19,22 30:7,9,11,14, 15 31:5,20 32:23,24 33:6, 10,12 38:24 42:21,23 43:4, 9,11,14,16,22 48:16,19 51:9,11,20,22 54:10,15,17, 24 55:2 59:21,23 60:4,6 72:4 73:20 75:14,15,21,23 76:2,4 78:17 87:2,4,12 88:1,3 89:20,22 90:2,10 91:22,23 92:3,5 97:13,15, 22 98:1 100:14

**expect** 29:16

**expectation** 8:11 24:7, 23 25:3 32:20 57:23 58:8

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

**expected** 24:14 26:25

**expedited** 106:4

**expense** 98:25

**expert** 70:23 99:15 100:5

**experts** 18:25 19:2

**expire** 56:14

**external** 94:5,10

**eyes** 78:4

---

**F**

---

**Facebook** 99:24

**fact** 57:25

**factors** 95:14

**failed** 76:15

**failure** 82:7 86:25 90:24

**fair** 12:6 20:6,12 21:19 22:5 40:5 67:1 96:3 99:1

**familiar** 11:7 13:3 29:8, 11 30:1,9,17,23 33:8,10 43:14 60:4 87:12 90:2 92:3 95:16,22,23

**familiarity** 98:7

**Family** 34:20 36:23 101:1,17,21 104:2,9,21

**February** 51:25 52:2 83:14 85:12

**Fed** 28:23

**felt** 7:20

**fide** 24:18 25:5

**figure** 56:19 68:22 98:21 99:10,25

**file** 10:13 45:13,17,22 83:2,6 85:8 101:16

**Filed** 97:17

**fill** 25:4 28:16

**filled** 18:8

**fills** 25:7

**final** 13:24 15:2,9,11 17:16 62:25 68:12

**Financial** 62:18 65:2

**find** 42:18 65:9

**fine** 50:13 56:19 70:9 106:6

**finish** 99:6

**finished** 44:9

**firing** 12:6

**Fitz** 5:18 6:14,24 7:1 29:2, 21 32:15 33:4 42:7,10,16, 17 43:1 50:5,9,14,18 51:2, 15 54:21 60:2 73:8 75:19 87:7 90:1 91:2,6,17 92:1 97:19 105:8,12,20,22 106:1,9,12

**fix** 18:3 70:4,13

**fixed** 18:5

**flew** 64:18,21,22 69:23 70:2,19

**flipping** 38:4

**floor** 77:13

**Flores** 6:2

**flows** 78:6

**FLSA** 21:8 71:22 86:20

**flying** 64:9

**FMLA** 17:22,23 18:21,22

**focus** 76:7

**follow** 61:2

**follow-up** 89:1

**forever** 72:3

**form** 24:5,6,12,15 27:23 28:4,5,10,15,17 88:13

**formal** 71:11 74:25 77:20

**format** 87:22

**forms** 27:20

**forward** 76:6

**foul** 37:18

**found** 16:8,11 61:23 100:25

**Franciscan** 7:24 8:4

**Frank** 5:21

**frankness** 98:15

**Friday** 37:5 45:9

**front** 32:16 36:5 93:10

**full** 76:22 82:13 94:24

**full-time** 20:21 21:4 75:7 88:16 93:5

**fully** 68:9

**funneled** 19:11

**fuzzy** 97:1

---

**G**

---

**G-H-A-F** 5:21

**Gabrielle** 65:19

**gave** 13:19

**general** 7:16 98:7

**generally** 11:8 19:19

**Ghafoor** 5:20 6:16 9:19, 22,23 33:21 42:9,14 69:7 70:5,20 83:7 91:8 105:11 106:2,5,10

**Ghafoor's** 69:17

**give** 6:7 8:25 13:21 14:4 26:2 42:20 80:3 93:22

**goal** 64:14 71:24 93:3,15, 23

**good** 5:3 6:1,25 21:8 34:6,14 39:9,19 50:18 67:19 103:19

**granted** 13:10

**great** 8:18 9:11 44:10 50:8,9,18

**ground** 9:9

**Group** 8:3

**guess** 30:17 73:12

**guidance** 79:2

**guidelines** 79:15

**guilty** 61:23

---

**H**

---

**hand** 6:5 37:19 63:15 70:14

**handbooks** 79:12

**handle** 61:16 78:3

**handled** 23:14 58:5 68:6 71:7

**handling** 81:18

**happen** 27:18 36:8

**happened** 18:16 37:10 39:3 40:14 46:11 63:14 64:17 65:8 66:25 94:22,24 99:8 102:22,23 103:14 104:2

**happening** 63:10 64:8 68:2 69:16 81:19

**happy** 31:8 87:10

**hard** 33:13

**harm** 99:17,23 100:1,10

**head** 96:21

**Health** 7:25 8:4

**healthcare** 11:22 13:2 16:10,12 25:19 52:17 57:19

**heard** 99:8

**hearing** 16:7

**helped** 64:19 65:3,4 69:7

**hierarchy** 14:16 15:12, 19,22

**high** 25:17

**higher** 13:23

**higher-rate** 93:16

**hire** 83:14

**hiring** 12:6 82:18,20,24 83:12

**Holly** 5:13

**home** 58:8,17,19

**honest** 8:25 64:7 84:15

**honestly** 8:12 93:15 94:23 101:4

**hospital** 6:19 12:4 17:14
25:22 26:22 31:13 52:15
62:19 64:24 77:8

**hospitals** 23:8

**hour** 10:2 50:6 53:25 54:4
55:14 100:20

**hourly** 22:21 53:25 96:4

**hours** 23:15 24:1,8 28:2
58:12 79:3 89:22

**housing** 53:9

**Houston** 5:10 6:15,18

**HR** 10:13 11:11,22 17:14
18:2,14,16,19 65:4 70:22
80:23 88:23 90:11,12,22
103:17

**HRIS** 12:10 16:23 18:3,20
19:1,2

**HSA** 5:6,7,22 6:17 9:13
10:15 11:10,13 15:23 16:3,
11,13,18 19:6,20 20:6,12,
15 21:3,22 23:8,19,23,25
25:20,21,23,25 26:4,7,9,12
28:24 32:24 44:12,20 46:5
47:5 48:12 52:3,7 53:17,18
54:6,10,15,17 60:16 61:2
68:8 69:25 70:21 71:9
74:16 75:15 76:22 77:8
79:20 80:1,9,10,12,17,21
82:25 83:12,25 84:3,19
85:1,4,8 86:22 87:8 90:7,
12,22 92:14 93:11,13,18
94:1 95:8 96:7,12,16,20,25
97:4 98:10,13,24 99:17
100:9 101:6 106:17

**HSA's** 11:7 21:13 24:11
25:25 81:22 82:7 97:8
100:19,21

**HSO's** 82:13

**human** 7:12 11:9 12:1,4,
9,18 13:14 14:7,9 15:10
16:20 20:19 63:19 64:1
88:7

**human-resource**
7:17

**hundred** 77:15

**I**

**idea** 67:18 83:16,19

**identification** 29:1,20
33:3 42:25 51:14 54:20
60:1 75:18 87:6 89:24
91:25 97:18

**identified** 29:14 54:9
68:18 100:10

**identify** 5:16,24 7:9
68:21

**identifying** 34:3 79:1,8

**Imani** 5:7 7:1 30:16 40:21
41:7,8 43:20 47:14,21
48:3,14 49:2 52:16,20
79:23 87:4 92:17 106:17

**impact** 67:19,20,21
68:21

**implement** 19:19,22

**important** 70:13

**imposed** 13:17

**Improvement** 75:3,5,
11

**in-depth** 36:12 101:4

**incentive** 53:4,5,16,19,
22

**incident** 38:1 101:7
104:9,21

**include** 12:20,25 13:6,9,
12 83:18

**included** 10:7 12:21
76:19

**includes** 33:15 62:17

**including** 12:5 64:17
70:19,21 77:24

**increased** 100:8,13

**indicating** 91:8 101:16
104:21

**individual** 9:12 25:11

**individually** 5:6 6:20
66:16 69:4 70:14 106:16

**individuals** 13:18 22:4
34:3 67:22 92:11,14 96:8,

17

**influence** 9:4

**information** 34:23
59:19 92:21 93:9

**infrastructure** 18:18

**inhibit** 9:5

**initial** 53:11 83:14

**initially** 23:3

**initiatives** 32:2

**inquiries** 76:13

**ins** 81:17 97:23

**integrated** 68:9

**intends** 96:16

**intent** 72:2 99:6

**interchangeably**
73:24

**interface** 12:9 17:15

**interfaced** 17:7

**internal** 17:20 19:15
30:13 52:5,15 53:15 54:1
57:13 71:20,24 75:7,11
92:8 93:2,4,18,24 94:8
95:6 101:13 104:13,16

**internally** 16:25 17:2
18:21 52:14 57:14 70:18

**interpretation** 99:16

**interrogatories** 33:2,
13 75:17 76:3,6

**interrogatory** 34:3,11,
16 36:24 44:12 72:5 73:20
76:2,10,23 78:18

**interrupted** 26:18 27:6,
12

**interrupting** 26:15

**interview** 41:2

**interviews** 45:24

**investigation** 35:7,9,
13 61:9 101:2,4,7,16,20
103:20

**investigations** 76:13

**involve** 62:21

**involved** 14:2 21:19
22:2,5 34:6 68:11,23 98:22

**involving** 76:14

**isolved** 18:21,25 20:23
22:15 23:5,6,10 36:9,11
68:10 69:25 70:24 71:1

**issue** 18:1,2,4 25:9,11,14
36:14 63:1,4 66:4 68:2
69:18 70:4,6 76:20

**issues** 17:4,9 18:10
80:24 81:22

**items** 54:8

**J**

**J-A-I-M-E** 7:5

**Jamie** 5:5,21 6:17,20 7:4
106:15

**January** 11:24

**job** 12:2,25 13:1,3 29:19
30:12,19 31:21 32:18
57:23 79:3 80:8 94:10

**join** 11:22

**joined** 11:24,25

**Jones** 65:2,13 68:3,12

**Joseph** 5:7,8,22 6:17
9:13 11:16,17,23,24 15:20,
22 16:8 17:11 19:20 20:12,
15 23:17,20 28:25 32:24
51:24 52:3,18,20 60:8,11
62:9,12 75:9,15 77:2,7
102:8 106:17,18

**Joseph's** 59:23 76:22

**K**

**key** 78:3,7

**keying** 58:12

**keywords** 31:23,25

**kind** 37:19 69:1 77:25
79:15

**kitchen** 68:17

**knew** 67:2,16 68:1 82:2

JAMIE MALVEAUX
SEPTEMBER 29, 2025                                    Individually & 30(b)(6)                                    JOB NO. 2028526

**knock** 94:9

**knowing** 58:14

**knowledge** 20:9 21:8
34:7,14 39:10 81:24

**Kronos** 18:2 20:23 22:15
36:9 67:2 95:16,18,19 96:1

**Kronos's** 86:25

---

**L**

**label** 87:9

**labeled** 29:22

**labor** 20:6,12 21:19 22:5
77:1

**Lady** 7:25 8:2,4

**Lake** 8:2

**Landclose** 65:1

**language** 37:18 72:20

**laptops** 68:24

**lasted** 71:23 93:20

**lasts** 61:19

**late** 65:10,14 66:7 67:15
68:14

**lawsuit** 7:19 10:10

**lawsuits** 76:14

**leader** 14:3 28:8 63:24
77:25 90:14

**leaders** 12:23 15:22,25
68:23 89:5 104:5

**leadership** 12:3 17:13
19:13 24:3 62:14,15,17
63:5,6,16 65:24 66:6 67:25
68:1,11,20 78:4 90:18,23
104:25

**learn** 16:2

**leave** 12:11 16:24 18:22
34:19,25 35:4,5,10,16
36:22 37:1,14,15 40:22
41:12 44:13,16 46:7,11,13
58:19,21,23,24 59:3,6,8,
16,17 61:5,7,12,14,17,19
62:2,4,9,11,21 63:2,12,17
64:1 71:7 102:13 104:23
105:2

**leaving** 88:22

**ledger** 67:14 68:12,13

**left** 92:19

**legal** 5:13 70:5 97:25
100:8,11,13

**lesser** 14:3

**letter** 41:20,21,22,25
42:2,7,15 55:21 56:3,7
72:12,16,19,21 73:10,15

**letting** 66:3,8

**level** 13:23 14:18,25
15:12 16:20 55:11 62:16

**liaison** 78:10

**limitation** 86:11

**limited** 12:17 86:10

**list** 79:18

**listed** 18:10 92:12 99:7

**lists** 20:20

**litigation** 45:18 85:16
96:24 99:1

**lived** 69:2

**lives** 64:22

**LLC** 5:7,8,22 9:13 28:25
106:17,18

**LLC's** 32:25 75:16

**local** 12:23 16:20 17:13
55:4,7,8,10,12

**locally** 36:11 83:5

**locate** 6:12

**located** 6:15 17:6

**location** 6:12

**locations** 95:21

**long** 10:1 50:10 71:23
93:11,13,20 103:17 104:15

**longer** 16:22,23,24 17:3
22:24 41:23 53:9 74:3
102:8

**looked** 38:2 44:11 46:13
47:15,16 48:4,7 94:23

**loop** 63:5

**Lori** 40:17 43:17 46:2,6,15
47:19 48:4 49:16,19 101:8

**Los** 5:15

**lose** 20:2

**losing** 67:2 81:15

**loss** 98:13,18,21,24 99:3,
7,13,19 100:8,10,13,22

**losses** 99:4

**lot** 25:18 64:8 65:5 69:16,
20 95:13

**loud** 37:17 39:18 40:6

**loudly** 103:9

**Louis** 64:21

**low** 58:7

**lowest** 14:15

**lunch** 24:6,12,15 25:2,4,8
27:8,9 28:3,4,14

---

**M**

**M-A-L-V-E-A-U-X** 7:5

**made** 58:13 63:12 66:22
71:2 76:15 104:4

**mail** 41:21

**mailed** 41:20 104:24

**mailing** 42:5

**main** 64:11

**maintain** 18:19

**maintains** 44:20

**make** 19:7,16 32:10 43:9
44:2 47:24 63:21,25 64:17
76:8 78:8 82:2

**making** 64:11 69:21

**Malveaux** 5:5,21 6:17,
20,25 7:4,5,6 29:3,10,24
30:6 42:20 43:3 50:14
51:3,19 91:18 105:9
106:16

**Manning** 37:23 39:2,8,
11 40:15 41:4 43:22 44:24
102:2,12,20 103:8,11,23
104:1

**Mansaray** 93:7

**Mansaray's** 93:1

**manual** 36:3,10 66:15
67:13

**manually** 23:4

**March** 47:18

**Maria** 92:18

**mark** 38:23 54:15 87:2,21
89:20

**marked** 28:21,25 29:20
32:23 33:2 42:24 43:4,8
48:19 51:13 54:19 60:1
72:5 75:17 76:1 87:5 89:23
91:21,24 97:17

**marking** 42:21 51:9
59:21 75:14 97:13

**mass** 66:2

**Massachusetts** 17:8

**math** 56:16

**matter** 5:7 18:25 19:2
70:23 99:14 100:5

**meal** 23:14 24:10,18,21
25:6 26:16,19,25 27:3,5,
13,20,22 28:6,7,10,18
79:14 85:5

**meaning** 17:13 78:1
100:5

**means** 74:2 84:23 98:8

**meant** 67:10

**Medical** 51:25 52:18,20
77:2 102:8,9

**medication** 9:5

**meet** 62:24

**meeting** 66:6

**member** 12:3 15:10
62:16 63:6,16 65:4 70:23
90:12

**members** 90:11 92:9

**memorandum** 66:2,8

**memorializing** 82:5

**memory** 46:10

**mentioned** 14:13 27:19

---

JAMIE MALVEAUX
SEPTEMBER 29, 2025                          Individually & 30(b)(6)                          JOB NO. 2028526

58:23,25 59:1

**met** 65:23 68:19 100:20

**Metrick** 5:13

**Michelle** 33:15 40:18,20
57:12 64:25

**middle** 43:21 56:5

**Milo** 92:17,23,25 93:7

**mind** 14:12 30:2 31:7
93:2

**Mindee** 76:25

**minimum** 24:24 90:5,8,
24

**minister** 6:5

**minutes** 24:2,25 50:11,
16 85:4

**missed** 24:12,15 25:4,6
27:20,22 28:6,7,10,18

**missed-punch** 24:5

**misses** 25:2

**missing** 24:6,21 61:15
89:22

**mission** 31:13

**Missionaries** 7:24 8:4

**modified** 52:7

**moment** 9:21 36:6,20
38:5 39:5 42:20 44:11
48:11 63:15 82:11 94:25
95:25 96:10,19 97:11
102:18 103:5

**Monday** 66:18 67:12

**monitors** 26:4,7

**morning** 5:3 6:1,25
29:16 64:21 68:20 69:11
72:11 78:22 94:14

---

**N**

**named** 10:8

**names** 34:8 37:25 92:22,
23

**narcotic** 61:15,17

**National** 30:22 51:11,23
52:11,12 53:14 54:17
79:24 83:1 85:12

**nationwide** 95:19

**nature** 37:16 95:11

**nearby** 37:13

**necessarily** 25:13
34:13

**needed** 17:19 18:5,7,22
19:14 35:9 58:16 69:4,19,
22 92:19,24 94:11 99:11

**Network** 30:22 51:12,23
52:11,13 53:14 54:18
79:25 83:1 85:12

**newly** 65:3

**news** 99:21,22

**night** 37:5,7,8 39:4 45:9,
10 65:10,16 68:15

**nonexempt** 20:16

**noon** 91:2

**notes** 38:17 103:19,22

**notice** 15:14 28:24 73:17

**noticed** 65:17

**notices** 76:13 82:6

**November** 37:6 56:5,6,
23 57:6 58:3,17 59:12
67:17 68:1,24,25 69:6,9,
10,15,24 72:18 73:15
94:24 95:9 96:5,14,18
102:24 103:13,23

**Nuchurch** 6:2

**number** 5:11 6:3 23:13
34:4,11,16 53:8 72:6 76:10
79:11 80:4 81:25 82:4,16
83:20 84:10,17 86:18 88:7

**nurse** 24:14 26:18,24
27:1,3,8,10,12 77:12,14,
15,19,23 78:13

**nurses** 24:11,17 26:16,
20 27:2,19 28:9,16 37:22
40:7 61:16 78:8 103:3

**nursing** 33:16 37:12
40:19 62:17

---

**O**

**oath** 6:5 8:11 51:4

**objections** 73:2 91:11

**observed** 39:8

**obtain** 84:4

**occur** 35:7 37:3 73:14
74:23

**occurred** 16:11 18:15
28:7 34:5 37:24 40:25
43:18 44:19 45:7 89:11
96:13

**occurring** 25:17 39:25
81:13,21 102:18

**October** 11:12 16:14
18:13,15,17 66:23 67:9,20
84:24 85:2 86:25

**offense** 14:3

**Officer** 33:16 40:19
62:18,19 65:1,2

**offices** 69:2

**official** 106:14

**on-call** 54:12,13,25
55:15 58:5,10,12,13,14,16,
20 59:11,13,15,20

**ongoing** 25:3

**open** 87:17

**operational** 12:5

**opportunities** 17:21

**opportunity** 11:20 30:6
51:19 73:10 93:8 97:21

**order** 106:10

**ordered** 105:22

**orders** 106:9,10

**organization** 49:22

**Ortega** 57:12,16,23

**other's** 68:16

**outage** 95:16,18,19

**Outlook** 86:14 87:18

**outs** 81:17 97:23

---

**outwardly** 95:8

**overhead** 27:4

**overpaid** 35:22 94:17
95:1,9 96:5,9,17

**overpayment** 35:25
94:15,20 96:13,17

**overpayments** 95:11
96:8

**overtime** 76:16 82:7

**owned** 11:17 15:20,23
17:10

**owner** 16:8 23:16

---

**P**

**p.m.** 66:7 91:14,16
105:15,16,18 106:20,21

**packet** 82:19,20,24
83:12

**pages** 38:4

**paid** 35:10,15,16,18,19,
20,21 59:8 61:21 64:11,16
66:10 67:22 70:11,21 90:5,
8 94:18,19 95:12 103:16

**paper** 22:25 23:4 66:22,
25 68:9 85:5

**par** 88:10,11,21 89:3

**paragraph** 55:5

**part** 9:18 10:8,10,25 21:25
27:4 30:21 53:7,9,20,22
65:20 71:3 79:24 85:16,18

**partner** 18:3,4 24:3

**partnered** 13:19 18:14

**partnering** 70:25

**partners** 64:23 65:19
104:6

**party** 71:22 99:3

**pass** 105:8

**passes** 38:17

**past** 18:6

**patient** 26:24 27:13
37:19 39:18 46:12 94:11

JAMIE MALVEAUX
SEPTEMBER 29, 2025                    Individually & 30(b)(6)                    JOB NO. 2028526

patient-nurse 26:7

patient-staff 26:5

patients 27:10 31:14
32:7 37:13 78:9 94:5 99:7

pay 18:6 24:11 53:4,16,
22,25 54:3 55:10,15 58:5
59:11 67:5,8,9,10,12 76:16
82:7 89:23 90:24

paycheck 10:13 36:14
41:9 68:12 99:22

paychecks 35:23 66:16
69:5

payment 36:7 58:13
59:2,4,5 94:19

payments 65:8 71:1

payroll 12:10,24 18:6,8
36:11 57:20 64:23 65:14,
21 66:4,20 67:11,14,15
68:4,7,14 83:22 84:1,10

pays 53:19

peaceful 24:25

peers 62:24

penalty 33:21 35:14

Pending 91:23

people 17:8 24:23 25:4
32:3,5 36:10 59:14 64:10
65:5,17 70:10 77:21,24
98:22 103:15

perceiving 74:6

percent 77:15

perception 99:15

perform 31:1,6 77:24
80:8

Performance 59:24
75:3,5,10

Performance/
disciplinary 60:8

performed 52:18 71:8
77:18 86:3

period 18:6 19:17,21,25
20:5,17 21:20 22:8 24:18
25:3 28:10 67:5,8,9,10,12
80:21 84:20,23 85:2,8

perjury 33:21

person 28:6 35:13 61:20
70:14 74:3 78:3,5 88:22

personal 48:13 86:1
88:12,17

personally 9:4

personnel 45:13,17,22
64:9,18,23 85:8 101:15

phase 93:13

phased 93:18

phone 64:23,24

phonetic 65:1,20 66:1

physical 39:22,25

Physician 8:3

Physicians 8:2

place 5:12 63:16,25

plaintiff 5:19 6:15 7:1
72:8 73:20

Plaintiff's 33:1 75:16

plan 66:9 75:3,5,11

platform 22:15,18 23:5

play-by-play 65:7

player 78:7

pod 78:1

point 31:22 45:15 49:8
53:19 66:21 67:24

policies 10:23,25 11:2,7
12:13,15,20,22 14:10 19:3,
5,20,24 20:3,13 21:13,20
22:6,9,13 35:12 58:23,24
74:16 79:13,18,20 80:7,17,
20,23,24 81:7

policy 11:3,5 12:6 14:21
19:16 20:10 21:9 23:23,25
24:11 25:12 28:2,13 58:21,
22 59:1,7,24 60:8,9,17,19,
22 61:1,2 62:2,3,6,8 79:2
80:4,10,11,16

Port 6:18 102:9

position 19:10 88:19

positions 17:19 19:13,
14 92:11

post 99:24

preferable 50:17

preference 50:15

preparation 33:23 39:6
42:3 102:4

prepare 9:15 10:6,18,23
21:13 29:13 100:18 102:14

prepared 48:23 88:2
89:2 100:21 102:21

pretty 103:19,25

previously 9:17 27:19
48:19 72:5 76:1 78:18

primarily 17:7

primary 64:14

principal 30:23 31:1,4

prior 7:9 45:2 60:11

priorities 102:17

priority 64:11 103:16

PRN 20:21 21:5 88:16

probation 14:4

problem 65:9 67:1

procedure 12:7 14:24
19:12 28:13 62:4

procedures 19:4,5
79:13

proceed 44:1

proceedings 106:21

process 18:21 19:10
66:11,19 67:14 71:2,8

processing 12:24 18:9
67:11

produce 79:21 81:23

produced 41:25 42:8,15
45:17 49:6 79:6 82:19,21
85:1 86:25 87:8,22

producing 79:9

production 78:19 82:14

programs 79:12

prompt 38:14

prone 26:15,17

proper 76:16

protocol 79:2

protocols 79:14

provide 32:6 34:23
40:23 51:24 70:5 76:15
98:16

provided 27:20 71:12
74:21,24,25 75:25 79:10,
22 80:5 83:3,6,7,9,19
85:16 100:24 104:25

providing 32:9 34:25

PTO 35:18 36:6 94:15,17
95:1,7

pull 38:23

punch 27:20,23

punches 25:4,8

purchased 23:19

purposes 11:12 56:2

put 49:11,12 61:15 98:21
99:9

Pyxis 61:15,16

---

Q

Quality 62:18 65:1

quarter 11:23

question 8:16 9:2 14:12
17:25 26:2 29:7,25 30:18
33:7 38:7,19 43:6,8 51:17
54:11,23 71:10 73:10
74:22 80:22 81:6,10 86:6
87:11 90:21 94:21 95:7
96:5 98:1

questioning 74:6

questions 9:8 33:17
38:8,14,15,18 74:5 76:7
82:22 84:23 88:2 98:1
102:22

quote 97:10

---

R

radiology 26:21

JAMIE MALVEAUX
SEPTEMBER 29, 2025                Individually & 30(b)(6)                JOB NO. 2028526

**raise** 6:4

**raised** 40:4

**rate** 54:1 93:3

**ratios** 26:5,7

**read** 21:9,17 43:5 82:3

**Reading** 29:9 33:9 51:18 97:23

**readout** 106:14

**ready** 44:1

**reason** 8:24 25:5 36:25 44:12,20 56:24,25 59:10, 17 71:12 74:23 96:4 97:6 102:12 105:1

**reasons** 28:5,7 74:24

**Reba** 21:24 65:19

**recall** 16:1 20:10,18,21 21:2,9 22:7 34:14 35:2 37:4,17,18 38:11 40:16 42:14 45:8,23 47:13 49:21 50:4 54:12 57:10,18 62:10 78:15 103:13,24

**receive** 15:14 55:14 84:10 94:18

**received** 36:6 38:1 46:19 53:25 56:20 65:13 68:12 81:8 94:19 104:20

**receives** 14:22 15:3 66:5

**receiving** 39:12,16

**recently** 23:8 45:15 46:24

**recess** 50:24 73:5 91:14 105:16

**recollection** 55:13

**recommendation** 13:20,21 63:21

**recommendations** 17:16

**reconciliation** 10:13 35:23,24 36:2 94:24

**record** 5:4 7:3 9:18 29:22 43:10 50:5,21,22 51:1 72:25 73:2,3,7 76:1 84:22 85:15 91:4,7,11,12,16

96:12 105:10,14,18 106:19

**recording** 82:5

**records** 20:22 56:25 83:22 84:1,10 85:19 88:23 93:22

**recruited** 11:21

**recruiter** 11:21 57:11

**refer** 73:19

**reference** 43:7 62:5

**referenced** 59:7

**referencing** 19:23 38:20 79:1

**referring** 74:8

**refrain** 38:16

**refresh** 55:13

**register** 65:14 67:15 68:14,17

**regular** 75:6 105:25 106:3,5

**rehired** 65:4

**reimbursement** 96:7

**related** 7:12,18 11:4 39:3 49:10,14 81:18 83:12 86:20,24 96:25 98:17 100:1,12 104:12

**relates** 62:8

**relations** 12:7

**relevant** 80:6 102:11

**relieve** 77:13

**relieved** 24:9,24

**remain** 72:3

**remained** 55:5

**remedy** 66:16 69:4

**remember** 7:22 8:5 11:2,3 16:7 22:2 34:5 38:20 39:23,24 40:13 42:4, 5 45:25 53:4,6,7,22 56:3 65:16 68:2,7,15 69:8,9,10, 12,15 70:1,16 85:25 89:2 94:15 97:23 103:15

**remind** 8:9

**remotely** 8:14

**renew** 41:18

**repeat** 42:12

**repeating** 14:12

**replace** 92:11,24

**replacement** 19:13 88:19 92:7

**reply** 87:15

**report** 22:19 40:15 59:15

**reporter** 5:24 6:1,3,10 42:11 47:24 50:11,12 105:19,21,24 106:2,7

**reporter's** 56:2

**reporting** 17:12

**represent** 5:17 87:17

**representative** 5:6 69:24 70:2 106:16

**represented** 8:18

**reprocess** 71:1

**reputation** 99:23

**reputational** 99:17 100:10,22

**request** 19:13 78:19,25 81:25 82:4,14,16 83:20 84:17 86:18 88:12

**requested** 17:19

**requesting** 17:22 43:23 88:19 92:6

**requests** 19:10 78:21

**required** 32:19

**requirement** 31:21 79:2

**rerunning** 66:19

**resignation** 49:22,23 88:20

**resigned** 50:3

**resource** 7:12 11:9 12:4,10 13:14 14:7

**resources** 12:1,18 14:9 15:10 16:21 20:19 63:19 64:2 88:7 98:19

**respect** 31:15 32:14 99:19

**respiratory** 26:21

**responding** 13:6

**response** 34:10 76:23 79:17 82:10

**responses** 32:25 33:24 75:16

**responsibilities** 30:24 31:2

**responsibility** 12:9 24:2 31:5

**responsible** 12:4 58:11,14 61:1

**responsive** 34:3 48:13 58:15

**rest** 63:5

**result** 39:14 98:14,25 99:18 100:23

**retaliation** 7:14

**return** 58:9,15

**returned** 59:8

**review** 10:5,18,23 20:6,8, 12,15,19 21:16 22:9 30:7 36:3 42:2 43:11,23,25 44:23 51:20 73:10 86:12 97:21

**reviewed** 9:17 21:4,13 22:5,12 33:18 44:24 45:2, 13 49:13 82:11 101:11

**reviewing** 20:10 21:19 32:16,17 44:9

**revise** 12:15

**revised** 59:25 60:12

**RFP2-002** 42:24

**RFP2-003** 42:24

**RFP2-004** 54:19

**RFP2-006** 54:19

**RFP2-010** 51:13

**RFP2-013** 51:13

**RFP2-038** 29:19,23

**RFP2-041** 29:20,23

RFP2-090 87:9

RFP2-098 59:25

RFP2-101 60:1

rid 93:16

RN 30:12,21 77:1,13

RNS 54:2

Rob 21:23 64:21 65:19 69:23 70:22,25 71:3

Rogers 76:25 77:12,18, 24 82:10

Rogers's 77:3,10

role 12:17 13:6,9,12 16:16 69:17 75:7

roll 66:22

room 8:21 66:13 69:3 98:16

Rosland 65:3 88:5,6,25 89:4

rough 105:23

rude 56:1

rules 8:10 9:9 11:4

running 70:17

---

**S**

safe 103:25

safety 79:14

Sandra 57:12

Saturday 37:5 45:10 64:21 69:11

save 86:14

scheduled 56:13

scope 12:17 67:22

screen 29:3,4 43:2,12 87:19

scroll 29:6,24 31:10 33:6 43:3 44:6,7 48:19 51:16 52:8,23 53:1 54:22 60:3,20 75:20 92:2 97:20 98:4

scrolling 31:7

---

search 47:2,5,11,19 48:12,13,14,24 49:1,9,11, 12,18 86:3

searched 47:21,25 49:2, 16,17

searching 47:12

section 78:20 98:4

seek 96:7,16

seeking 98:10

sees 26:24

send 17:9 58:7 88:9,17, 21 101:24

sending 85:25 88:8

senior 12:3 19:13 25:22, 25 62:14,15,17 63:5,6,16, 24 65:23 67:24 68:1,11,20, 23 104:5

sense 76:8

sentence 92:10

separate 84:7

separated 73:12,24

separation 13:24 74:2, 9

September 5:1,4 11:14 16:4 18:12,13 56:17,24 57:1,15 58:2

serve 63:25

service 31:14 32:1,6,9, 13 63:25 99:11

services 51:24 52:17

set 18:18,21 19:6,10 33:1 53:8 66:11,13 75:16,24

setting 71:2 95:7 97:24

severe 63:4

severity 63:1

share 29:17 43:2,12 87:19 91:21

shared 29:4

sharing 29:3

sheets 36:3,10 66:15,22, 25 67:5,13 68:4 84:20 85:2,5

---

shift 24:9 28:19 37:8 54:13 59:15 78:1,5 95:13

short 55:6

shortfall 94:3

Shorthand 6:3

shortly 28:19

should've 89:8

show 28:21 32:22 35:23 46:19 72:4 87:19,22

showed 32:17 38:13 83:15 89:7 97:10

showing 38:8,10,11

signature 53:13

signed 28:8 30:14 56:23

similar 15:24 19:11

sir 8:23 9:1,7,10,14 10:17, 22 11:9,19 14:17,20 15:16, 21,24 27:24 38:10,15 41:13,16 45:19 48:1 51:8 57:18 58:4 76:9,24 82:12, 15 84:5,18,25 85:3,6 91:20 95:10,22 102:6,15,23 103:24 105:24

sister 6:19

sit 69:3

sitting 39:6 68:16,17 97:3

situation 25:16 34:5 40:16,18 41:10 43:18 46:14 49:14 63:9,15,17,22, 23 64:3,13,15 66:17 78:2 99:5

situations 81:20

skim 10:21

slower 30:4

slowly 29:7,24 33:7 51:16 54:22 60:3 75:20 92:2 97:20

SNTN 53:21 54:10 55:3,9 85:18 92:17

sought 96:13

Sounds 50:18

Source 17:23

---

Southeast 102:9

Southern 5:10

speak 9:19 21:7 22:10 41:19 78:12 85:17 102:4, 11

speaking 19:19

special 100:7

specific 19:6 58:22 78:11 80:2 83:1 95:7,18 97:6 99:14

specifically 34:25 39:21 57:16 62:3

specifics 45:12 81:18 100:12

spell 7:2

spelled 7:4

spoke 9:17,23 41:4,7,8, 19 59:6 85:10 102:6

spoken 41:11,14,17 102:20 104:1

St 5:7,8,22 6:17 8:2 9:13 11:16,17,23,24 15:20,22 16:8 17:11 19:20 20:12,15 23:17,20 28:24 32:24 51:24 52:3,18,20 59:23 60:8,11 62:9,12 64:21 75:9,15 76:22 77:2,7 102:8 106:17,18

staff 64:12 66:3,10 84:9 92:9

staffed 25:15

staffing 17:20 25:20 26:1 94:3

stand 50:20 73:2 91:11

standard 9:2 13:1 54:1 106:10

Standards 20:6,13 21:20 22:6 59:23 60:7

Standby 105:13 106:14

standpoint 13:14

stands 32:13

STAR 31:14,23,25 32:2, 13,20

---

**stark** 22:16

**start** 11:10 19:14 22:23 60:11 65:15 99:5

**started** 11:16 56:16 57:1 65:18

**starting** 51:25

**starts** 67:11,14

**state** 5:17 6:11 7:2

**stated** 40:11 73:20

**statement** 36:1

**statements** 38:1

**states** 5:9 28:1,2 35:12 36:24 60:12 62:3 71:19 88:13

**stating** 55:21 72:12

**station** 37:12 40:7 103:3

**stations** 68:25

**status** 88:13

**stay** 93:8

**Steno** 5:14

**step** 11:15

**steps** 49:5 81:20 84:3

**Stew** 93:11

**Steward** 11:18,22 12:8 13:2 15:20 16:3 17:5,10 18:11,14 19:3,4,11,16 20:6 23:16,23 30:21 32:3 35:20 47:1,12 49:2,9,13 51:11,23 52:11,12,14,17 53:13 54:3, 12,17 55:9 60:9 68:7 79:24,25 80:1,7,11,15,20 83:1,7 84:1,4,7,20,23 85:8, 12,17,21 86:1,4,9,22 90:16 93:17

**Steward's** 19:19 86:20

**Steward-era** 93:14

**stock** 13:1

**stop** 54:25

**strange** 87:10

**Street** 5:14

**structure** 16:19 17:12

**stub** 36:4

**study** 21:17

**subject** 18:25 19:2 70:23 73:17 99:14 100:4

**submit** 34:7

**submitted** 10:9,14,15 11:1 34:8 35:2 49:23

**submitting** 18:8

**sued** 96:20

**suffered** 98:13,24 99:18 100:9

**suggests** 101:19

**suite** 5:15 66:12

**summary** 68:14

**sundry** 69:12

**superior** 32:6

**supervise** 13:17

**Supplemental** 32:25

**support** 31:12 64:9,18, 23 70:18

**supposed** 32:5 46:2 101:8

**suspension** 17:17

**swear** 5:25 6:6

**sworn** 6:21

**system** 7:25 8:4 18:2,20 19:1,3 57:20 69:20 74:8,13 77:16 84:12 93:22

**system-related** 18:4

**systems** 16:10,12 81:13 95:20

---

**T**

**tables** 68:17

**taking** 5:12 25:12

**talk** 70:12 87:23

**talking** 71:6 74:7,20 78:22 96:2

**talks** 59:2

**team** 12:3,11 21:22 22:1, 5 27:5 62:14,17 63:5,6 64:16 65:21,24,25 68:20 69:25 71:4 78:4 104:25

**Teamwork** 31:15 32:13

**technical** 8:14

**technique** 24:17

**techniques** 94:4

**telephone** 10:3

**telling** 104:8

**temporary** 71:22

**tendered** 49:21 88:20

**tenure** 53:24

**term** 48:14 71:19 88:10, 11,21 89:3

**terminate** 71:16

**terminated** 34:19 55:22 72:9,13,17 73:11,21,23 74:4,8,11,13 104:10

**terminating** 74:7

**termination** 13:9,24 15:13 17:17

**terminations** 17:18

**terms** 47:11 49:11,12 52:6 54:10

**testified** 6:22 21:3 71:9 72:11 94:14

**testify** 8:12 9:6 21:14 29:13 38:23 48:23 100:15, 18,21

**testifying** 9:12 21:10

**testimony** 6:6 31:20 45:2 51:7 57:22 58:1 59:6 62:1 74:10 91:19 105:5

**Texas** 5:10 6:3,15,18 102:9

**thing** 32:11 99:14

**things** 12:5,12 17:15 18:14,19 37:19 39:18,25 59:19 64:8 69:16 78:11 80:2 81:16 98:19 99:20

**third-from-last** 31:22

**third-party** 17:23 80:25 81:10

**Thomas** 65:25

**thousand** 65:17

**Thursday** 9:20 29:15 66:6 100:20

**tied** 81:9

**till** 65:15

**time** 5:1,4 7:20,23,25 9:23 12:2,13,15,17 13:21 16:9, 14,18 19:6 20:2,19 22:16, 19 23:2,8,12 24:25 25:17 27:3 34:12 35:1,6,15,19,20 36:3,10 37:24 40:13,14,17 41:6,8,9 43:25 46:3,23 50:22,23 51:1 55:11 57:11, 19 58:16 59:9 61:16,21,22 63:10 64:7,11 65:23 66:1, 15,22,25 67:4,5,13 68:3,4, 23 70:11,17,24 71:23 73:4, 7 77:15 79:24 80:21 81:1 84:19,20,23 85:2,5 86:21 91:13,16 93:17 94:11,18, 19 95:12,24 98:18,25 102:19 103:14,16,17 104:16 105:9,15,18,25 106:4,5,20,22

**timecard** 58:12

**timekeeper** 58:11

**timekeeping** 11:5 12:20,22 22:9,13 35:12 59:1,7 62:5 68:10 95:20

**timeline** 65:8 66:21 67:24 71:6

**times** 94:7,8

**timing** 63:20,22

**title** 11:25 29:19 77:20

**today** 8:19,25 9:6,16 29:14 39:6 51:7 91:19 102:5,14 105:5

**told** 28:16 40:20 55:20 57:16

**Tolopka** 40:18 46:2,6 47:20 101:8,24

**Tolopka's** 48:4 49:16, 19

**top** 28:1 52:9 55:5 96:21

**Topic** 48:21

**topics** 29:14 48:20

**touched** 40:1

**training** 28:9,12 79:12

**transcript** 106:3

**transferred** 77:7

**transition** 11:11,13 16:3,10,17,19 18:15,16,20 20:11,13,19 21:7,22,23,25 22:1,5,21,23 23:1,23 36:9 53:21 55:7,8 57:19,21 68:8 69:25 71:3 80:9,11 81:1

**transitionary** 19:17,20, 25 20:5,17 21:20 22:8

**transitioned** 16:15 20:23 23:3 65:16

**transitioning** 22:14 55:12

**travel** 30:22 51:23 52:11, 13 53:9,14 79:24 83:1 85:12 93:5 94:10 101:13

**traveler** 17:20 19:15 30:13 35:20 41:23 51:11 52:15 54:17 71:21 72:2 75:8,11 93:8 94:8 101:13 104:13,16

**travelers** 52:14 55:10,12 57:13 71:24 92:9,15,17,20, 24 93:3,4,14,19,24,25 94:2,17,18 95:6

**trip** 53:11

**true** 23:16,19 55:17

**truth** 6:7,8

**truthful** 46:9

**truthfully** 9:6

**Tuesday** 42:23

**turnaround** 105:25 106:4,5

**type** 35:7 44:18 45:9 47:1

**typed** 47:2

**types** 17:9 77:23

**typically** 9:3 16:20 56:12 62:13 63:18 67:11

---

## U

**Uh-huh** 55:16,23

**unable** 8:15 24:4 59:18 80:22 94:25 97:11 98:18

**understand** 8:15 9:11 20:24 31:16 37:11,12,14 39:20,24 40:6 51:3 65:7 77:17 78:23 80:19

**understanding** 67:19 81:9

**unit** 26:19 27:7,14,21 45:5,7 78:8

**United** 5:9

**units** 26:9,12,15,17 77:14 78:10

**unlawful** 7:13

**unprofessional** 45:5

**unsure** 9:20 20:14 37:25 47:9 92:17 99:21

**update** 88:23

---

## V

**values** 31:13

**variables** 25:18

**variety** 17:12

**vendor** 80:25 81:10 82:23

**venue** 5:9

**verbal** 14:5,13,15 74:24

**verbally** 41:19 64:4 71:9

**verifications** 84:8

**vernal** 14:15

**version** 76:5

**versus** 5:7 74:7 106:17

**vessel** 18:23 59:2,5,14 67:3,4

**video** 106:9,10

**view** 89:6

**violated** 31:22

**violations** 14:10

**virtually** 65:4

**vision** 31:13

**voice** 40:4

**voiced** 35:8

---

## W

**wage** 90:5,8,24

**wages** 66:5 76:16 82:7

**wait** 68:18

**walk** 66:14 87:11

**walking** 69:12,13

**wanted** 105:25

**warning** 13:24 14:19,22, 23 15:1,2,11 71:11 74:21, 25

**warnings** 14:5,6,13,15 15:9 17:16

**warrants** 63:17

**watching** 27:10

**watermark** 60:17

**Wednesday** 65:10,13

**week** 9:23 57:5 66:2 71:18 104:19

**weekend** 64:14

**weeks** 51:25 52:25 56:12 57:6 102:6

**West** 5:14

**Whispering** 42:9

**wide** 17:12

**Wiens** 21:24 65:19

**witnessed** 37:21 102:12

**word** 20:8 21:18 33:13 59:4 73:23

**wording** 73:13

**work** 18:1 24:4,9,24 25:1, 19,23 27:1 28:2 37:23 40:21 58:9,15 59:18 61:24 75:1 84:9 86:15 94:1,3 102:8,9

**worked** 21:23 24:8 30:21 36:11 54:4 64:16 68:3 79:4 86:22

**workers** 20:16 23:6,9 70:21 92:7

**working** 7:20 11:10,12, 16 20:9 21:8 23:15 24:1 34:7,14 37:22 39:10 65:18 69:13 70:14 75:7 78:1 95:25

**workplace** 11:4

**works** 50:12 62:12 78:7

**would've** 47:16,17

**Wright** 90:14

**write** 28:7 47:25

**writing** 14:11,23 15:3,15 104:21

**written** 13:24 14:6,18,22 15:1,2,9,11 17:16 56:20 62:8 71:11 74:21,25 104:7

**wrong** 65:18,21,25 66:15 67:17 68:18,21

**wrongdoing** 61:23

**Wyrick** 65:3 88:5,6

---

## Y

**y'all** 87:22

**year** 8:5 21:9 50:1 86:13 89:12,18 102:24

**years** 7:11 95:17,19

---

## Z

**Ziakas** 33:15 40:18 64:25

**Zoom** 5:12 8:14 10:3,4