# Exhibit 2

# Deposition Transcript

Case Number: 4:24-cv-5106
Date: September 30, 2025

In the matter of:

# IMANI CHINDA v HSA ST. JOSEPH LLC.

## MICHELLE ZIAKAS, MSN, MBA, RN

Reported by:
Marsha Jo Husted



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

MICHELLE ZIAKAS, MSN, MBA, RN                                    JOB NO. 2028550
SEPTEMBER 30, 2025

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3
    IMANI CHINDA,                    )
 4                                   )
             Plaintiff,              )
 5                                   )
        v.                           ) Case No. 4:24-cv-5106
 6                                   )
    HSA ST. JOSEPH, LLC,             )
 7                                   )
             Defendant.              )
 8                                   )
                                     )
 9                                   )

10

11

12

13

14
              VIDEOTAPED REMOTE DEPOSITION OF
15               MICHELLE ZIAKAS, MSN, MBA, RN
          was taken pursuant to notice and reported by
16    Marsha J. Husted, Registered Professional Reporter.

17
                  TUESDAY, SEPTEMBER 30, 2025
18

19

20

21

22

23

24

25
```

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

---

Page 2

```
 1         A P P E A R A N C E S
 2
   For the Plaintiff:
 3 ATTORNEY CARL A. FITZ
        FITZ LAW, PLLC
 4      3730 Kirby Drive, Suite 1200
        Houston, TX  77098
 5      (713)766-4000
        carl@fitz.legal
 6
 7 For the Defendant and for the witness:
   ATTORNEY ASIM GHAFOOR
 8      Healthcare Systems of America
        1401 St. Joseph Parkway
 9      Houston, TX  77002
        aghafoor@hsahospitals.com
10
11 Also present: Mr. Rick Ketzel, Videographer
12
13
           I N D E X
14
   Michelle Shepard Ziakas, MSN, MBA, RN
15 Examination by Mr. Fitz:  5
16 Reporter's Certificate:  53
17
18
19       E X H I B I T S
20 Exhibit                     First Referenced
   4 - Two-page e-mail thread with top date of
21      11-5-2024..........................39
        (Exhibit was marked in a prior deposition.)
22
   7 - Standards of Performance/Disciplinary
23      Action Policy......................41
        (Exhibit was marked in a prior deposition.)
24
   10 - One-page e-mail dated 11-2-2024.......45
25      (Exhibit was marked in a prior deposition.)
```

---

Page 3

```
 1            (The deposition commenced at 1:37 p.m.
 2       Central Standard Time, Tuesday,
 3       September 30, 2025.)
 4       THE VIDEOGRAPHER:  Good afternoon.  We are on
 5 the record at 1:37 p.m. Central Time on September 30,
 6 2025, to begin the deposition of Michelle Shepard Ziakas
 7 in the matter of Imani Chinda versus HSA St. Joseph,
 8 LLC.
 9       The venue of this case is United States
10 District Court, Southern District of Texas, Houston
11 Division.  The case number is 4:24-cv-5106.  This
12 deposition is taking place via Zoom.
13       The legal videographer is Rick Ketzel, here on
14 behalf of Steno, whose business address is 315 West
15 Ninth Street, Suite 807, Los Angeles, California 90015.
16       Would counsel please identify yourselves and
17 state who you represent.
18       MR. FITZ:  Carl Fitz on behalf of plaintiff.
19       MR. GHAFOOR:  This is Asim Ghafoor on behalf
20 of the witness, Michelle Ziakas.
21       THE VIDEOGRAPHER:  Thank you, counsel.
22       Will the court reporter please identify
23 yourself and swear in the witness.
24       THE COURT REPORTER:  Hello again, everyone.
25 I'm Marsha Husted.  I'll be your court reporter today.
```

---

Page 4

```
 1 Before I swear the witness in, I'd like to read a
 2 stipulation.
 3       The attorneys appearing in this deposition
 4 acknowledge that I am not physically present in the
 5 deposition room, that I will be reporting on this
 6 deposition remotely, and that I will administer the oath
 7 to the witness remotely.
 8       The parties and their counsel further agree
 9 that while I am a licensed court reporter, the witness
10 may be in a state where I am not licensed.  The parties
11 stipulate that this deposition may be taken before me.
12       If any party has an objection to this manner
13 of reporting or anything stated above, please state your
14 objection now.
15       Hearing no objection, we can proceed and I'll
16 swear the witness in.
17       Ms. Ziakas, please raise your right hand.
18       Do you solemnly swear or affirm under
19 penalties of perjury that the testimony you're about to
20 give will be the truth, the whole truth, and nothing but
21 the truth?
22       THE WITNESS:  I do.
23       THE COURT REPORTER:  Thank you.
24       You may proceed, Mr. Fitz.
25       /      /      /      /      /
```

---

Page 5

```
 1       MICHELLE SHEPARD ZIAKAS, MSN, MBA, RN,
 2 being first duly sworn, was examined and testified as
 3 follows:
 4            EXAMINATION
 5 BY MR. FITZ:
 6   Q.  Good afternoon, Ms. Ziakas.  My name is Carl
 7 Fitz and I'm the plaintiff [sic] for Imani Chinda in the
 8 Chinda v. HSA St. Joseph, LLC, matter.
 9       Can you please state and spell your name for
10 the record?
11   A.  Yes.  My name is Michelle Ziakas,
12 M-i-c-h-e-l-l-e, last name Ziakas, Z-i-a-k-a-s.
13   Q.  Have you ever appeared for a deposition
14 before, Ms. Ziakas?
15   A.  I have.
16   Q.  Can you describe the context for the prior
17 deposition?
18   A.  The context was over a contract and lease
19 regarding space in our behavioral health building at
20 St. Joseph under Steward.
21   Q.  Okay.  Can you tell me more about that?
22   A.  It was with a company that we did, Matthew
23 Toop (phonetic).  That was for detox on the first floor
24 and we were closing behavioral health and we were
25 looking to end our programs -- that program, prior to
```

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 6

1 the end date on the contract, and there was disagreement
2 on that. And I was called to be deposed on the
3 operational functions of that unit, not really as far as
4 the contract piece, but more in the daily census and so
5 forth. And so we wanted to end that contract and there
6 was disagreement in that.
7      Q.  Were you a corporate representative for
8 Steward in that deposition?
9      A.  Not a corporate, no. I was a local to
10 St. Joseph. My role then wasn't as chief nursing
11 officer.
12      Q.  Did you testify on behalf of St. Joseph or in
13 your individual capacity?
14      A.  On behalf of St. Joseph.
15      Q.  Okay. Is that the only time that you've
16 testified on behalf of St. Joseph?
17      A.  We had another -- it was more -- that was a
18 hearing. It wasn't really a deposition that I was in,
19 so that was different.
20      Q.  Where was that hearing? What type of
21 proceeding was it?
22      A.  That was an in-person at downtown Houston. It
23 was regarding a nurse's actions against the patient and
24 we were in a hearing about -- regarding her termination
25 of employment with St. Joseph and it was an abuse case.

Page 7

1      Q.  Was that an administrative hearing?
2      A.  I don't really know the definition of an
3 administrative hearing. We had -- the judge was on the
4 screen and then, of course, her counsel was there, the
5 counsel for Steward there, and I was in a room with
6 all members and the judge overseeing, and a court
7 reporter.
8      Q.  Were you in a courthouse?
9      A.  No. It was a building. It was in a law firm.
10      Q.  Okay. And that was not a deposition; that was
11 a hearing?
12      A.  Yes.
13      Q.  And in that hearing, were you testifying on
14 behalf of yourself or St. Joseph?
15      A.  For St. Joseph.
16      Q.  Okay. And are there any other examples where
17 you've provided sworn testimony other than the two that
18 you just provided?
19      A.  Yes. For Memorial Hermann I did a deposition
20 and testimony very similar. It was on another case that
21 I was a witness for, for Memorial Hermann for a staff, a
22 member about her employment and her disability.
23      Q.  Was that a case involving allegations of
24 disability discrimination?
25      A.  Yes. The -- yes. For her side, it was. And

Page 8

1 then what was the actions that Memorial Hermann took to
2 support her with her new disability and so forth.
3      Q.  And did you testify on behalf of Memorial
4 Hermann or in your individual capacity that time?
5      A.  On behalf of Memorial Hermann.
6      Q.  Okay. Are there any other examples of sworn
7 testimony that you have?
8      A.  No, sir.
9      Q.  Okay. And you are represented by an attorney
10 today?
11      A.  Yes.
12      Q.  Who is your lawyer?
13      A.  Asim Ghafoor.
14      Q.  And when did you hire Mr. Ghafoor?
15      A.  He is -- he's representing me as a former
16 employee of St. Joseph. And I reached out to him when I
17 received this subpoena; that I have received this and
18 would he be representing me, as I'm a former employee,
19 and he agreed to represent me.
20      Q.  Okay. So the day or the day after you
21 received the subpoena, you reached out to Mr. Ghafoor?
22      A.  Yes, sir.
23      Q.  Are you paying Mr. Ghafoor?
24      A.  No.
25      Q.  Do you have any attorney-client agreement with

Page 9

1 Mr. Ghafoor?
2      A.  Not a written agreement. I'm just as a former
3 employee for HSA.
4      Q.  Okay. Thank you.
5          Tell me about your educational background.
6      A.  So I am a bachelor-prepared registered nurse.
7 I was an associate-degree nurse prior to that. I then
8 went on later and received a master's in nursing and
9 then from there, I furthered my education with a
10 master's in business.
11      Q.  Where did you get your master's in nursing?
12      A.  So I went to American Sentinel University,
13 which is now known as Post University and I did the --
14 my first master's in -- let's see here. It was 2013 I
15 received that master's in nursing.
16      Q.  And how about the master's in business?
17      A.  In 2016, the same university. I just -- I got
18 that in 2016.
19      Q.  Okay. And I should have asked this earlier.
20 You're testifying in your individual capacity today, not
21 on behalf of the company, right?
22      A.  My individual and as a former employee for
23 HSA.
24      Q.  Okay. What did you do to prepare for your
25 deposition today?

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 10

1      A.    I received the public documents that were
2  public to review, to refamiliarize myself with -- with
3  the situation, as time has passed.
4      Q.    And time has passed since some of the events
5  that --
6      A.    Uh-huh.
7      Q.    -- concern this lawsuit, so my request would
8  be if the honest answer to any of my questions this
9  afternoon are I don't know or I don't remember, feel
10  free to give that honest answer, okay?
11      A.    Absolutely.
12      Q.    Did you review anything else other than public
13  documents in preparation?
14      A.    There was a few e-mails attached that I was
15  CC'd on, just to refresh any memory or any communication
16  that was between Imani and her direct leadership.
17      Q.    And were those e-mails that related to
18  Ms. Chinda's termination?
19      A.    I did not see any e-mails that relate to her
20  termination, just with her request for her time cards.
21      Q.    Okay.  Do you recall any of the other e-mails
22  other than Ms. Chinda's request for time cards?
23      A.    No, sir.  Not -- not that I have received here
24  and not that I can just recall off the top of my head,
25  no.

Page 11

1      Q.    Other than the public documents and the
2  e-mails that you were copied on, did you review any
3  other documents to prepare today?
4      A.    No, sir.
5      Q.    Did you speak to anyone to prepare today?
6      A.    Briefly with Mr. Ghafoor about today, and he,
7  you know, just said -- give everything that you can
8  remember and, you know, your answers to what you can
9  recall and -- you know, and read the documents, the
10  public documents.
11      Q.    Did you speak with anyone other than
12  Mr. Ghafoor?
13      A.    No, sir.
14      Q.    Okay.  After you received your master's in
15  business around 2016, how did you end up at Steward?
16      A.    Yes.  So I returned to St. Joseph Hospital.  I
17  worked there for ten years.  I left.  I, you know,
18  explored other hospital systems and I returned to
19  St. Joseph in January -- January of 2020 and I became
20  the director of critical care in January of 2020.
21          I was -- you know, my whole background and
22  experience is ICU and so forth, and so I came back.  And
23  then quickly COVID hit and I moved into a role of
24  associate CNO in 2021.  So I came back to St. Joseph in
25  2020 and then became the CNO there in an interim

Page 12

1  capacity in 2022 and then to the full-time CNO.
2      Q.    So just so the record is clear, in 2022, did
3  you become the interim CNO?
4      A.    It was the interim CNO and it was that,
5  really, for a year because at that time Steward was
6  going through a lot of changes and we were -- Steward
7  was working on a new president, a new president for
8  St. Joseph, and they really wanted the incoming
9  president to St. Joseph, the permanent president, to
10  make that final decision about making me full time.  And
11  I had been in that capacity about a year and then when
12  the new president came in, he said, yes, I want to make
13  her my full-time CNO.
14      Q.    Okay.  So you became full-time CNO around
15  2023, correct?
16      A.    Yes, sir.  So interim and then full time,
17  uh-huh.
18      Q.    What does a CNO do at Steward?
19      A.    So at Steward, the CNO, the main function of a
20  chief nursing officer is to oversee the practice -- the
21  nursing practice of the registered nurses, any licensed
22  vocational nurses, techs, which are like certified
23  nursing assistants or patient care techs that support
24  nursing practice to ensure that the practice is done
25  correctly and for the safety of the patient.  So making

Page 13

1  -- that's my overall functions, anything as it relates
2  to nursing practice.
3      Q.    Does human resource fall within the scope of
4  the CNO?
5      A.    No.  Human resources reports up to the
6  president or we call also as a chief executive officer.
7  Nursing CNO will work closely with human resources, but
8  the human resources does not fall within that same
9  trajectory path of reporting structure.
10      Q.    As a CNO, were you familiar with Steward or
11  St. Joseph's policies?
12      A.    Yes.  We reviewed policies.  We had a database
13  where we could pull up any policies for reference to
14  review.  It depends if it's an HR, human resource
15  related, we would always pull up policies, talk to the
16  content expert.  If it's quality related, same thing.
17  Nursing related, I would be that content expert over
18  nursing practice.  So we have policies at our disposal
19  where we can build from.
20      Q.    Did you ever draft policies?
21      A.    I drafted policies.  I would review policies
22  regularly as it relates to, like, say, quality of care,
23  anything like an emergency department, ICU.
24          Each policies, you know, we would draft it,
25  but it had a line of approval process that it would have

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 14

1  to go to based on what's in that policy.  It may need
2  physician approval.  It may need the quality department.
3  There may be certain committees that would have to
4  review that policy before it went on to the next
5  process.  All policies, after all approval processes,
6  they have a policy committee and then it goes up to what
7  we call QSAC, which is the quality oversight committee
8  of the board and they would review that policy and then
9  the final approvers of all policies during my time there
10  is the board of directors for St. Joseph.
11          And so it had --
12      Q.  I apologize.  Please continue.
13      A.  No, that's okay.
14          So it had multiple layers of approval process,
15  ensuring that if there is an HR piece, HR reviews it.
16  If there's medications listed in a policy, that pharmacy
17  reviews that.  If there's women services policies, those
18  committees that are also comprised of physicians have a
19  chance to review that.
20          So policies have to touch all the hands that
21  are involved and, you know, there may be changes made,
22  no changes made.  It just depends on the policy.
23      Q.  And can you tell me about the transition from
24  Steward to HSA at St. Joseph?
25      A.  The transition was one that it was -- it was a

Page 15

1  change of ownership, of course, and with any change of
2  ownership, you know, things have to be re-looked at,
3  reviewed, making sure that we try to make it as seamless
4  as possible for staff so they do not feel interruptions,
5  especially for our patients, making sure they don't feel
6  any interruptions.
7          A lot of the stuff in change of ownership that
8  what I experienced with Steward going to HSA, most of it
9  was just kept in the background of that exchange of
10  kingdoms.  Things -- as it relates to policies, since
11  you brought up policies, it's how does transitioning
12  those policies over and what does that look like?
13          It's a process.  It doesn't happen overnight
14  because you're -- it's a -- it's like a tanker ship,
15  trying to turn a tanker ship.  So it's just trying to do
16  those small changes without any disruption in operations
17  so that your staff and patients do not feel the effect
18  of that.
19          So I think it went pretty smooth, considering
20  everything that was going on with Steward at that time
21  and their bankruptcy.  We tried, as an executive leader,
22  to make that as seamless as possible, working very
23  closely with all team members, so...
24      Q.  And this transition was from approximately
25  September to November of 2024, correct?

Page 16

1      A.  Correct.  Yes.
2      Q.  What was your role in ensuring a seamless
3  transition?
4      A.  Primarily my role as a chief nurse would
5  ensure that any policies that relate to patient care, my
6  nurses are staffed.  During this transition, you want to
7  be fiscally responsible looking at your expense,
8  ensuring that, you know, you're looking at overtime for
9  nurses.  You want to make sure that your duck's in a
10  row, your house is clean, not to -- to make that
11  transition easier.
12          So everything, even as a chief nurse, you
13  know, financially you have to ensure that your labor
14  costs are appropriate for each department and area,
15  you're managing your overtime, certifications are good,
16  licensures are good, your nursing and patient care
17  policies are intact so that anyone delivering patient
18  care is supported.
19          So that is mainly what my role and my position
20  was during that transition time, so that the effects of
21  the transition is not felt.
22      Q.  During that transition, who reported to you?
23      A.  So reporting to me would be all the nursing
24  directors for each area is my direct reports.  And if
25  they have managers underneath them, they would report to

Page 17

1  the directors.  Any clinical coordinators, charge nurses
2  and staff, it goes up that chain.  So my absolute direct
3  reports would be those directors.
4      Q.  Did Lori Tolopka report to you?
5      A.  Yes, sir.
6      Q.  And what was her role?
7      A.  Lori was the director of women's services.
8      Q.  And what was Ms. Tolopka's role during the
9  transition from Steward to HSA?
10      A.  She was the director of women's services
11  during this transition.
12      Q.  Was there something in particular that she was
13  expected to do to facilitate a seamless transition?
14      A.  As it relates -- if you're wanting -- are you
15  wanting general or specific to the case?
16      Q.  Let's start general.
17      A.  So general, just again, kind of like what my
18  -- extension of myself, ensuring that -- that if there's
19  any changes in policies or anything needed or any
20  ordering of any supplies, any changes in that.  If
21  there's any equipment needs, that she vets those
22  appropriately.  And if she has -- if she needs
23  assistance or help, she's escalating that up to me so
24  that we can ensure a seamless transition for patient
25  care and for staff if there is hiring of positions,

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

1 changes in how we ask for an approval process for
2 different nursing positions, that she's working closely
3 with me and HR to ensure that we keep positions that are
4 filled. So that's her main thing, is making sure that
5 just like mine, is my extension, ensuring that there is
6 not a disruption in patient care. And that's the
7 biggest thing. It's going to be your labor force, your
8 supplies for your patients, and ensuring that we have
9 our positions filled to take care of patients.
10    Q. Do you recall there being a disruption in the
11 compensation of St. Joseph nurses during the transition?
12    A. Yes, sir. When we were switching over from
13 KRONOS to isolved.
14    Q. And what happened?
15    A. We went -- we did a downtime procedure to go
16 to paper time cards, which are standard in a downtime
17 procedure so that we can do the transition from KRONOS
18 to isolved. During that transition, we submitted two
19 sets of time cards. One, one set, the first sheet was
20 for that first week and then the second sheet was for
21 that following week. And those times were being
22 manually entered by the corporate office and they would
23 be downloaded into the new system so when payroll came
24 around, folks will get paid under isolved and -- versus
25 KRONOS. So it's that manual downtime to get loaded and

1 then to get electronically paid.
2        So in that period there, a lot of time -- I
3 don't know if it was not entered or that piece, because,
4 again, that manual -- that entry into isolved was not
5 here at our level. We just ensured that those time
6 cards got sent.
7        So we had missing time. We had shift
8 differentials that were not correct or acquired PTO that
9 was not calculated correctly. So we had to -- as
10 executives, we went in. We set up incident command on
11 the weekend. Incident command, what that means is just
12 everyone comes -- we all came to the board room. We set
13 up all the computers. We started then investigating and
14 trying to figure out how the times -- I mean, payroll
15 was off. And so we worked very closely with our
16 corporate partners at HSA to start deciphering how these
17 times were missed. And so we -- I was in at the command
18 center all weekend. Our -- all of our directors and
19 managers came in for all departments across the hospital
20 so that we could quickly try and rectify and correct as
21 quickly as possible the inaccurate paychecks that had
22 occurred. And that was -- that was a very large task
23 because it wasn't just a singular one or two people.
24 There was numerous folks and, you know, when you're
25 looking at a paycheck, you have to -- it's hard to, at

1 first glance, to figure out a shift differential that's
2 off or an hour that's off. So every single time card
3 required 100 percent focus and attention to try and
4 correct it so that the person could be paid accurately.
5    Q. Hundreds of workers were affected, right?
6    A. There was quite a few.
7    Q. And you all worked over the weekend --
8    A. Yes.
9    Q. -- to correct the issue, right?
10    A. Yes. We all went in. The expectation is that
11 we were working around the clock to -- because it was a
12 very serious matter and that we had to fix.
13    Q. Okay. And what was your role during that
14 incident command?
15    A. Yes. So my role is, is that -- especially
16 with a nursing division, so nursing is the largest
17 workforce in a hospital. And working -- so my division
18 was affected the most.
19        So we had -- so each leader had to -- because
20 we kept all the paper copies of the time cards and for
21 everyone that felt that their payroll was not accurate,
22 each leader went through that paper time card with the
23 employee to say, okay, did anything on the paper time
24 card, did we miss that? Because we kept those copies.
25 And so they had to go back and scrub that time card with

1 that employee. Is this accurate? Did we miss a time
2 with you? Did you not record a time? So let's start
3 there first, right.
4        So when those time cards were scrubbed for
5 every employee with their direct leader, then it came
6 back to the incident command where we then went in and
7 looked at a master spreadsheet to say, okay, was every
8 line item transcribed correctly into this Excel --
9 master Excel spreadsheet that they used to download into
10 isolved? So there was some discrepancies with that
11 piece.
12        Again, like I said originally, we are --
13 differentials were not paid correctly, so those had to
14 get fixed. And that is a -- again, that's a pretty
15 large task. So the differentials, PTO accruals, and so
16 it was a -- it took a lot of work between us, our local
17 HR, and for our corporate partners to go line item by
18 line item for every employee.
19        And so what we were doing, as soon as we would
20 get one corrected, we were working through the process
21 of printing checks locally for employees so that we can
22 start as quickly as possible getting checks for the
23 corrected amounts to the employee. So that was a
24 process too, right, because just to print checks, we had
25 to make sure that was being done appropriately,

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 22

1  accurately, and it was being recorded of every dollar
2  for each person.  And we had to make sure too that those
3  checks were funded before you hand that check over.  So
4  it took multiple days.  More -- I would say -- and
5  again, I don't want to just put an exact number, but it
6  was more than a week to -- because of the number of
7  folks -- to get that corrected and to do it cor-- -- to
8  do it accurately.  Because, you know, it's very hard
9  getting something like this accurate, but you need to be
10  accurate and if you did make a mistake, you need to
11  rectify that because this is people's money.  And so we
12  truly felt accountable and responsible to fix it quick.
13      Q.    Who was present at the incident command other
14  than yourself?
15      A.    So it was myself; our chief financial officer,
16  Deborah Jones; our CEO, Thomas Dunning, was there; our
17  chief quality officer, Debra Lanclos was there; our
18  director of human resources was there, Jamie Malveaux.
19  Asim was coming in to do work.  He was there checking on
20  us, what can he do to support us.  And then our -- that
21  was our main incident command.  And then all of the
22  leaders were expected to be present there that weekend
23  to start working through this.
24            And we kept that incident command going until
25  we can get through what we considered a crisis and so it

Page 23

1  stayed open the majority of a week, where we worked
2  around the clock to get the number of employees's checks
3  fixed.  And it took some time.  And even when we fixed
4  one, if we missed a differential or we missed an hour,
5  our goal to our staff was to -- for every minute was to
6  get that fixed for them because that's what they
7  deserve.  They deserve their money earned for time
8  spent.
9      Q.    And what was Ms. Malveaux's role at incident
10  command?
11      A.    She was -- Jamie had -- she worked very hard
12  to -- everything that we were trying to cross-check and
13  reference, that it was -- she was double-checking that
14  for every single employee, making sure that those
15  differentials, the times, the hours are right.  Did they
16  work day shift?  Did they work night shift?  Even they
17  got flipped.  Some people who were on night shift showed
18  as day and just the opposite, and that does make a
19  difference.
20            So she was making sure -- everything that we
21  were doing, she was double-checking that and she was the
22  number one person that was communicating with our HSA
23  partners and HR at corporate to make sure that we were
24  getting this information back to them so then we can get
25  checks cut for the staff.

Page 24

1      Q.    And what was Mr. Ghafoor's role at incident
2  command?
3      A.    He came in and he checked on us.  Very
4  supportive of us.  If there was any concerns that staff
5  maybe brought up legally, he was just there mainly to
6  support us.
7            And because it was -- I think most of us in
8  that room never went through anything like that and so
9  nor did we anticipate that.  And so we felt, you know,
10  his support to us as being if there was any questions
11  that we had, he was there for us.  And he was.  I mean,
12  he was a very good support for us and, you know, if
13  staff had any legal questions or if there was anything,
14  he was available.  And he was available.
15      Q.    Do you recall what any of the legal concerns
16  were that Mr. Ghafoor helped with at incident command?
17      A.    At that -- at that point in time, I didn't
18  have anything at that point in time from my side.  Our
19  main thing and hyper focus -- nor had I heard at that
20  immediate point in time, because that's right when it
21  occurred because that payroll was Friday when we
22  realized Friday that things were not accurate.  That's
23  when we set up that incident command.  Not immediately,
24  no.  Nothing that came out right then and there from my
25  perspective that I can recall.

Page 25

1      Q.    When you mentioned legal concerns a moment
2  ago, was there something that you had in mind?
3      A.    If anyone had a concern about maybe they're
4  not going to get paid or, you know, or -- you know,
5  because that's scary because people had -- it was at the
6  beginning of the month and people had rent due, mortgage
7  due.  They had a lot of things due to them.
8            So when I say legal, I just mean, you know,
9  what is the employee's rights.  But at that time,
10  nothing came up.  We were also letting our staff know
11  that we were there and we're not going to stop until we
12  get this fixed.  So...
13      Q.    So it was more answering general legal
14  questions?
15      A.    Just general.  Just very -- yeah.  Because
16  nothing at that point -- because everything was just,
17  you know.  You know, a quick response to get it
18  corrected.
19      Q.    Understood.
20      A.    Uh-huh.
21      Q.    Shifting gears, have you ever spoken with
22  Imani Chinda?
23      A.    No, sir.  Huh-uh.
24      Q.    Do you know who she is?
25      A.    I know that she was a local traveler.  We had

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 26

1  local travelers in our family working unit, but I have
2  never spoken to her.
3      Q.   How many local travelers did HSA have during
4  the transition from Steward to HSA?
5      A.   I don't remember the exact amount, but not --
6  not very many.  We had -- because even local travelers
7  like external agency is at a high dollar amount, so
8  hospital systems and part of that housekeeping during a
9  transition is to try and transition folks to full-time
10  status or -- and a lot of times they don't want
11  full-time status; they like the travel contract or local
12  contract to see if they are not -- if we're not going to
13  a full time or filling those vacant full-time positions,
14  then we can end contracts.
15      We did the same thing in the emergency
16  department.  We ended all local contracts there and we
17  hired full-time staff.  We did the same thing in the
18  ICU, the med-surg unit.  So we did it in a lot of areas
19  to try and reduce cost, operational cost.
20      Q.   So whenever HSA was trying to wind down the
21  traveler nursing contracts, was it HSA's common practice
22  to offer them to be a full-time employee?
23      A.   It just depends if that is something that that
24  person has expressed that they want to do or if they
25  have -- if they -- a lot of times if we had local

Page 27

1  travelers wanting to transition, they have already had
2  that conversation with their manager or director,
3  saying, hey, I really like it here.  I'm really thinking
4  about settling down.  Would you consider me for a
5  full-time position?  Do you have a full-time position
6  open?
7      Like all positions, whether, you know, you're
8  a -- if you're a local traveler through an agency or
9  you're wanting to change roles within the hospital, you
10  go online and you apply so that we have a formal request
11  for a -- that you're interested in a position.
12      Q.   It's not like HSA just fired all the travel
13  nurses, right?
14      A.   No.  No, no, no.  We always -- no.  We always
15  allow folks -- and some people want to be full time.
16  They want to settle.  And then some others are like, you
17  know, their rate is not as -- the pay rate is not the
18  same.  And they're right, because full time is not the
19  same pay rate as a local traveler or external traveler.
20  It's lower.  And that's --
21      Q.   You were -- oh.  I apologize.
22      A.   No.  That's okay.
23      And that's just standard.
24      Q.   Do you recall if some of the HSA St. Joseph
25  travel nurses continued working on contracts through

Page 28

1  2025?
2      A.   For -- I do.  Yes.  We -- like in labor and
3  delivery, we had some there that we were -- that either
4  declined to come on full time because they wanted to
5  continue to travel or we -- or they came on full time.
6  So the goal with Steward and HSA, of course, is always
7  decrease your labor cost.  So decreasing labor cost,
8  whether you're this hospital institution or another, is
9  to decrease or eliminate high-cost labor, which is going
10  to be considered agency, internal or external contract.
11      Q.   Do you remember the names of any of the travel
12  nurses and labor and delivery who were brought on full
13  time?
14      A.   Not off the top of my head.  I don't want to
15  give inaccurate names because I wasn't their -- I wasn't
16  their director.  I mean, I was the chief nurse, so my
17  role -- I may not know everyone.
18      Q.   Who do you believe would be the correct person
19  to ask that question to?
20      A.   So the director or the manager could remember
21  a name and then HR would have a -- the recruitment would
22  have a list of people that were transitioned.
23      Q.   Got it.  Thank you.
24      Were you involved in the discipline or
25  termination of Ms. Chinda?

Page 29

1      A.   No.
2      Q.   And so the decision to discipline Ms. Chinda
3  was not yours, right?
4      A.   No.  She -- she -- the local -- not the local.
5  Her immediate supervisor, which would be the manager and
6  director, would work closely with HR.  They would -- if
7  they needed to reference me, fill me in, they would.
8  They would include me in that.
9      So again, I was on some e-mails there, but I
10  am not the one to be directly doing that.  If I do not
11  agree with something or HR is questioning something that
12  does not look agreeable, then we're going to push back.
13  So there's multi-layered approach to any sort of
14  discipline or termination.  It's never left with one
15  individual.  It makes -- it ensures that things are done
16  fair and just, and that's really important.
17      So anything of that nature has to be reviewed
18  with HR.  I am brought up to speed because it does fall
19  within my division as the chief nurse to make sure if I
20  have any questions or concerns or something that sticks
21  out, like doesn't -- is not kosher, then I'm going --
22  I'm going to say something.  So they will review it with
23  me.  I'm not the final de- -- I'm not that final
24  decision.
25      Just like with Steward, with HSA, then it goes

Page 30

1  up if there is a corporate approval.  I don't know if
2  there was a corporate approval at that time, but it is
3  -- definitely has to be reviewed with our local HR
4  director.
5      Q.  Do you recall -- oh, I apologize.
6      A.  No.  It's okay.
7          And, of course, that's -- Jamie was our
8  director at that time.
9      Q.  Thank you.  And do you recall who Ms. Chinda's
10 immediate supervisor was?
11     A.  It was going to be -- my goodness.  My mind
12 just -- it went blank.  My mind went blank on her name.
13 I'm so sorry about that.  I see her face in front of me
14 and I forgot her -- I do not remember her name.  I don't
15 have it in front of me.  I'm sorry.
16     Q.  It's not Lori Tolopka, is it?
17     A.  No.  Lori -- Lori is the director.  Yeah.
18     Q.  Is it Emily Manning?
19     A.  Emily.  That's it.  Thank you, sir.  It's --
20 Emily Manning was -- she was the interim manager and
21 then became full-time manager.
22     Q.  And so between Ms. Malveaux and Ms. Manning,
23 whose decision would you say it was to discipline
24 Ms. Chinda?
25     A.  Well, it has to -- anybody being put on

Page 31

1  administrative leave has to go -- needs to involve
2  directly that director and it needs to also -- we need
3  to loop in HR; again, making sure is it fair?  Is it
4  just?  Are we doing -- is this really something that you
5  want to put someone on administrative leave for?
6  Because, again, HR is that person with the knowledge of
7  these things and can give guidance and direction to make
8  sure that we're doing this correctly.
9      Q.  Would you characterize administrative leave as
10 discipline?
11     A.  No.  And I'll say -- this is why.  There's
12 many reasons why we put someone on administrative leave
13 during an investigation and we do that a lot to protect
14 the employee.  It does not mean that there be -- that
15 that is a form of discipline.
16         I've had instances where someone, a patient,
17 may accuse someone of abuse or something of that nature.
18 We always have to put someone on administrative leave
19 pending that investigation.
20         If it's unfounded, it's -- you know, the
21 accusations or the complaint is not founded, we bring
22 that employee back.  They're paid for their time off.
23     Q.  The purpose of an administrative leave is to
24 conduct an investigation?
25     A.  That is correct.  It's not -- I know it may

Page 32

1  feel punitive, but it's not punitive.  Administrative
2  leave allows for an investigation to take place, to --
3  whatever that concern is there, to kind of put a halt to
4  that concern and let's protect all parties so that an
5  investigation can take place and it can be justly.
6      Q.  Is the decision to place a worker on
7  administrative leave written down anywhere?
8      A.  Again, I don't have the policies in front of
9  me.  That would be an HR policy.  So that would have to
10 be pulled up and reviewed.
11     Q.  Okay.  Is there an HR policy regarding
12 administrative leave?
13     A.  Again, I -- I left in May and I don't have
14 that in front of me.  It's something I would -- if I had
15 a concern, even as a CNO thinking someone needs to be on
16 administrative leave, I'm going to call and speak
17 directly with the HR director.  They're going to ask the
18 questions why and I don't -- again, I don't remember
19 exactly if there was a direct policy, an HR policy, on
20 administrative leave.
21     Q.  Okay.
22     A.  I believe that there would be, but I don't
23 want to say without it being in front of me.
24     Q.  Absolutely.
25         So I'd like to ask you about your experience

Page 33

1  in dealing with incidents of administrative leave --
2      A.  Yes.
3      Q.  -- at St. Joseph.  Every time you've seen a
4  worker placed on administrative leave, have you seen an
5  investigation?
6      A.  Yes.
7      Q.  Who typically conducts that investigation?
8      A.  It depends on the type of allegation that is
9  inquiring.  One that if I'm ever involved in is more of
10 a -- is a serious -- it would be a level of complaints
11 of patient abuse, very -- anything that could be a
12 direct report to the board of nursing, I'm involved with
13 that, something of that nature, along with the chief
14 quality officer.  It would be something that would be
15 more -- very egregious in nature.
16         One less egregious, if there was any
17 disruption in the environment, anything as it relates to
18 behaviors that are not really affecting patients, we try
19 and let the local leadership with HR work on those
20 things so that I can focus on others.
21         Again, if there's any big concerns or
22 something that cannot be resolved with them, then it
23 would get escalated up that chain of command.
24     Q.  For those behavioral incidents, does local
25 leadership and HR document their investigation?

MICHELLE ZIAKAS, MSN, MBA, RN                                          JOB NO. 2028550
SEPTEMBER 30, 2025

Page 34

1   A.   Yes.
2   Q.   Are employees informed in writing that they're
3   being placed on administrative leave?
4   A.   Yes.  It's supposed to be documented and it's
5   supposed to be filed in HR that they are going on
6   administrative leave.
7   Q.   And this might be a silly question, but if
8   there is an employee placed on administrative leave
9   because of their behavior, that employee is interviewed,
10  right?
11  A.   Yes.
12  Q.   And that interview is documented, right?
13  A.   Yes.
14  Q.   And the outcome of the investigation is shared
15  with the employee in writing, right?
16  A.   Yes.
17  Q.   Okay.  Have you ever seen any instances at
18  St. Joseph during the Steward time period or the HSA
19  time period that deviated from this procedure for
20  placing a worker on administrative leave?
21  A.   Not in my division.  I did not.
22  Q.   Okay.  Do you know, was Ms. Chinda ultimately
23  terminated after the conclusion of her administrative
24  leave?
25  A.   She was not terminated.  The decision was made

Page 35

1   that they would -- that we would not renew her contract.
2   We would let her contract just go ahead and complete and
3   finish.
4        And at that time, we had other candidates,
5   full-time candidates, that had been interviewed that are
6   waiting to fill a full-time role.  And like I said
7   previously, we always want to consider the -- filling a
8   role with a full-time position.  It wasn't that she --
9   necessarily we terminated.  We did not extend -- we did
10  not renew her contract.
11       In the contracting world with external agency
12  or you can represent that as an internal agency, it
13  would be the same thing.  The same practice applies.  We
14  would -- we can make the decision to not renew someone's
15  contract.
16  Q.   Do you know when that decision was made?
17  A.   I don't have that in front of me, so I don't
18  want to misquote a time.
19  Q.   Perfectly fine.
20       And do you know why Ms. Chinda was placed on
21  administrative leave?
22  A.   From what I can recall and what I read, her --
23  it was related to her behavior in the work- -- in the
24  nurse's station and her behavior toward other staff
25  nurses at the nurse's station.

Page 36

1   Q.   You didn't personally witness what occurred,
2   right?
3   A.   No, sir.  No.
4   Q.   Do you know who did witness what occurred?
5   A.   I would have to go back in the public
6   documents and the e-mails to review, but what I did
7   review was it was witnessed by the charge nurse there,
8   Lisa McCorkle, at the -- in the nurse's station and her
9   commentary that she was saying in the nurse's station,
10  making the work environment one of such that it was
11  deemed not comfortable.  I don't know if I would use the
12  word hostile, but not -- very uncomfortable.  And making
13  comments during this time was not seen as appropriate.
14  Q.   Between your review of the e-mail and your
15  memory, do you remember what Ms. Chinda said?
16  A.   It's not directly in front of me and I
17  certainly don't want to misquote her.  I would have to
18  look -- bring it up from the e-mail.
19  Q.   Sure.  And I'll bring up the e-mail in a
20  moment.  I'm just focussing on your memory first and
21  then we'll --
22  A.   Sure.
23  Q.   -- bring up the e-mail.
24  A.   Absolutely.
25  Q.   So you don't remember when this incident

Page 37

1   occurred with Ms. Chinda, right?
2   A.   I don't -- I think it was probably -- again, I
3   don't have the exact date, but it was right when the
4   issues with the payroll and getting the checks cut for
5   employees.  It was a very stressful time.  So it was
6   during that time of us trying to get people paid
7   accurately.
8   Q.   And you don't remember what Ms. Chinda said,
9   right?
10  A.   No, sir.  I don't have it direct from memory.
11  No, sir.  I don't remember her exact words.
12  Q.   And how was this incident first brought to
13  your attention?
14  A.   The director came and she did -- she discussed
15  it with me that there was an employee that was -- had
16  very disruptive behavior in the nurse's station, making
17  comments about HSA's ability to pay their employees and
18  so forth.  And my feedback to her would be -- for any
19  feedback, I said, you need to work closely with HR, you
20  need to investigate the matter, make sure that, as
21  always, you have appropriate witness statements, talk to
22  the employee, and go from there.
23       And so something of this -- like, this nature,
24  not just for this situation, but for of this type, I
25  would make sure that that director or that manager is

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 38

1  looped in HR, number one; they're working closely with
2  HR; and they're following that guidance as it relates to
3  any type of interviews, witness statements, anything
4  that -- anything that it would be appropriate to
5  investigate what was being stated.
6      Q.  Who did you give that advice regarding witness
7  statements to?
8      A.  That would be to Lori, the director.  And I
9  would give that to anything being investigated.  Was
10 there anybody standing around?  Did anybody hear this?
11 Did -- you know, is there any text messages?  Feedback?
12 I said, you just have to make sure that, you know, it's
13 -- what is being stated is true and accurate.
14     Q.  Did you tell Ms. Tolopka that she should
15 obtain a statement from Ms. Chinda?
16     A.  I said either her or her manager, they need to
17 get statements and, again, work closely with HR to
18 ensure that what is being asked to investigate is -- is
19 just and fair.
20     Q.  And as the investigation into Ms. Chinda's
21 incident proceeded, you were kept in the loop, right?
22     A.  They would fill me in as to where they were at
23 in that investigation at different intervals.
24     Q.  What is the purpose of keeping you in the
25 loop?

Page 39

1      A.  Because it's under that nursing division.  You
2  know, I want to know what happens with our nurses.  And
3  I want to -- you know, it's not that I'm that person
4  directly involved in that situation, but if it's
5  happened within my division, they'll bring me up to
6  speed.  Fill me in.  I'm not that one doing the
7  investigating on this type of investigation, but I want
8  to be kept in the loop.
9      Q.  Other than the advice that you provided
10 Ms. Tolopka and being kept in the loop on the
11 investigation, did you have any other involvement with
12 Ms. Chinda's administrative leave or departure?
13     A.  No.
14     Q.  Okay.  I'm going to show you what has been
15 previously marked as Exhibit 4.
16     A.  Okay.
17     Q.  And this is just a two-page document.  I'm
18 going to scroll through it slowly.
19     A.  Okay.
20     Q.  And then my first question will be does it
21 look familiar?
22     A.  Yes, sir.  This is what I reviewed.
23     Q.  Okay.  Is this the primary e-mail that you
24 reviewed in preparation for your deposition today?
25     A.  Yes, sir.

Page 40

1      Q.  And here on the first page of Exhibit 4, there
2  is the reference to Lisa McCorkle, correct?
3      A.  Yes, sir.
4      Q.  And that's what you were referring to earlier,
5  right?
6      A.  Yes.
7      Q.  Would you characterize Exhibit 4 as a witness
8  statement?
9      A.  This is -- to me, how I would characterize
10 this, this is a statement from the manager on -- based
11 on her feelings and what she recalls and her
12 interpretation of that to Lori.  And putting the pieces
13 together, I don't know if -- I don't see in here in this
14 document anything from Lisa McCorkle or what anything
15 else was from in that nurse's station in what they
16 provided.  Just -- what I see here is just from Emily
17 and what she witnessed -- not what she witnessed.  What
18 she is experiencing and what has been told to her.
19     Q.  Right.  So this is not a witness statement,
20 right?
21     A.  It's -- really, I take it as a witness
22 statement, really a statement from Emily, and what --
23 the information that has been provided to her.
24     Q.  Other than this e-mail that we just reviewed
25 as Exhibit 4, have you seen any other documentation of

Page 41

1  the basis for placing Ms. Chinda on administrative
2  leave?
3      A.  Not in this information here.  I have not seen
4  anything else.
5      Q.  Okay.  In your preparation of your deposition,
6  you haven't seen anything additional to that, right?
7      A.  No.
8      Q.  And then in -- you don't recall from October
9  or November of 2024 seeing anything else, right?
10     A.  No, not that I can think of off the top of my
11 head.
12     Q.  Okay.  And I'm showing you what has been
13 marked as Exhibit 7.  And I'm going to scroll through
14 this slowly.  And then my question will be does this
15 look familiar?
16     A.  Yes.  This does look familiar to me.
17     Q.  Okay.  Can you tell me what this is?
18     A.  This is a standards of performance and
19 disciplinary action policy.
20     Q.  Okay.
21     A.  It's a human resources policy.
22     Q.  Does this apply when you place workers on
23 administrative leave?
24     A.  I'd have to be able to read through it --
25     Q.  Oh, absolutely.

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 42

1    A.    -- in its entirety.
2    Q.    Let me scroll through it slowly.
3    A.    Okay.  Thank you.
4          Okay.  Keep scrolling.  Right there.
5          Okay.  If you don't mind, keep going.  Thank
6    you.  Okay.
7          Okay.  Keep going.  Thank you.
8          You can keep scrolling.  Okay.
9          Can you go up to the previous page, up before
10   review and approval?  Thank you.  Right there.
11   Q.    There's a bit of a delay.  Sorry.
12   A.    Oh, okay.  Sorry.
13   Q.    Thank you for letting me know.
14   A.    Okay.  Thank you.
15   Q.    Did you have an opportunity to review the
16   entirety --
17   A.    I did.  I did not see the word specifically as
18   it relates to administrative leave, but that is a very
19   common practice.
20   Q.    This policy states that, for example, an
21   employee should be verbally counseled, right?
22   A.    Correct.  And it depends -- this is why
23   consulting HR very important.  Depending on what it
24   is, what's going on, not every action starts with just a
25   verbal counseling, so it depends.

Page 43

1          I'll give you an example of a verbal
2    counseling would be time and attendance.  Someone has
3    too many absences or they're tardy.  It may -- you know,
4    that will start with a verbal.  Or something, they
5    missed something on documentation.  It just really
6    depends on the situation.  Every situation is unique and
7    that's why working with HR is so important.
8    Q.    Different line of questioning.  Do you recall
9    a nurse named Mindee Rogers?
10   A.    I do.
11   Q.    What do you recall about Ms. Rogers?
12   A.    Mindee is a charge nurse in labor and
13   delivery.
14   Q.    And do you recall her raising a complaint
15   about the failure to pay her minimum wage?
16   A.    She -- yes.  She had a concern about her check
17   not being accurate.  Mindee -- because I work closely a
18   lot with labor and delivery, she reached out to me
19   directly versus her director.  But she reached out to me
20   and Jamie regarding her pay.  So since we had so many
21   hands in the fire -- since she went ahead and reached
22   out to me, then I just -- I didn't cause any disruption
23   in that.  I just kept with the same course.  And so
24   her -- Mindee's pay was off.  It was not correct.  And
25   so I -- we were trying to work through.  I think she had

Page 44

1    some differentials that were not correct and missing
2    some hours.  And so -- and Mindee did work quite a bit.
3    She worked a lot, a lot of hours.  So we were trying to
4    get her up to speed and her fixed on her payroll.
5    Q.    And since she was a charge nurse, she had a
6    direct line of communication to you, right?
7    A.    Not necessarily because she's a charge nurse.
8    I'm not really sure why she didn't go directly to her
9    director, but everything was so chaotic, I didn't want
10   to disrupt that she has already communicated.  So she
11   continued -- I just continued to communicate with her
12   with Jamie.  I did update Lori that, hey, Mindee's
13   reaching out.  We need to make sure, you know, work
14   closely with you so that we can -- and HR -- so that we
15   can get her paid.
16   Q.    As a charge nurse, she falls within the group
17   that you categorized as managers earlier in your
18   deposition, correct?
19   A.    She's not a manager, Mindee's not.  A charge
20   nurse is someone in a role that you're -- oversees the
21   shift-by-shift management of that shift.  But it's not a
22   manager.
23   Q.    Tell me more about what a charge nurse does,
24   please.
25   A.    So a charge nurse -- for example, her role in

Page 45

1    labor and delivery, and any role is the -- it's the
2    through-put of that department for admissions coming in,
3    discharges going out.  It is for the staffing
4    management; staffing and that for that day, for that
5    next shift.  Ensuring that we have the staff.  If
6    there's any concerns related to staff, it gets escalated
7    so we can work to get that department staffed.
8          Mindee's role, for example, in labor and
9    delivery is she's -- it's -- that role is a big role, so
10   there's a lot of, you know, imminent deliveries coming
11   in, C-sections coming in.  So she -- her -- the charge
12   nurse role in labor and delivery is a very busy one and
13   she worked a lot of hours.
14   Q.    Okay.  I'm going to show you what's been
15   marked as Exhibit 10.
16   A.    Okay.
17   Q.    And it's just one page, but I will scroll
18   through it.
19   A.    Okay.
20   Q.    And does Exhibit 10 look familiar?
21   A.    Yes.
22   Q.    And so you were copied on this e-mail on
23   November 2, 2024, right?
24   A.    Correct.
25   Q.    It's fair to say that HSA St. Joseph was aware

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 46

1  that Ms. Chinda was complaining about the failure to pay
2  minimum wage, right?
3      A.   Yes.  That she had missing time.  Yes.
4      Q.   And that she was not paid minimum wage,
5  correct?
6      A.   I'm just a little bit confused on that minimum
7  wage.  Just meaning she was missing hours?
8      Q.   How about I put it this way --
9      A.   Okay.
10     Q.   -- HSA St. Joseph was aware that there were
11 multiple workweeks when Ms. Chinda was not paid at all,
12 right?
13     A.   I don't know about multiple.  Again, I don't
14 have her time card.  I'm aware of missing shifts that
15 were not paid, according to the e-mails.  I don't know
16 about multiple.
17     Q.   Do you know if there was at least one work
18 week where Ms. Chinda was not paid at all?
19     A.   Correct.  Yes.  Missing shifts.
20     Q.   So for that one workweek Ms. Chinda was not
21 paid minimum wage for a period of time and HSA was aware
22 of it, right?
23     A.   Correct.
24     Q.   Thank you.
25          MR. FITZ:  We've been on the record for about

Page 47

1  an hour.  Can we go off the record and discuss a break,
2  potentially?
3          THE VIDEOGRAPHER:  Okay.  We are now off the
4  record.  The time is 2:40 p.m. Central Time.
5          (Break taken.)
6          THE VIDEOGRAPHER:  We are now on the record.
7  The time is 2:50 p.m. Central Time.
8  BY MR. FITZ:
9      Q.   And Ms. Ziakas, do you understand that you're
10 still under oath?
11     A.   Yes, sir.
12     Q.   Is there anything that you would like to add
13 or clarify to your testimony so far today?
14     A.   No, sir.
15     Q.   And did you speak with anybody during the
16 short break we just took?
17     A.   No.  I did not speak.  No.
18     Q.   Okay.  Can you tell me about the circumstances
19 of your departure from HSA St. Joseph?
20     A.   Yes.  I left May 20, 2025.  I took a new role,
21 a new position that is remote.  I'm a -- my new
22 position, I'm currently a vice president for enterprise
23 development and partnerships for a company where I work
24 on contracting nurses and I do a lot of sourcing for
25 government contracts, particularly with the VA

Page 48

1  healthcare system across the US.  So, you know, the
2  needs of my family changed and I had this opportunity
3  come up and I get to work from home.
4      Q.   When did you leave HSA St. Joseph?
5      A.   My last day was May 20, 2025.  So just this
6  last May.
7      Q.   Okay.  And what is your job title with your
8  current employer?
9      A.   Yes.  It is the vice president for enterprise
10 development and partnerships.
11     Q.   And what is the name of your current employer?
12     A.   It's Advantage Staffing Services.
13     Q.   Thank you.  Is there anything else regarding
14 the circumstances of Ms. Chinda's complaints or placing
15 Ms. Chinda on administrative leave or Ms. Chinda's
16 departure from HSA St. Joseph that you recall that you
17 have not already testified to today?
18     A.   Not that I recall, sir.
19     Q.   Okay.  And have you been able to understand
20 all of my questions today?
21     A.   Yes, sir.
22     Q.   No technical difficulties?
23     A.   No.
24          MR. FITZ:  Okay.  Well, that's all the
25 questions that I have.  I'll pass the witness.

Page 49

1          MR. GHAFOOR:  This is counsel for the witness,
2  Asim Ghafoor.  I have no questions or redirect.
3          THE VIDEOGRAPHER:  All right.  Counsel, since
4  all questioning has concluded, I'll just get transcript
5  and video orders before we go off the record.
6          Starting with you, Mr. Fitz, I have you down
7  as a standard video and transcript.  Would you like that
8  sync'd, the video and the transcript, or just standard
9  is fine?
10          MR. FITZ:  Standard, please.
11          THE VIDEOGRAPHER:  Okay, sure.
12          And for you, Mr. Ghafoor, for a transcript
13 and/or video?
14          MR. GHAFOOR:  Standard.
15          THE VIDEOGRAPHER:  You would also like a
16 standard video, okay.
17          MR. GHAFOOR:  Yes.
18          THE VIDEOGRAPHER:  Very good.
19          MR. GHAFOOR:  Actually, I don't need an extra
20 copy for myself, no.
21          THE VIDEOGRAPHER:  You don't want the video.
22 Just the transcript, then?
23          MR. GHAFOOR:  Yes.
24          THE VIDEOGRAPHER:  Okay.  All right.  That's
25 fine.  We will go to our readout.

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

Page 50

1      This concludes the deposition of Michelle
2  Shepard Ziakas for Imani Chinda versus HSA St. Joseph,
3  LLC.  We are now off the record.  The time is 2:53 p.m.
4  Central Time.
5            (The deposition concluded at 2:53 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 51

DECLARATION UNDER PENALTY OF PERJURY

1
2
3      I declare under penalty of perjury that the
4  foregoing is true and correct to the best of my
5  knowledge and belief.
6
                        (signature)
7
      Dated this _____ day of _____, 20___.
8
      Executed at _____,_____.
9                    (city)              (state)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 52

1    2028550  DEPOSITION ERRATA SHEET  (Page 1 of 1)
2  Page No.:_____          Line No._____
3  Change:_____
4  Reason for Change:_____
5  Page No.:_____          Line No._____
6  Change:_____
7  Reason for change:_____
8  Page No.:_____          Line No._____
9  Change:_____
10 Reason for change:_____
11 Page No.:_____          Line No._____
12 Change:_____
13 Reason for change:_____
14 Page No.:_____          Line No._____
15 Change:_____
16 Reason for change:_____
17 Page No.:_____          Line No._____
18 Change:_____
19 Reason for change:_____
20 Page No.:_____          Line No._____
21 Change:_____
22 Reason for change:_____
23
    Name:_____ Date:_____
24        (signature)
25

Page 53

REPORTER'S CERTIFICATE

1
2
3      The undersigned, being empowered to administer
4  oaths and affirmations remotely pursuant to Section
5  30(F)(1) of the Federal Rules of Civil Procedure, do
6  hereby certify that the foregoing proceedings were taken
7  remotely before me at the time and place herein set
8  forth; that any witness in the foregoing proceedings
9  prior to testifying was placed under oath; that a
10 verbatim record of the proceedings was made by me using
11 machine shorthand which was thereafter transcribed under
12 my direction; and that the foregoing is an accurate
13 transcription thereof.
14      I further certify that I am neither
15 financially interested in the action nor a relative or
16 employee of the attorney(s) or any of the parties.
17      Further, that if the foregoing pertains to the
18 original transcript of a deposition in a federal case
19 before completion of the proceedings, review of the
20 transcript was requested.
21      IN WITNESS WHEREOF, I have this date
22 subscribed my name.
23 DATED:  October 4, 2025.  *Marsha J. Husted*
24
25      MARSHA J. HUSTED    RPR No. 834396

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

**Exhibits**

**Exhibit 4 - PME** 2:20
39:15 40:1,7,25

**Exhibit 7 - PME** 2:22
41:13

**Exhibit 10 - PME**
2:24 45:15,20

**1**

**10** 45:15,20
**100** 20:3
**1:37** 3:1,5

**2**

**2** 45:23
**20** 47:20 48:5
**2013** 9:14
**2016** 9:17,18 11:15
**2020** 11:19,20,25
**2021** 11:24
**2022** 12:1,2
**2023** 12:15
**2024** 15:25 41:9 45:23
**2025** 3:3,6 28:1 47:20
48:5
**2:40** 47:4
**2:50** 47:7
**2:53** 50:3,5

**3**

**30** 3:3,5
**315** 3:14

**4**

**4** 39:15 40:1,7,25

**4:24-cv-5106** 3:11

**7**

**7** 41:13

**8**

**807** 3:15

**9**

**90015** 3:15

**A**

**ability** 37:17
**absences** 43:3
**absolute** 17:2
**absolutely** 10:11 32:24
36:24 41:25
**abuse** 6:25 31:17 33:11
**accountable** 22:12
**accruals** 21:15
**accurate** 20:21 21:1
22:9,10 24:22 38:13 43:17
**accurately** 20:4 22:1,8
37:7
**accusations** 31:21
**accuse** 31:17
**acknowledge** 4:4
**acquired** 19:8
**action** 41:19 42:24
**actions** 6:23 8:1
**add** 47:12
**additional** 41:6
**address** 3:14
**administer** 4:6
**administrative** 7:1,3
31:1,5,9,12,18,23 32:1,7,
12,16,20 33:1,4 34:3,6,8,

20,23 35:21 39:12 41:1,23
42:18 48:15
**admissions** 45:2
**Advantage** 48:12
**advice** 38:6 39:9
**affected** 20:5,18
**affecting** 33:18
**affirm** 4:18
**afternoon** 3:4 5:6 10:9
**agency** 26:7 27:8 28:10
35:11,12
**agree** 4:8 29:11
**agreeable** 29:12
**agreed** 8:19
**agreement** 8:25 9:2
**ahead** 35:2 43:21
**allegation** 33:8
**allegations** 7:23
**American** 9:12
**amount** 26:5,7
**amounts** 21:23
**and/or** 49:13
**Angeles** 3:15
**answering** 25:13
**answers** 11:8
**anticipate** 24:9
**apologize** 14:12 27:21
30:5
**appeared** 5:13
**appearing** 4:3
**applies** 35:13
**apply** 27:10 41:22
**approach** 29:13
**appropriately** 17:22
21:25
**approval** 13:25 14:2,5,
14 18:1 30:1,2 42:10
**approvers** 14:9

**approximately** 15:24
**area** 16:14,24
**areas** 26:18
**Asim** 3:19 8:13 22:19
49:2
**assistance** 17:23
**assistants** 12:23
**associate** 11:24
**associate-degree**
9:7
**attached** 10:14
**attendance** 43:2
**attention** 20:3 37:13
**attorney** 8:9
**attorney-client** 8:25
**attorneys** 4:3
**aware** 45:25 46:10,14,21

**B**

**bachelor-prepared**
9:6
**back** 11:22,24 20:25 21:6
23:24 29:12 31:22 36:5
**background** 9:5 11:21
15:9
**bankruptcy** 15:21
**based** 14:1 40:10
**basis** 41:1
**begin** 3:6
**beginning** 25:6
**behalf** 3:14,18,19 6:12,
14,16 7:14 8:3,5 9:21
**behavior** 34:9 35:23,24
37:16
**behavioral** 5:19,24
33:24
**behaviors** 33:18
**big** 33:21 45:9
**biggest** 18:7

MICHELLE ZIAKAS, MSN, MBA, RN                                    JOB NO. 2028550
SEPTEMBER 30, 2025

**bit** 42:11 44:2 46:6

**blank** 30:12

**board** 14:8,10 19:12 33:12

**break** 47:1,5,16

**Briefly** 11:6

**bring** 31:21 36:18,19,23 39:5

**brought** 15:11 24:5 28:12 29:18 37:12

**build** 13:19

**building** 5:19 7:9

**business** 3:14 9:10,16 11:15

**busy** 45:12

---

**C**

---

**C-SECTIONS** 45:11

**calculated** 19:9

**California** 3:15

**call** 13:6 14:7 32:16

**called** 6:2

**candidates** 35:4,5

**capacity** 6:13 8:4 9:20 12:1,11

**card** 20:2,22,24,25 46:14

**cards** 10:20,22 18:16,19 19:6 20:20 21:4

**care** 11:20 12:23 13:22 16:5,16,18 17:25 18:6,9

**Carl** 3:18 5:6

**case** 3:9,11 6:25 7:20,23 17:15

**categorized** 44:17

**CC'D** 10:15

**census** 6:4

**center** 19:18

**Central** 3:2,5 47:4,7 50:4

**CEO** 22:16

**certifications** 16:15

**certified** 12:22

**chain** 17:2 33:23

**chance** 14:19

**change** 15:1,7 27:9

**changed** 48:2

**chaotic** 44:9

**characterize** 31:9 40:7, 9

**charge** 17:1 36:7 43:12 44:5,7,16,19,23,25 45:11

**check** 22:3 43:16

**checked** 24:3

**checking** 22:19

**checks** 21:21,22,24 22:3 23:2,25 37:4

**chief** 6:10 12:20 13:6 16:4,12 22:15,17 28:16 29:19 33:13

**Chinda** 3:7 5:7,8 25:22 28:25 29:2 30:24 34:22 35:20 36:15 37:1,8 38:15 41:1 46:1,11,18,20 48:15 50:2

**Chinda's** 10:18,22 30:9 38:20 39:12 48:14,15

**circumstances** 47:18 48:14

**clarify** 47:13

**clean** 16:10

**clear** 12:2

**clinical** 17:1

**clock** 20:11 23:2

**closely** 13:7 15:23 18:2 19:15 29:6 37:19 38:1,17 43:17 44:14

**closing** 5:24

**CNO** 11:24,25 12:1,3,4, 13,14,18,19 13:4,7,10 32:15

**comfortable** 36:11

**command** 19:10,11,17

20:14 21:6 22:13,21,24 23:10 24:2,16,23 33:23

**commenced** 3:1

**commentary** 36:9

**comments** 36:13 37:17

**committee** 14:6,7

**committees** 14:3,18

**common** 26:21 42:19

**communicate** 44:11

**communicated** 44:10

**communicating** 23:22

**communication** 10:15 44:6

**company** 5:22 9:21 47:23

**compensation** 18:11

**complaining** 46:1

**complaint** 31:21 43:14

**complaints** 33:10 48:14

**complete** 35:2

**comprised** 14:18

**computers** 19:13

**concern** 10:7 25:3 32:3, 4,15 43:16

**concerns** 24:4,15 25:1 29:20 33:21 45:6

**concluded** 49:4 50:5

**concludes** 50:1

**conclusion** 34:23

**conduct** 31:24

**conducts** 33:7

**confused** 46:6

**considered** 22:25 28:10

**consulting** 42:23

**content** 13:16,17

**context** 5:16,18

**continue** 14:12 28:5

**continued** 27:25 44:11

**contract** 5:18 6:1,4,5 26:11,12 28:10 35:1,2,10, 15

**contracting** 35:11 47:24

**contracts** 26:14,16,21 27:25 47:25

**conversation** 27:2

**coordinators** 17:1

**copied** 11:2 45:22

**copies** 20:20,24

**copy** 49:20

**cor-** 22:7

**corporate** 6:7,9 18:22 19:16 21:17 23:23 30:1,2

**correct** 12:15 15:25 16:1 19:8,20 20:4,9 28:18 31:25 40:2 42:22 43:24 44:1,18 45:24 46:5,19,23

**corrected** 21:20,23 22:7 25:18

**correctly** 12:25 19:9 21:8,13 31:8

**cost** 26:19 28:7

**costs** 16:14

**counsel** 3:16,21 4:8 7:4, 5 49:1,3

**counseled** 42:21

**counseling** 42:25 43:2

**court** 3:10,22,24,25 4:9, 23 7:6

**courthouse** 7:8

**COVID** 11:23

**crisis** 22:25

**critical** 11:20

**cross-check** 23:12

**current** 48:8,11

**cut** 23:25 37:4

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

## D

**daily** 6:4

**database** 13:12

**date** 6:1 37:3

**day** 8:20 23:16,18 45:4 48:5

**days** 22:4

**de-** 29:23

**dealing** 33:1

**Deborah** 22:16

**Debra** 22:17

**deciphering** 19:16

**decision** 12:10 29:2,24 30:23 32:6 34:25 35:14,16

**declined** 28:4

**decrease** 28:7,9

**decreasing** 28:7

**deemed** 36:11

**definition** 7:2

**delay** 42:11

**deliveries** 45:10

**delivering** 16:17

**delivery** 28:3,12 43:13, 18 45:1,9,12

**department** 13:23 14:2 16:14 26:16 45:2,7

**departments** 19:19

**departure** 39:12 47:19 48:16

**Depending** 42:23

**depends** 13:14 14:22 26:23 33:8 42:22,25 43:6

**deposed** 6:2

**deposition** 3:1,6,12 4:3,5,6,11 5:13,17 6:8,18 7:10,19 9:25 39:24 41:5 44:18 50:1,5

**describe** 5:16

**deserve** 23:7

**detox** 5:23

**development** 47:23 48:10

**deviated** 34:19

**difference** 23:19

**differential** 20:1 23:4

**differentials** 19:8 21:13,15 23:15 44:1

**difficulties** 48:22

**direct** 10:16 16:24 17:2 21:5 32:19 33:12 37:10 44:6

**direction** 31:7

**directly** 29:10 31:2 32:17 36:16 39:4 43:19 44:8

**director** 11:20 17:7,10 22:18 27:2 28:16,20 29:6 30:4,8,17 31:2 32:17 37:14,25 38:8 43:19 44:9

**directors** 14:10 16:24 17:1,3 19:18

**disability** 7:22,24 8:2

**disagreement** 6:1,6

**discharges** 45:3

**disciplinary** 41:19

**discipline** 28:24 29:2, 14 30:23 31:10,15

**discrepancies** 21:10

**discrimination** 7:24

**discuss** 47:1

**discussed** 37:14

**disposal** 13:18

**disrupt** 44:10

**disruption** 15:16 18:6, 10 33:17 43:22

**disruptive** 37:16

**District** 3:10

**division** 3:11 20:16,17 29:19 34:21 39:1,5

**document** 33:25 39:17

40:14

**documentation** 40:25 43:5

**documented** 34:4,12

**documents** 10:1,13 11:1,3,9,10 36:6

**dollar** 22:1 26:7

**double-checking** 23:13,21

**download** 21:9

**downloaded** 18:23

**downtime** 18:15,16,25

**downtown** 6:22

**draft** 13:20,24

**drafted** 13:21

**duck's** 16:9

**due** 25:6,7

**duly** 5:2

**Dunning** 22:16

## E

**e-mail** 36:14,18,19,23 39:23 40:24 45:22

**e-mails** 10:14,17,19,21 11:2 29:9 36:6 46:15

**earlier** 9:19 40:4 44:17

**earned** 23:7

**easier** 16:11

**education** 9:9

**educational** 9:5

**effect** 15:17

**effects** 16:20

**egregious** 33:15,16

**electronically** 19:1

**eliminate** 28:9

**emergency** 13:23 26:15

**Emily** 30:18,19,20 40:16, 22

**employee** 8:16,18 9:3, 22 20:23 21:1,5,18,23 23:14 26:22 31:14,22 34:8, 9,15 37:15,22 42:21

**employee's** 25:9

**employees** 21:21 34:2 37:5,17

**employees's** 23:2

**employer** 48:8,11

**employment** 6:25 7:22

**end** 5:25 6:1,5 11:15 26:14

**ended** 26:16

**ensure** 12:24 16:5,13 17:24 18:3 38:18

**ensured** 19:5

**ensures** 29:15

**ensuring** 14:15 16:2,8 17:18 18:5,8 45:5

**entered** 18:22 19:3

**enterprise** 47:22 48:9

**entirety** 42:1,16

**entry** 19:4

**environment** 33:17 36:10

**equipment** 17:21

**escalated** 33:23 45:6

**escalating** 17:23

**events** 10:4

**exact** 22:5 26:5 37:3,11

**EXAMINATION** 5:4

**examined** 5:2

**examples** 7:16 8:6

**Excel** 21:8,9

**exchange** 15:9

**executive** 13:6 15:21

**executives** 19:10

**Exhibit** 39:15 40:1,7,25 41:13 45:15,20

MICHELLE ZIAKAS, MSN, MBA, RN                                          JOB NO. 2028550
SEPTEMBER 30, 2025

**expectation** 20:10
**expected** 17:13 22:22
**expense** 16:7
**experience** 11:22 32:25
**experienced** 15:8
**experiencing** 40:18
**expert** 13:16,17
**explored** 11:18
**expressed** 26:24
**extend** 35:9
**extension** 17:18 18:5
**external** 26:7 27:19
  28:10 35:11
**extra** 49:19

**F**

**face** 30:13
**facilitate** 17:13
**failure** 43:15 46:1
**fair** 29:16 31:3 38:19
  45:25
**fall** 13:3,8 29:18
**falls** 44:16
**familiar** 13:10 39:21
  41:15,16 45:20
**family** 26:1 48:2
**feedback** 37:18,19
  38:11
**feel** 10:9 15:4,5,17 32:1
**feelings** 40:11
**felt** 16:21 20:21 22:12
  24:9
**figure** 19:14 20:1
**filed** 34:5
**fill** 29:7 35:6 38:22 39:6
**filled** 18:4,9
**filling** 26:13 35:7
**final** 12:10 14:9 29:23

**financial** 22:15
**financially** 16:13
**fine** 35:19 49:9,25
**finish** 35:3
**fire** 43:21
**fired** 27:12
**firm** 7:9
**fiscally** 16:7
**Fitz** 3:18 4:24 5:5,7 46:25
  47:8 48:24 49:6,10
**fix** 20:12 22:12
**fixed** 21:14 23:3,6 25:12
  44:4
**flipped** 23:17
**floor** 5:23
**focus** 20:3 24:19 33:20
**focussing** 36:20
**folks** 18:24 19:24 22:7
  26:9 27:15
**force** 18:7
**forgot** 30:14
**form** 31:15
**formal** 27:10
**founded** 31:21
**free** 10:10
**Friday** 24:21,22
**front** 30:13,15 32:8,14,23
  35:17 36:16
**full** 12:10,16 26:13 27:15,
  18 28:4,5,12
**full-time** 12:1,13,14
  26:9,11,13,17,22 27:5
  30:21 35:5,6,8
**function** 12:19
**functions** 6:3 13:1
**funded** 22:3
**furthered** 9:9

**G**

**gears** 25:21
**general** 17:15,16,17
  25:13,15
**Ghafoor** 3:19 8:13,14,
  21,23 9:1 11:6,12 24:16
  49:1,2,12,14,17,19,23
**Ghafoor's** 24:1
**give** 4:20 10:10 11:7
  28:15 31:7 38:6,9 43:1
**glance** 20:1
**goal** 23:5 28:6
**good** 3:4 5:6 16:15,16
  24:12 49:18
**goodness** 30:11
**government** 47:25
**group** 44:16
**guidance** 31:7 38:2

**H**

**halt** 32:3
**hand** 4:17 22:3
**hands** 14:20 43:21
**happen** 15:13
**happened** 18:14 39:5
**hard** 19:25 22:8 23:11
**head** 10:24 28:14 41:11
**health** 5:19,24
**healthcare** 48:1
**hear** 38:10
**heard** 24:19
**hearing** 4:15 6:18,20,24
  7:1,3,11,13
**helped** 24:16
**Hermann** 7:19,21 8:1,4,
  5
**hey** 27:3 44:12

**high** 26:7
**high-cost** 28:9
**hire** 8:14
**hired** 26:17
**hiring** 17:25
**hit** 11:23
**home** 48:3
**honest** 10:8,10
**hospital** 11:16,18 19:19
  20:17 26:8 27:9 28:8
**hostile** 36:12
**hour** 20:2 23:4 47:1
**hours** 23:15 44:2,3 45:13
  46:7
**house** 16:10
**housekeeping** 26:8
**Houston** 3:10 6:22
**HR** 13:14 14:15 18:3 21:17
  23:23 28:21 29:6,11,18
  30:3 31:3,6 32:9,11,17,19
  33:19,25 34:5 37:19 38:1,
  2,17 42:23 43:7 44:14
**HSA** 3:7 5:8 9:3,23 14:24
  15:8 17:9 19:16 23:22
  26:3,4,20 27:12,24 28:6
  29:25 34:18 45:25 46:10,
  21 47:19 48:4,16 50:2
**HSA's** 26:21 37:17
**Huh-uh** 25:23
**human** 13:3,5,7,8,14
  22:18 41:21
**Hundreds** 20:5
**Husted** 3:25
**hyper** 24:19

**I**

**ICU** 11:22 13:23 26:18
**identify** 3:16,22
**Imani** 3:7 5:7 10:16 25:22
  50:2

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

**immediately** 24:23

**imminent** 45:10

**important** 29:16 42:23 43:7

**in-person** 6:22

**inaccurate** 19:21 28:15

**incident** 19:10,11 20:14 21:6 22:13,21,24 23:9 24:1,16,23 36:25 37:12 38:21

**incidents** 33:1,24

**include** 29:8

**incoming** 12:8

**individual** 6:13 8:4 9:20,22 29:15

**information** 23:24 40:23 41:3

**informed** 34:2

**inquiring** 33:9

**instances** 31:16 34:17

**institution** 28:8

**intact** 16:17

**interested** 27:11

**interim** 11:25 12:3,4,16 30:20

**internal** 28:10 35:12

**interpretation** 40:12

**interruptions** 15:4,6

**intervals** 38:23

**interview** 34:12

**interviewed** 34:9 35:5

**interviews** 38:3

**investigate** 37:20 38:5, 18

**investigated** 38:9

**investigating** 19:13 39:7

**investigation** 31:13, 19,24 32:2,5 33:5,7,25 34:14 38:20,23 39:7,11

**involve** 31:1

**involved** 14:21 28:24 33:9,12 39:4

**involvement** 39:11

**involving** 7:23

**isolved** 18:13,18,24 19:4 21:10

**issue** 20:9

**issues** 37:4

**item** 21:8,17,18

---

**J**

**Jamie** 22:18 23:11 30:7 43:20 44:12

**January** 11:19,20

**job** 48:7

**Jones** 22:16

**Joseph** 3:7 5:8,20 6:10, 12,14,16,25 7:14,15 8:16 11:16,19,24 12:8,9 14:10, 24 18:11 27:24 33:3 34:18 45:25 46:10 47:19 48:4,16 50:2

**Joseph's** 13:11

**judge** 7:3,6

**justly** 32:5

---

**K**

**keeping** 38:24

**Ketzel** 3:13

**kind** 17:17 32:3

**kingdoms** 15:10

**knowledge** 31:6

**kosher** 29:21

**KRONOS** 18:13,17,25

---

**L**

**labor** 16:13 18:7 28:2,7,9, 12 43:12,18 45:1,8,12

**Lanclos** 22:17

**large** 19:22 21:15

**largest** 20:16

**law** 7:9

**lawsuit** 10:7

**lawyer** 8:12

**layers** 14:14

**leader** 15:21 20:19,22 21:5

**leaders** 22:22

**leadership** 10:16 33:19, 25

**lease** 5:18

**leave** 31:1,5,9,12,18,23 32:2,7,12,16,20 33:1,4 34:3,6,8,20,24 35:21 39:12 41:2,23 42:18 48:4,15

**left** 11:17 29:14 32:13 47:20

**legal** 3:13 24:13,15 25:1, 8,13

**legally** 24:5

**letting** 25:10 42:13

**level** 19:5 33:10

**licensed** 4:9,10 12:21

**licensures** 16:16

**Lisa** 36:8 40:2,14

**list** 28:22

**listed** 14:16

**LLC** 3:8 5:8 50:3

**loaded** 18:25

**local** 6:9 21:16 25:25 26:1,3,6,11,16,25 27:8,19 29:4 30:3 33:19,24

**locally** 21:21

**looked** 21:7

**loop** 31:3 38:21,25 39:8, 10

**looped** 38:1

**Lori** 17:4,7 30:16,17 38:8 40:12 44:12

**Los** 3:15

**lot** 12:6 15:7 19:2 21:16 25:7 26:10,18,25 31:13 43:18 44:3 45:10,13 47:24

**lower** 27:20

---

**M**

**M-I-C-H-E-L-L-E** 5:12

**made** 14:21,22 34:25 35:16

**main** 12:19 18:4 22:21 24:19

**majority** 23:1

**make** 12:10,12 15:3,22 16:9,10 21:25 22:2,10 23:18,23 29:19 31:7 35:14 37:20,25 38:12 44:13

**makes** 29:15

**making** 12:10,25 15:3,5 18:4 23:14,20 31:3 36:10, 12 37:16

**Malveaux** 22:18 30:22

**Malveaux's** 23:9

**management** 44:21 45:4

**manager** 27:2 28:20 29:5 30:20,21 37:25 38:16 40:10 44:19,22

**managers** 16:25 19:19 44:17

**managing** 16:15

**manner** 4:12

**Manning** 30:18,20,22

**manual** 18:25 19:4

**manually** 18:22

**marked** 39:15 41:13 45:15

**Marsha** 3:25

**master** 21:7,9

**master's** 9:8,10,11,14, 15,16 11:14

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

**matter** 3:7 5:8 20:12 37:20

**Matthew** 5:22

**MBA** 5:1

**Mccorkle** 36:8 40:2,14

**meaning** 46:7

**means** 19:11

**med-surg** 26:18

**medications** 14:16

**member** 7:22

**members** 7:6 15:23

**Memorial** 7:19,21 8:1,3, 5

**memory** 10:15 36:15,20 37:10

**mentioned** 25:1

**messages** 38:11

**Michelle** 3:6,20 5:1,11 50:1

**mind** 25:2 30:11,12 42:5

**Mindee** 43:9,12,17 44:2

**Mindee's** 43:24 44:12, 19 45:8

**mine** 18:5

**minimum** 43:15 46:2,4, 6,21

**minute** 23:5

**misquote** 35:18 36:17

**missed** 19:17 23:4 43:5

**missing** 19:7 44:1 46:3, 7,14,19

**mistake** 22:10

**moment** 25:1 36:20

**money** 22:11 23:7

**month** 25:6

**mortgage** 25:6

**moved** 11:23

**MSN** 5:1

**multi-layered** 29:13

**multiple** 14:14 22:4 46:11,13,16

---

**N**

**named** 43:9

**names** 28:11,15

**nature** 29:17 31:17 33:13,15 37:23

**necessarily** 35:9 44:7

**needed** 17:19 29:7

**night** 23:16,17

**Ninth** 3:15

**November** 15:25 41:9 45:23

**number** 3:11 22:5,6 23:2,22 38:1

**numerous** 19:24

**nurse** 9:6,7 16:4,12 28:16 29:19 36:7 43:9,12 44:5,7, 16,20,23,25 45:12

**nurse's** 6:23 35:24,25 36:8,9 37:16 40:15

**nurses** 12:21,22 16:6,9 17:1 18:11 27:13,25 28:12 35:25 39:2 47:24

**nursing** 6:10 9:8,11,15 12:20,21,23,24 13:2,7,17, 18 16:16,23 18:2 20:16 26:21 33:12 39:1

---

**O**

**oath** 4:6 47:10

**objection** 4:12,14,15

**obtain** 38:15

**occurred** 19:22 24:21 36:1,4 37:1

**October** 41:8

**offer** 26:22

**office** 18:22

**officer** 6:11 12:20 13:6 22:15,17 33:14

**online** 27:10

**open** 23:1 27:6

**operational** 6:3 26:19

**operations** 15:16

**opportunity** 42:15 48:2

**opposite** 23:18

**ordering** 17:20

**orders** 49:5

**originally** 21:12

**outcome** 34:14

**overnight** 15:13

**oversee** 12:20

**overseeing** 7:6

**oversees** 44:20

**oversight** 14:7

**overtime** 16:8,15

**ownership** 15:1,2,7

---

**P**

**p.m.** 3:1,5 47:4,7 50:3,5

**paid** 18:24 19:1 20:4 21:13 25:4 31:22 37:6 44:15 46:4,11,15,18,21

**paper** 18:16 20:20,22,23

**part** 26:8

**parties** 4:8,10 32:4

**partners** 19:16 21:17 23:23

**partnerships** 47:23 48:10

**party** 4:12

**pass** 48:25

**passed** 10:3,4

**path** 13:9

**patient** 6:23 12:23,25 16:5,16,17 17:24 18:6 31:16 33:11

**patients** 15:5,17 18:8,9 33:18

**pay** 27:17,19 37:17 43:15, 20,24 46:1

**paycheck** 19:25

**paychecks** 19:21

**paying** 8:23

**payroll** 18:23 19:14 20:21 24:21 37:4 44:4

**penalties** 4:19

**pending** 31:19

**people** 19:23 23:17 25:5, 6 27:15 28:22 37:6

**people's** 22:11

**percent** 20:3

**Perfectly** 35:19

**performance** 41:18

**period** 19:2 34:18,19 46:21

**perjury** 4:19

**permanent** 12:9

**person** 20:4 22:2 23:22 26:24 28:18 31:6 39:3

**personally** 36:1

**perspective** 24:25

**pharmacy** 14:16

**phonetic** 5:23

**physically** 4:4

**physician** 14:2

**physicians** 14:18

**piece** 6:4 14:15 19:3 21:11

**pieces** 40:12

**place** 3:12 32:2,5,6 41:22

**placing** 34:20 41:1 48:14

**plaintiff** 3:18 5:7

**point** 24:17,18,20 25:16

**policies** 13:11,12,13,15, 18,20,21,24 14:5,9,17,20 15:10,11,12 16:5,17 17:19 32:8

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

**policy** 14:1,4,6,8,16,22 32:9,11,19 41:19,21 42:20

**position** 16:19 27:5,11 35:8 47:21,22

**positions** 17:25 18:2,3, 9 26:13 27:7

**Post** 9:13

**potentially** 47:2

**practice** 12:20,21,24 13:2,18 26:21 35:13 42:19

**preparation** 10:13 39:24 41:5

**prepare** 9:24 11:3,5

**present** 4:4 22:13,22

**president** 12:7,9,12 13:6 47:22 48:9

**pretty** 15:19 21:14

**previous** 42:9

**previously** 35:7 39:15

**Primarily** 16:4

**primary** 39:23

**print** 21:24

**printing** 21:21

**prior** 5:16,25 9:7

**procedure** 18:15,17 34:19

**proceed** 4:15,24

**proceeded** 38:21

**proceeding** 6:21

**process** 13:25 14:5,14 15:13 18:1 21:20,24

**processes** 14:5

**program** 5:25

**programs** 5:25

**protect** 31:13 32:4

**provided** 7:17,18 39:9 40:16,23

**PTO** 19:8 21:15

**public** 10:1,2,12 11:1,10 36:5

**pull** 13:13,15

**pulled** 32:10

**punitive** 32:1

**purpose** 31:23 38:24

**push** 29:12

**put** 22:5 30:25 31:5,12,18 32:3 46:8

**putting** 40:12

**Q**

**QSAC** 14:7

**quality** 13:16,22 14:2,7 22:17 33:14

**question** 28:19 34:7 39:20 41:14

**questioning** 29:11 43:8 49:4

**questions** 10:8 24:10, 13 25:14 29:20 32:18 48:20,25 49:2

**quick** 22:12 25:17

**quickly** 11:23 19:20,21 21:22

**R**

**raise** 4:17

**raising** 43:14

**rate** 27:17,19

**re-looked** 15:2

**reached** 8:16,21 43:18, 19,21

**reaching** 44:13

**read** 4:1 11:9 35:22 41:24

**readout** 49:25

**realized** 24:22

**reasons** 31:12

**recall** 10:21,24 11:9 18:10 24:15,25 27:24 30:5, 9 35:22 41:8 43:8,11,14 48:16,18

**recalls** 40:11

**received** 8:17,21 9:8,15 10:1,23 11:14

**record** 3:5 5:10 12:2 21:2 46:25 47:1,4,6 49:5 50:3

**recorded** 22:1

**recruitment** 28:21

**rectify** 19:20 22:11

**redirect** 49:2

**reduce** 26:19

**refamiliarize** 10:2

**reference** 13:13 23:13 29:7 40:2

**referring** 40:4

**refresh** 10:15

**registered** 9:6 12:21

**regularly** 13:22

**relate** 10:19 16:5

**related** 10:17 13:15,16, 17 35:23 45:6

**relates** 13:1,22 15:10 17:14 33:17 38:2 42:18

**remember** 10:9 11:8 26:5 28:11,20 30:14 32:18 36:15,25 37:8,11

**remote** 47:21

**remotely** 4:6,7

**renew** 35:1,10,14

**rent** 25:6

**report** 16:25 17:4 33:12

**reported** 16:22

**reporter** 3:22,24,25 4:9, 23 7:7

**reporting** 4:5,13 13:9 16:23

**reports** 13:5 16:24 17:3

**represent** 3:17 8:19 35:12

**representative** 6:7

**represented** 8:9

**representing** 8:15,18

**request** 10:7,20,22 27:10

**required** 20:3

**resolved** 33:22

**resource** 13:3,14

**resources** 13:5,7,8 22:18 41:21

**response** 25:17

**responsible** 16:7 22:12

**returned** 11:16,18

**review** 10:2,12 11:2 13:14,21 14:4,8,19 29:22 36:6,7,14 42:10,15

**reviewed** 13:12 15:3 29:17 30:3 32:10 39:22,24 40:24

**reviews** 14:15,17

**Rick** 3:13

**rights** 25:9

**RN** 5:1

**Rogers** 43:9,11

**role** 6:10 11:23 16:2,4,19 17:6,8 20:13,15 23:9 24:1 28:17 35:6,8 44:20,25 45:1,8,9,12 47:20

**roles** 27:9

**room** 4:5 7:5 19:12 24:8

**row** 16:10

**S**

**safety** 12:25

**scary** 25:5

**scope** 13:3

**screen** 7:4

**scroll** 39:18 41:13 42:2 45:17

**scrolling** 42:4,8

**scrub** 20:25

MICHELLE ZIAKAS, MSN, MBA, RN
SEPTEMBER 30, 2025

JOB NO. 2028550

**scrubbed** 21:4

**seamless** 15:3,22 16:2 17:13,24

**Sentinel** 9:12

**September** 3:3,5 15:25

**services** 14:17 17:7,10 48:12

**set** 18:19 19:10,12 24:23

**sets** 18:19

**settle** 27:16

**settling** 27:4

**shared** 34:14

**sheet** 18:19,20

**Shepard** 3:6 5:1 50:2

**shift** 19:7 20:1 23:16,17 44:21 45:5

**shift-by-shift** 44:21

**Shifting** 25:21

**shifts** 46:14,19

**ship** 15:14,15

**short** 47:16

**show** 39:14 45:14

**showed** 23:17

**showing** 41:12

**sic** 5:7

**side** 7:25 24:18

**silly** 34:7

**similar** 7:20

**single** 20:2 23:14

**singular** 19:23

**sir** 8:8,22 10:23 11:4,13 12:16 17:5 18:12 25:23 30:19 36:3 37:10,11 39:22, 25 40:3 47:11,14 48:18,21

**situation** 10:3 37:24 39:4 43:6

**slowly** 39:18 41:14 42:2

**small** 15:16

**smooth** 15:19

**solemnly** 4:18

**someone's** 35:14

**sort** 29:13

**sourcing** 47:24

**Southern** 3:10

**space** 5:19

**speak** 11:5,11 32:16 47:15,17

**specific** 17:15

**specifically** 42:17

**speed** 29:18 39:6 44:4

**spell** 5:9

**spent** 23:8

**spoken** 25:21 26:2

**spreadsheet** 21:7,9

**St** 3:7 5:8,20 6:10,12,14, 16,25 7:14,15 8:16 11:16, 19,24 12:8,9 13:11 14:10, 24 18:11 27:24 33:3 34:18 45:25 46:10 47:19 48:4,16 50:2

**staff** 7:21 15:4,17 17:2,25 23:5,25 24:4,13 25:10 26:17 35:24 45:5,6

**staffed** 16:6 45:7

**staffing** 45:3,4 48:12

**standard** 3:2 18:16 27:23 49:7,8,10,14,16

**standards** 41:18

**standing** 38:10

**start** 17:16 19:16 21:2,22 22:23 43:4

**started** 19:13

**Starting** 49:6

**starts** 42:24

**state** 3:17 4:10,13 5:9

**stated** 4:13 38:5,13

**statement** 38:15 40:8, 10,19,22

**statements** 37:21 38:3, 7,17

**states** 3:9 42:20

**station** 35:24,25 36:8,9 37:16 40:15

**status** 26:10,11

**stayed** 23:1

**Steno** 3:14

**Steward** 5:20 6:8 7:5 11:15 12:5,6,18,19 13:10 14:24 15:8,20 17:9 26:4 28:6 29:25 34:18

**sticks** 29:20

**stipulate** 4:11

**stipulation** 4:2

**stop** 25:11

**Street** 3:15

**stressful** 37:5

**structure** 13:9

**stuff** 15:7

**submitted** 18:18

**subpoena** 8:17,21

**Suite** 3:15

**supervisor** 29:5 30:10

**supplies** 17:20 18:8

**support** 8:2 12:23 22:20 24:6,10,12

**supported** 16:18

**supportive** 24:4

**supposed** 34:4,5

**swear** 3:23 4:1,16,18

**switching** 18:12

**sworn** 5:2 7:17 8:6

**sync'd** 49:8

**system** 18:23 48:1

**systems** 11:18 26:8

**T**

**taking** 3:12

**talk** 13:15 37:21

**tanker** 15:14,15

**tardy** 43:3

**task** 19:22 21:15

**team** 15:23

**technical** 48:22

**techs** 12:22,23

**ten** 11:17

**terminated** 34:23,25 35:9

**termination** 6:24 10:18,20 28:25 29:14

**testified** 5:2 6:16 48:17

**testify** 6:12 8:3

**testifying** 7:13 9:20

**testimony** 4:19 7:17,20 8:7 47:13

**Texas** 3:10

**text** 38:11

**thing** 13:16 18:4,7 24:19 26:15,17 35:13

**things** 15:2,10 24:22 25:7 29:15 31:7 33:20

**thinking** 27:3 32:15

**Thomas** 22:16

**through-put** 45:2

**time** 3:2,5 6:15 8:4 10:3,4, 20,22 12:5,10,16 14:9 15:20 16:20 18:16,19 19:2, 5,7 20:2,20,22,23,25 21:1, 2,4 23:3,7 24:17,18,20 25:9 26:13 27:15,18 28:4, 5,13 30:2,8 31:22 33:3 34:18,19 35:4,18 36:13 37:5,6 43:2 46:3,14,21 47:4,7 50:3,4

**times** 18:21 19:14,17 23:15 26:10,25

**title** 48:7

**today** 3:25 8:10 9:20,25 11:3,5,6 39:24 47:13 48:17,20

**told** 40:18

MICHELLE ZIAKAS, MSN, MBA, RN                                                   JOB NO. 2028550
SEPTEMBER 30, 2025

**Tolopka** 17:4 30:16
38:14 39:10

**Tolopka's** 17:8

**Toop** 5:23

**top** 10:24 28:14 41:10

**touch** 14:20

**trajectory** 13:9

**transcribed** 21:8

**transcript** 49:4,7,8,12,
22

**transition** 14:23,25
15:24 16:3,6,11,20,21,22
17:9,11,13,24 18:11,17,18
26:4,9 27:1

**transitioned** 28:22

**transitioning** 15:11

**travel** 26:11 27:12,25
28:5,11

**traveler** 25:25 26:21
27:8,19

**travelers** 26:1,3,6 27:1

**true** 38:13

**truth** 4:20,21

**Tuesday** 3:2

**turn** 15:15

**two-page** 39:17

**type** 6:20 33:8 37:24 38:3
39:7

**typically** 33:7

---

**U**

**uh-huh** 10:6 12:17 25:20

**ultimately** 34:22

**uncomfortable** 36:12

**underneath** 16:25

**understand** 47:9 48:19

**Understood** 25:19

**unfounded** 31:20

**unique** 43:6

**unit** 6:3 26:1,18

**United** 3:9

**university** 9:12,13,17

**update** 44:12

---

**V**

**VA** 47:25

**vacant** 26:13

**venue** 3:9

**verbal** 42:25 43:1,4

**verbally** 42:21

**versus** 3:7 18:24 43:19
50:2

**vets** 17:21

**vice** 47:22 48:9

**video** 49:5,7,8,13,16,21

**vocational** 12:22

---

**W**

**wage** 43:15 46:2,4,7,21

**waiting** 35:6

**wanted** 6:5 12:8 28:4

**wanting** 17:14,15 27:1,9

**week** 18:20,21 22:6 23:1
46:18

**weekend** 19:11,18 20:7
22:22

**West** 3:14

**wind** 26:20

**witnessed** 36:7 40:17

**women** 14:17

**women's** 17:7,10

**word** 36:12 42:17

**words** 37:11

**work** 13:7 21:16 22:19
23:16 29:6 33:19 36:10
37:19 38:17 43:17,25 44:2,
13 45:7 46:17 47:23 48:3

**work-** 35:23

**worked** 11:17 19:15 20:7
23:1,11 44:3 45:13

**worker** 32:6 33:4 34:20

**workers** 20:5 41:22

**workforce** 20:17

**working** 12:7 15:22 18:2
20:11,17 21:20 22:23 26:1
27:25 38:1 43:7

**workweek** 46:20

**workweeks** 46:11

**world** 35:11

**writing** 34:2,15

**written** 9:2 32:7

---

**Y**

**year** 12:5,11

**years** 11:17

---

**Z**

**Z-I-A-K-A-S** 5:12

**Ziakas** 3:6,20 4:17 5:1,6,
11,12,14 47:9 50:2

**Zoom** 3:12