EXHIBIT 3

# Deposition Transcript

Case Number: 4:24-cv-5106
Date: October 4, 2025

In the matter of:

# IMANI CHINDA v HSA ST. JOSEPH LLC.

# Lori Tolopka

**CERTIFIED COPY**

Reported by:
Dara Sanoff



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

```
 1            UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF TEXAS

 3                  HOUSTON DIVISION

 4
     IMANI CHINDA,              )Case No.:
 5                              )4:24-cv-5106
                                )
 6           Plaintiff,         )
                                )
 7    vs.                       )
                                )
 8                              )
 9    HSA ST. JOSEPH LLC,       )
                                )
10                              )
             Defendant.         )
11    _____)

12

13         VIRTUAL EXAMINATION BEFORE TRIAL of

14    LORI TOLOPKA, a Third-Party Witness, taken by the

15    Plaintiff, pursuant to the provisions of Federal Rules

16    of Civil Procedure, commencing at 10:07 a.m. Central

17    Standard Time on Saturday, October 4th, 2025, before

18    DARA SANOFF, a Certified Court Reporter and Notary

19    Public for and within the State of New York.

20

21

22

23

24    STENO
      Concierge@Steno.com
25    (888)707-8366
```

LORI TOLOPKA                                                          JOB NO. 2035790
OCTOBER 04, 2025

```
 1    APPEARANCES VIA ZOOM:

 2    FOR THE PLAINTIFF:

 3         FITZ LAW PLLC
           BY:  CARL A. FITZ, ESQ.
 4         3730 Kirby Drive, Suite 1200
           Houston, Texas 77098
 5         712-766-4000
           carl@fitz.legal
 6


 7
      FOR THE DEFENDANT:  HSA ST. JOSEPH LLC and THIRD-PARTY
 8    WITNESS LORI TOLOPKO

 9         HEALTHCARE SYSTEMS OF AMERICA
           BY:  ASIM GHAFOOR, ESQ.
10         Regional Counsel
           St. Joseph Medical Center
11         1401 St. Joseph Parkway
           Houston, Texas 77002
12         202-330-1469
           aghafoor@hsahospitals.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          F E D E R A L   S T I P U L A T I O N S

 2

 3     IT IS HEREBY STIPULATED AND AGREED by and between the

 4     counsel for the respective parties herein that the

 5     sealing, filing and certification of the within

 6     deposition be waived; that the original of the

 7     deposition may be signed and sworn to by the witness

 8     before anyone authorized to administer an oath, with

 9     the same effect as if signed before a Judge of the

10     Court; that an unsigned copy of the deposition may be

11     used with the same force and effect as if signed by

12     the witness, 30 days after service of the original & 1

13     copy of same upon counsel for the witness.

14

15       IT IS FURTHER STIPULATED AND AGREED that all

16     objections except as to form, are reserved to the time

17     of trial.

18

19

20

21

22

23

24

25
```

1        THE COURT REPORTER:  Before I

2    swear in the witness I'm just going

3    to do a brief Federal read on

4    required by Steno.

5        The attorneys appearing in this

6    deposition acknowledge that I am not

7    physically present in the deposition

8    room, that I will be reporting on

9    this deposition remotely, and that I

10    will administer the oath to the

11    witness remotely.

12        The parties and their counsel

13    further agree that while I am a

14    Notary the witness may be in a state

15    where I am not licensed and stipulate

16    pursuant to Federal Rule of Civil

17    Procedure 29, that this deposition

18    may be taken before me.

19        If any party does have an

20    objection to this manner of reporting

21    or anything stated above, please

22    state so now.

23        Hearing none, we can proceed.

24

25

1           THE COURT REPORTER:  Please

2       raise your right hand.

3           THE WITNESS:  (Complied)

4           THE COURT REPORTER:  Do you

5       solemnly swear the testimony you're

6       about to give will be the truth, the

7       whole truth and nothing but the truth

8       so help you God?

9           THE WITNESS:  I do.

10

11  L O R I   T O L O P K A, called as a witness, having

12  been first duly sworn by a Notary Public of the State

13  of New York, was examined and testified as follows:

14           THE COURT REPORTER:  Please

15       state your full legal name and spell

16       it for the record.

17           THE WITNESS:  Lori Tolopka.

18       L-o-r-i and then T-o-l-o-p-k-a.

19           THE COURT REPORTER:  And please

20       state the city and state in which

21       you're located.

22           THE WITNESS:  I'm in Wenatchee,

23       Washington.

24           THE COURT REPORTER:  Thank you.

25       You may proceed, Counsel.

```
 1   DIRECT EXAMINATION

 2   BY MR. FITZ:

 3        Q.    Ms. Tolopka, can you please state and

 4   spell your name for the record.

 5        A.    Yes.  It's again Lori, L-o-r-i, and the

 6   last name is Tolopka, T-o-l-o-p-k-a.

 7        Q.    And do you understand that you're still

 8   under oath today?

 9        A.    Yes.

10        Q.    Have you ever given a deposition before?

11        A.    No.

12        Q.    If you ever cannot understand my questions

13   because of some technical issue will you let me know?

14        A.    Yes.

15        Q.    Is there anything that would inhibit you

16   from giving full and complete and truthful answers

17   today?

18        A.    No.

19        Q.    And you're represented by an attorney

20   today, correct?

21        A.    Yes.

22        Q.    Who is your lawyer?

23        A.    I -- well, sir, I don't know how to

24   pronounce the name.  Asim?

25        Q.    Asim Ghafoor is here on this deposition
```

1    with us, right?

2         A.    Yes.

3         Q.    Is he your lawyer?

4         A.    Yes.

5         Q.    Is anybody else representing you?

6         A.    No.

7         Q.    When did Mr. Ghafoor become your lawyer?

8         A.    Recently.  Whenever this went through or

9    whenever I found out that I had to be a witness.

10        Q.    Did he become your lawyer this week?

11        A.    I received a call like I did from you,

12   like -- well, Jamie Malvo (phonetic) who was HR for

13   HSA reached out to me with his link on there and

14   then I had not spoken to him until this week.

15        Q.    When did Ms. Malvo reach out to you?

16        A.    I would have to say maybe -- it was by

17   a text message.  Maybe last week.  Hold on and I can

18   tell you the date.  I have no problem telling you.

19   Jamie.  Let's see.  9/24/25.

20        Q.    And what did Ms. Malvo tell you?

21        A.    She basically was just saying that,

22   "Jamie here.  There's -- Asim is cc'd.  We wanted

23   to reach out as we understand we have -- the

24   attorneys are trying to -- attempting to give you

25   -- to depose you regarding the paycheck incident

1  person."  And then it said, "Asim would be more

2  than happy to partner with you regarding legal

3  representation."

4       Q.   Did you have any phone calls with

5  Ms. Malvo?

6       A.   Nope.

7       Q.   Have you spoken to anyone about Imani

8  Chinda's case other than Mr. Ghafoor?

9       A.   Not -- I mean way back when everything

10  -- everything happened at the beginning, but not

11  about her case, about when the debacle happened,

12  but no.

13       Q.   And that was in November of last year,

14  correct?

15       A.   I believe so.

16       Q.   Okay.  Do you have a written

17  attorney-client agreement with Mr. Ghafoor?

18       A.   No.

19       Q.   Are you paying Mr. Ghafoor for his

20  representation?

21       A.   No.

22       Q.   Do you understand that I'm Imani Chinda's

23  attorney?

24       A.   Yes.

25       Q.   Can you tell me about the debacle in

1    November of last year?

2        A.    Sure.   During the process of HSA coming

3    in to take over for Steward Health, Steward Health

4    unfortunately was -- of course, there was yeah,

5    bankruptcy, a whole lot of issues going on with

6    multiple hospitals so unfortunately they shut down

7    our Krono System before we had our new system in

8    place, and when that happened we were unable to

9    record time appropriately, per se from the time

10   clock.

11            I mean we immediately -- I implemented

12   throughout the -- 'cause I was the director to do

13   paper timesheets as soon as we knew that the --

14   they were turning it off and we weren't sure, you

15   know, if we were gonna have our new thing in place

16   because they did it so quickly is all I can remember.

17   Didn't give us any time to put anything in -- you

18   know, like I said to put the new system in place and

19   so we had to do paper timecards.

20            The paper timecards were entered by HSA,

21   were all turned in and entered, but I'm not sure what

22   happened at that point, that crossover time that when

23   it came for people to get paid the pay was incorrect

24   and when I -- yeah, it was incorrect.

25        Q.    What was your job title at the time?

```
1         A.    Nursing director of women's services --
2    of all of women's services.
3         Q.    And what were your job duties as the
4    nursing director of women's services?
5         A.    Kind of hard to say.  I had multiple
6    different departments.  I oversaw NICU, I oversaw
7    labor and delivery, I oversaw the women's clinic.
8    I oversaw multiple areas, days and nightshift along
9    with supplies, you know, making sure I would handle
10   any policies or any counseling for employees.
11            I mean we had -- I had some managers
12   underneath me, but we had no manager in labor and
13   delivery so for me my focus was more on that
14   department because they had no other leadership as
15   mother/baby did, so did NICU.  I had managers in that
16   department so I kind of had more to focus in that area
17   and then the women's clinic because I still oversaw
18   everything, but I had to focus more there because I
19   was the only supervisor slash director, manager they
20   had.
21        Q.    And how long did you have that role?
22        A.    Well, let's see.  I -- let's see.  I
23   started there over in the OR, but I had the women's
24   background and then when the director left I moved
25   over there around -- sorry, I'm looking at a calendar
```

```
 1   to just kind of -- I believe like, December of --
 2   no, no, no.  That's whenever I took over the main OR.
 3             When this whole thing happened -- what
 4   year?  What, what -- I'm trying to think about my
 5   year.  Okay, so that was 1/20/25.  That was in 2024.
 6   So I guess that I was -- I moved over there around
 7   February is when Camra (phonetic) left, so February of
 8   2024.
 9             I went out on surgery in April and did
10   not return back until I had surgery, so I didn't
11   come back until July 2024, and then all of these --
12   the whole process of everything that was going on,
13   the bankruptcy was going -- you know, happening with
14   Steward Health.
15        Q.   And --
16        A.   And at that time too I was also overseeing
17   the main OR because there was no director over there
18   so I actually had all of that department as well until
19   like, when I -- before I went out on leave and when
20   I came back from leave June of 2024 they hired a
21   director.  So when I came back luckily there were
22   just things that I kind of had to bring her up to par
23   with on, on stuff, but -- so I had lots of areas.
24        Q.   How long did you hold that position?
25        A.   Which position?
```

```
1          Q.     The director of women's services role.
2          A.     From February of 2024 and then I put in
3    my notice in April of 2025.
4          Q.     Why did the paper timesheets issue fall
5    within your purview?
6          A.     I don't know what you mean by that, but
7    like because when we found out that there was no
8    system that could record time I had to get out.  Like,
9    let's say if somebody has a missed punch, they're
10   gonna do a paper time card.  So that's kind of our
11   standard process is that we're gonna go to a paper
12   timesheet if there's something ever wrong, so which
13   we already had multiple copies in the units for that.
14          So when we found that out, I can't remember
15   if there was a meeting saying to that.  There might
16   have been a meeting per se that said, "Hey, this is
17   gonna -- I don't think we're gonna have isolve up
18   in time, let's record.  Let's make sure we're doing
19   paper timecards," and so we did.
20          As far as the -- because there was so
21   many to enter, if I can remember correctly.  They
22   had a company, HSA had a company that came in if I
23   can remember correctly that entered those manual
24   time punches.  Because again, we weren't expecting
25   that and that's a lot.  Not to mention also I had a
```

1    manager that was on vacation.  So yeah, but at that

2    time too.  But that was when we knew the system was

3    being shut down, and then the new one wasn't coming

4    up.

5         Q.    You were familiar with HSA's timekeeping

6    policies, right?

7         A.    Yes.  I mean it was all again we were

8    transitioning into that so it was all new.

9         Q.    And you were familiar with HSA's meal

10   break policies, right?

11        A.    Yes.

12        Q.    And whenever the workers fill out the paper

13   timecard during the transition period, 30 minutes was

14   automatically deducted from their meal breaks, right?

15        A.    I don't -- depending -- I mean that's kind

16   of hard to say 'cause it's not -- I mean when you --

17   it is whenever you are doing your regular swipe, but

18   when you are doing -- when you're entering end time,

19   it's really gonna be dependent on how many -- you

20   know, you're gonna really have to pay attention to

21   it.  It's not something that's gonna be an automatic.

22   We have to look to see how many hours that person

23   worked and then they would have had to write in the

24   time that they went to lunch because I would still

25   expect them to say I went to lunch from 12 to 12:30.

1      Q.    Do you remember if the HSA nurses were

2   told to write down their lunches during the pay per

3   time card period?

4      A.    I honestly cannot.  I mean I would -- I

5   would think so because that's -- that's gonna be

6   again standard process of I want -- I mean like, I

7   need to know who's -- who's covering.  If I needed

8   to have some type of documentation I need to know

9   who's covering, who's -- for those patients.  If I

10  had an issue with a patient, right, so I would kind of

11  need to know who was caring for that patient so that

12  would be a standard process.

13     Q.    HSA St. Joseph implemented an automatic

14  meal break deduction policy after it transitioned

15  to isolve, right?

16     A.    Yes.  Once our system came up, yes.

17  Mm-hmm.

18     Q.    And that was the policy throughout the

19  rest of your tenure at HSA St. Joseph, correct?

20     A.    Correct.  Unless somebody did not get a

21  lunch, then they had a form.  They also had a paper

22  form to fill out.

23     Q.    And they were instructed to fill out the

24  paper form when they completely missed their lunch,

25  right?

1    A.    Well, yes, but they had to have followed

2  certain steps that we required and which I spoke to

3  on many, many meetings of if you missed your lunch,

4  first of all, you -- let me back this up.  So the

5  goal is always that everybody gets a lunch regardless

6  because that's my main focus.  They are supposed to

7  have a chain of command to follow.  If they -- if they

8  feel like that they haven't gotten together lunch

9  they're supposed to let the charge nurse know.

10         If the charge nurse cannot relieve them

11  at that time, then they're supposed to let leadership

12  know because we want to make sure they get a lunch

13  and we will break them even if I have to come down

14  and sit at the charge nurse desk for the charge nurse

15  to cover.  So that's the process.

16         Then if for any reason that it was which we

17  had gone over multiple times, if they didn't follow

18  that process because that they should be letting

19  somebody know, "Hey, I didn't get my break," or if

20  they were so busy, but I -- there's a form that says,

21  "I didn't get it.  This is the reason why."  The

22  charge nurse has to sign it and I would have to sign

23  it because I wanted to go back and say, "Hey, I was

24  never notified.  Why would you -- Why would you take

25  not a lunch when you didn't follow your proper chain.

 1  You can't just be -- unfortunately, people will just

 2  fill those out and not even follow the process.  So

 3  I always like to go back and if they did, I'd meet

 4  with them to find out what happened, why you didn't

 5  get a break because we want everybody to get a break.

 6  So I had a very standard process to make sure we

 7  were following that.

 8      Q.    And that policy applies when they miss

 9  their meal entirely, right?

10      A.    Yes.  Mm-hmm.

11      Q.    Thank you.  I want to talk about how HSA

12  ensured quality patient care during this time period,

13  so how does HSA St. Joseph ensure its nurses provide

14  quality patient care?

15      A.    I mean I've made sure that we always had

16  enough staff.  If there was ever a time we didn't

17  myself, another leader would come in because our

18  goal is always to make sure that we have adequate

19  staffing to provide excellent care, which we -- we

20  did.

21      Q.    HSA St. Joseph nurses are expected to

22  put patient care first, right?

23      A.    Absolutely.

24      Q.    How does HSA St. Joseph ensure that a

25  patient coding is responded to promptly?

1    A.    Oh, we have a code button that we push

2  that brings everybody, anesthesia, myself, everybody

3  runs into the room.  We also have the same thing if

4  prior to them -- if they're declining, a rapid

5  response.  Same thing, we would call rapid response

6  and everybody runs into the room, providers,

7  anesthesia, staff to make sure that the patient is

8  okay.

9    Q.    And the information about a patient coding

10  is also transmitted to the breakroom, right?

11    A.    Yes.  It's speakers, housewife.

12    Q.    And if a nurse is on their break and sees a

13  patient coding, they're expected to help, right?

14    A.    No, not at -- I mean that's hard to --

15  that's a fine line, right.  If you're not nearby I

16  mean I wouldn't expect -- if you're on your lunch

17  break I mean we have enough staff on the floor that --

18  we also don't want too many people on the ground.  So,

19  you know, that's a fine line to say that.

20    I've never -- I mean I've actually -- thank

21  goodness we don't -- I didn't see him that often so

22  that wouldn't be something that I would require.

23  That's why people that are on the floor, and we have

24  staff that are on the floor are gonna go along with

25  providers and a whole team that comes over that helps.

1    Because you also again can't have too many people in

2    the room.

3          Q.    But HSA St. Joseph allows the information

4    about a patient coding to be transmitted to the

5    breakroom, right?

6          A.    Yeah.  I mean it's again speakers,

7    housewife, so it -- you can hear it everywhere.

8          Q.    And if there's not enough staff in the

9    particular room, then the nurse who is on break would

10   be expected to help, right?

11         A.    Again, that's -- I -- I -- I wouldn't -- if

12   they're on their -- because we have a special team

13   that does that, right, so that it comes from another

14   building.  You know, yeah, it would be good for people

15   I guess to know what's going on, but I can't speak to

16   -- you know, there's people that leave the building

17   for their lunches.  People go to the cafeteria.

18                I've never seen since I've ever worked

19   in any facility that somebody that's in the cafeteria

20   is job seven runs to a code.  Honestly, I mean unless

21   they're on the code team or they're the provider

22   maybe, but I'm not gonna see people all of a sudden

23   everybody in the cafeteria get up because they heard

24   because it plays in there as well.

25                So no, I would actually disagree with that

```
 1  because everybody that's eating their lunch does
 2  not get up and run to a code wherever it's at in
 3  the building, so that's -- yeah.
 4       Q.    You stated --
 5       A.    So --
 6       Q.    I apologize.
 7       A.    It's okay.
 8       Q.    You stated that it's important for a nurse
 9  to be aware of what's going on, right?
10       A.    Yeah.  I think everybody that's in the
11  unit, right, that -- now, everybody that's working in
12  the unit that's out and about I would expect my staff
13  that's working in the unit to know that's -- what's
14  happening because somebody might yell that they need
15  help and the nurse right there might be able to help.
16  When you're in a breakroom or a cafeteria again,
17  that's a little bit different in my opinion.
18       Q.    Would it be fair to notify a nurse about a
19  change in a patient's condition during their break?
20       A.    Oh, if they're going on break, I mean
21  you're supposed to give a handoff to somebody that's
22  gonna look after your patient.  That way you're
23  relieved of, you know, your duties to walk away.
24       Q.    And HSA St. Joseph is aware of when these
25  handoffs occur, right?
```

```
1        A.    I -- I -- I'm not sure what you're asking.
2   Like the hospital in general?
3        Q.    Yes.  How do you know that the handoff
4   occurs?
5        A.    I mean it would be the nurse -- I mean the
6   charge nurse.  The -- you know, it would another shack
7   that we're taking over again.  That's not something
8   that like if somebody -- I'll put it like this.  If
9   I'm the director I'm not expecting everybody to tell
10  me because that's -- I would oversee over 200 people,
11  so.
12       Q.    Do you remember Imani Chinda?
13       A.    I know of her, yes.  Never met --
14       Q.    Have you ever --
15       A.    -- her.
16       Q.    Have you ever spoken with her?
17       A.    Yes.
18       Q.    Do you recall Ms. Chinda complaining
19  about HSA St. Joseph's failure to pay her paycheck?
20       A.    When the debacle happened there was --
21  I received multiple phone calls and one of those
22  that happened to be -- when I received it, it was -- I
23  want to say a day after from her and she called me.
24  My husband happened to be next to me, and she said
25  that her paycheck was incorrect, and I said, well,
```

1    we're trying to fix it out.  There's several people's

2    checks that are incorrect and we're in the process

3    of getting that taken care of.  So I can -- yes.

4         Q.    What happened next?

5         A.    The next thing was that I kind of -- 'cause

6    for her department she had a manager so I don't -- I

7    can't speak to, you know, what she did, how she went

8    about it.  I just can only speak to her phone call

9    to me and for me I had a generalized statement that

10   I needed everybody to send me an email of what was

11   wrong 'cause there was no way I could keep up again

12   with 200 plus employees of not knowing whose checks

13   were incorrect or wrong or right.

14            So for me the easiest way was I had asked

15   that an email be sent with what was wrong in their

16   paycheck so that way I could -- we can go back and

17   start sorting through of what happened and that's

18   what I had to ask.  If I can remember correctly, I

19   think I'm sure I probably told Imani the same thing,

20   that I needed to know what was wrong because I'll

21   say this, my priority was if somebody didn't get a

22   check at all and they got -- this is kind of how we

23   prioritized it.  If somebody didn't get a check at

24   all, those were the first people that we needed to

25   get taken care of.

LORI TOLOPKA
OCTOBER 04, 2025

JOB NO. 2035790

1           The people that got a 50 percent or you

2    know, 25 percent, those would be next.  Fifty percent,

3    75 percent as fastly as we could, but to me that

4    was kind of like the direction of what I wanted to

5    hurry up and help with first.  And so I spent multiple

6    -- I mean at 5:00 in the morning until midnight to

7    help because now we had to go back and enter time.

8    And that's what -- and that was really my only

9    conversation with Imani because she was extremely

10   frustrated and rude and I wanted to make sure that I

11   get out of this communicating the same thing to

12   everyone.

13        Q.   Did you communicate Ms. Chinda's complaint

14   to anyone else at HSA St. Joseph?

15        A.   I would say yes.  I don't know about her's

16   in particular because it was everybody's.  Everybody

17   that sent me an email, I -- I'm trying to think of

18   the wording.  I escalated to my superiors, you know,

19   and that's when we started prioritizing of looking

20   at who, you know, again who should we work on first

21   because Imani had received money, but I didn't -- I

22   didn't tell -- no.  Go ahead.  Sorry.

23        Q.   You prioritized the individuals who did

24   not receive any money, right?

25        A.   Yes.

LORI TOLPKA
OCTOBER 04, 2025

JOB NO. 2035790

1    Q.    Okay.  Were you involved in the decision to

2    terminate Ms. Chinda?

3    A.    I was not.  I mean I was involved in the

4    things that I know was written on Facebook which were

5    untruthful things because of what she had written

6    all over Facebook.  People from all over were sending

7    me screen shots because it had her name attached to

8    it, so I was aware of the unfortunate things that

9    she was saying on Facebook.  And I did share that

10   with my HR director, but she was -- she had already

11   known this as well because people had already taken

12   it to her.

13   Q.    Was it your role to investigate this

14   Facebook post?

15   A.    It was not my role to investigate.  It

16   was just me sharing with HR the things that were

17   being said to me and everything that was -- you know,

18   again, other people that were staffed at the company

19   that were seeing that, that had shared so I had shared

20   it as well with my HR director who I felt -- 'cause

21   I did not feel that I needed to discuss that with

22   anyone else.  Even if staff were sending that to me, I

23   told them, thank you, you know, like, that's it from

24   here.  And then I wanted to share with HR.

25   Q.    Human resources was responsible for

1    investigating Ms. Chinda's termination, right?

2        A.    Yes.

3        Q.    Do you know if Ms. Chinda was disciplined?

4        A.    I cannot speak to that.

5        Q.    You agree she was terminated, right?

6        A.    As far as I know, I don't think that she

7    was a traveler.  I don't think that she was asked to

8    return, but I don't know.  I never got like, "Hey,

9    this is the date.  This is what definitely happened"

10   because that wasn't discussed with me.

11       Q.    Do you know if human resources conducted

12   any investigation into the allegations against

13   Ms. Chinda in November of 2024?

14       A.    Say that one more time, sorry.

15       Q.    Do you know if HR conducted any

16   investigation related to Ms. Chinda in November of

17   2024?

18       A.    I mean I believe so because -- but then

19   again, I'm not HR so I can't -- I can't speak to what

20   they did.

21       Q.    I want to focus on what you know and if

22   your answer is I don't know or I don't remember, then

23   that's perfectly fine, okay?

24       A.    Okay.

25       Q.    Do you believe HR conducted an

1    investigation because that's what HR typically

2    does?

3         A.    Correct, that's what they would do.  They

4    would look into that if there was any issues or yes,

5    that's -- that's what a standard process would be from

6    human resources.

7         Q.    And the standard human resources

8    investigation is documented, correct?

9         A.    Yes, I would -- I would assume so.

10        Q.    And the outcome of the human resources

11   investigation is shared with the employee in writing,

12   right?

13        A.    I can't -- again, I'm not HR so I can't

14   say.  I mean I've had an employee that has been

15   terminated that never came back in so that had to

16   be done over the phone so I can't say what -- if they

17   did something in writing.  I mean I can't speak to

18   their process.

19             I can only speak to if I terminate somebody

20   in my department and I have human resources with me

21   and then we ask them to sign this.  Somebody can

22   refuse to sign something too, so I can't speak to what

23   HR would do.  That seems like a standard process

24   normally, but I don't know and every situation is

25   gonna be a little bit different.

LORI TOLOPKA                                                    JOB NO. 2035790
OCTOBER 04, 2025

1       Q.    And so the honest answer is you don't
2   know whether an investigation was conducted by HR
3   into Ms. Chinda, right?
4       A.    No.  I -- I -- I'm certain that -- well, I
5   mean I'm not gonna -- I know that it was being looked
6   at because Jamie told me or HR told me that they were
7   taking care of that because that's concerning.  There
8   were concerning things that were said on there, and
9   I was also aware of another employee that was -- Imani
10  was mistreating in the unit as well from some of that
11  stuff, so I'm aware that conversation that also was
12  forwarded to HR, not by me, but by the manager.
13      Q.    And this mistreatment was an incident
14  that occurred in the family birthing center, right?
15      A.    Yes.
16      Q.    Do you know when that occurred?
17      A.    No.
18      Q.    Do you know what happened in the family
19  birthing center related to Ms. Chinda and alleged
20  mistreatment?
21      A.    No, because I can't -- I mean I feel like I
22  remember them telling me a little bit about it, but
23  I've had lots of other things take place since then.
24      Q.    You weren't there, right?
25      A.    I was not there, no.

1    Q.    You didn't hear anything that Ms. Chinda

2    said, right?

3    A.    No.  That was between her and another

4    employee -- employee or employees if I can remember

5    correctly, but no, I was not there.

6    Q.    What do you remember hearing about what

7    happened with Ms. Chinda in the family birthing

8    center?

9    A.    Again, I can't remember everything.  I

10   think that she was maybe being ugly to the charge

11   nurse maybe and her staff members, but I can't -- I

12   don't -- I cannot fully remember exactly what took

13   place.

14   Q.    Do you remember who told you about this?

15   A.    It was Emily who's the -- who was the

16   interim manager at the time and I believe the charge

17   nurse and honestly I can't -- I can't even remember

18   the charge nurse's name because it's been a year ago

19   and there's multiple -- multiple people that I work

20   with, so maybe Lisa or something.  I can't remember

21   the charge nurse's name.

22   Q.    Are you referring to Emily Manning?

23   A.    Emily was the interim manager, but it -- I

24   don't -- I mean this didn't happen with her.  This

25   actually happened with another nurse on the unit,

1    but I can't remember the other nurse's name who was

2    involved.

3          Q.    So it's your understanding that Emily

4    Manning was not present in the family birthing center

5    when the incident with Chinda occurred, right?

6          A.    I can't speak to that because I don't

7    know if she heard it or was there or not.  I can't

8    -- I can't speak to that, and I can't remember.  Don't

9    -- this didn't happen with her.

10         Q.    Do you know if the other nurse you

11   mentioned, Lisa was there in family birthing center?

12         A.    The other nurse it happened with if I

13   can remember the correct name, that happened with

14   her so she would have been there.

15         Q.    But is that Lisa that you're referring

16   to?

17         A.    Again, I don't know if that's the correct

18   name, but it's the nurse -- the charge nurse that was

19   involved with Imani, but I don't -- I don't remember

20   what her name was.

21         Q.    If I said the name Lisa McCorkle

22   (phonetic), would that refresh your recollection?

23         A.    I mean I thought her name was Lisa, but

24   again I'm not sure.  I don't remember.  I know that

25   she provided a written statement at one point and

1    that -- that was given to HR.  I remember that whoever

2    the nurse was that was involved I believe it was Lisa.

3         Q.    How do you know that somebody provided

4    a written statement?

5         A.    Because when all the -- the stuff was

6    happening within the Facebook that was up at the same

7    time so I remember things were being shared with HR

8    so that they were knowing, you know, what was

9    happening as far as the post like I said and Jamie

10   was already aware, and then I know that there were

11   issues on the unit.

12             So my -- one of the things that I always

13   do, I've tried to always get things in writing, a

14   standard process that I've tried to teach my managers,

15   supervisors.  You know, anytime I speak with somebody,

16   anytime you do anything, try to write it down, try

17   to get a written statement, so I believe that she had

18   written a written and that was turned over to HR.

19        Q.    And just to be clear for the record, you

20   believe the nurse who was in the family birthing

21   center with Ms. Chinda submitted a written statement,

22   correct?

23        A.    Yes.

24        Q.    You didn't submit a statement, right?

25        A.    I did -- I did not submit a written

1  statement of anything other than I would put emails

2  of the things that were going on because it was so

3  many I would get it, print it, Prime timecards.

4  That's kind of what was my process.

5      Q.    What do you remember about the Facebook

6  posts?

7      A.    Well, I kept them on my phone for quite

8  a long time and I think I finally deleted them but

9  it was on a nursing group that was like a -- where

10  people go to when they're trying to hire -- kind of

11  like a community nursing page where a lot of times

12  where people are looking for a job, you know, they'll

13  post positions on there or, you know, ask how this

14  company is or the culture of this company.

15          And I remember that she wrote on there

16  that immediately something about not getting paid

17  or can you believe that the company -- you know, but

18  it also started talking about the director and manager

19  and so that was the part that I screen shot 'cause

20  there was misinformation in there because she had

21  never come to me except the phone call after the

22  fact.

23          But what she wrote on there were

24  unfortunately untrue information so that's why when

25  I saw it I screen shotted it because that was a lie

1    and I'm very funny about my character and my role,

2    so.  But it was just a lot of bad mouthing about

3    St. Joseph's, but I didn't respond or anything.  I

4    just screen shotted it because it was all a lie.

5    People started saying, "Call the news.  Get a lawyer."

6    And then the news showed up, so obviously, you know, I

7    felt like, you know, that was some of the aftermath

8    of that everything that was shared on that post.

9         Q.    One component of the post stated that

10   Ms. Chinda did not receive her paycheck, right?

11        A.    I believe so, but the problem even with

12   that was that she did receive the paycheck because

13   people did -- people -- the majority of the people

14   received a paycheck, it was incorrect.  There were

15   a few people that did not.  It was very wrong, but

16   she was not one of those who -- that was another issue

17   that I had with her because she wrote on there that

18   she did not get paid at all like, she was never paid,

19   but she was.  So that was also I found it a little

20   bit offending because she -- if you want to share

21   information, share accurate information.

22        Q.    Okay, and so do you remember if the post

23   said, "I haven't been paid at all" or "I haven't

24   been paid for one of my work weeks"?

25        A.    It said she had not got a check if I

1  remember correctly.  It didn't say anything about

2  that she had been paid for one of her weeks.  It said

3  she -- she made it seem like, "Can you believe I

4  didn't get paid at all?"  And then the way it was

5  transpired into the post to other people to see from

6  the surrounding area was like people just didn't get a

7  check at all, and that was upsetting to me because

8  that was not telling the truth.

9      Q.    And your testimony is that Ms. Chinda did

10  not call you to complain till after the Facebook post

11  was made, right?

12      A.    Correct.

13      Q.    Do you know if Ms. Chinda had complained to

14  anybody else at that time?

15      A.    I had -- I do not.  I feel like I asked

16  Emily when I saw that post and she had come to her

17  and because she had -- because I saw that post and

18  she had not come to me and that's why I was like,

19  "What is -- what are we talking about because you

20  didn't -- you know, you didn't -- it wasn't till

21  after the fact that I explained what had -- what

22  was taking place and what we were doing to correct

23  it."

24      Q.    Did Emily tell you whether or not

25  Ms. Chinda had complained to her?

1        A.    I can't -- I can't remember the full

2   conver -- I can't remember.  I mean I feel like --

3   I want to say I feel like that she had reached out

4   to Emily for something prior because I feel like

5   Emily also was in the same boat as me where she had

6   not talked to her, but I can't -- I don't remember.

7   I feel like there was something else maybe that had

8   happened prior to this that she had spoken to her

9   about, but I can't fully remember.

10       Q.    So is the honest answer that you don't

11  remember whether Ms. Chinda complained to Emily

12  Manning or not?

13       A.    Yes.

14       Q.    Do you know if Ms. Chinda complained to

15  anyone else at HSA St. Joseph?

16       A.    Not that I'm aware of because that would

17  have been -- I would have -- it would have -- I feel

18  like it would have come to me because again, we have a

19  process to follow so it was to go I got an email,

20  staple it to the timecard so I can go back and look

21  at it, so it wasn't until I spoke to her after the

22  fact that I immediately worked on her stuff along

23  with everybody else.  I mean I put it in my pile of

24  where are we at, you know, what's again my priority

25  where we are.  So that's how it was handled.

1    Q.    So is the honest answer that you're not

2    sure whether Ms. Chinda complained to anybody else,

3    but you believe the process states that she should

4    complain to you?

5    A.    Right.  I didn't believe that she

6    complained to anybody else.

7    Q.    You're not sure, right?

8    A.    Yeah, I'm not sure, but I -- yeah, I'll

9    just say I'm not sure.

10    Q.    This process, is it a policy that's in

11    writing?

12    A.    No, 'cause this was an unexpected issue.

13    I mean there's a policy in writing for if we have

14    timecard issues, right, that we would go to a paper

15    timecard, but for an event like this, the entire

16    hospital was having to do this, I can't speak to.  I

17    tried to handle it for my department the best.

18    Everybody I think would do it a little bit differently

19    and I tried to handle it the best way that I could

20    which was I couldn't get 20 million phone calls

21    because there was no way that I could keep up with

22    that.  So I felt like send me an email, I would go to

23    my email, print the email, go get their timecard and

24    then work on it and that was it and that was -- that

25    was for everywhere.  I mean that's actually how I told

LORI TOLOPKA
OCTOBER 04, 2025

JOB NO. 2035790

1    everybody in my women's are to do it because it made

2    more sense.  And again, I had a manager that was on

3    vacation so I also -- so all I had was myself, Emily

4    and the supervisor from the women's clinic helping me

5    and that was it.

6        Q.    Who was the manager on vacation?

7        A.    Angela.  She was the NICU manager.  Angela

8    -- oh my gosh, this is horrible.  I think it's Her,

9    Herma -- I think it starts with an H.

10       Q.    And you don't know whether Ms. Chinda

11   complained to Angela, right?

12       A.    No, she would not have because she was

13   gone on vacation.  And she's the NICU manager so

14   Imani wouldn't go to a NICU manager for something

15   in that area.

16       Q.    Why not?

17       A.    'Cause she's over the NICU and that's a

18   different department.  So she would go up to Emily

19   and myself.

20       Q.    Which department was Ms. Chinda in?

21       A.    Mother baby.

22       Q.    And can you tell me about the circumstances

23   of your departure from HSA St. Joseph?

24       A.    Me leaving?

25       Q.    Yes.

1       A.    Yes.  I put in a 30-day notice and they

2    asked me to leave the data up.

3       Q.    When was this?

4       A.    Can I -- I keep a folder usually when I

5    turn in a termination or anything, so let me -- it

6    was -- let's see.  I don't know the exact date that

7    -- it was -- it was -- actually, it would have been

8    in March because my 30 days would have been in

9    April, so I can't tell you the exact date.  I usually

10   keep a copy of everything in my records in case I

11   ever need to refer to it.  Yeah, I don't -- I don't

12   -- I don't have it.

13      Q.    Is it safe to say that your departure

14   was in March 2025?

15      A.    Yes.

16      Q.    And where did you begin working after

17   that?

18      A.    Actually I feel like it might have been

19   April 2nd.  I don't know.  It was somewhere right

20   in there.

21      Q.    To clarify for the record, your

22   departure from HSA St. Joseph was either in late

23   March of early April 2025, right?

24      A.    Yes.  That would be the easiest.  I

25   mean I could probably go through my phone and find

```
 1   it, but yes.
 2        Q.    Great.  And what did you do next in your
 3   career?
 4        A.    I was not expecting that to happen so I
 5   took a travel position as a leader in a town here
 6   in Washington.
 7        Q.    Who is your current employer?
 8        A.    The East Smith.
 9        Q.    And is it a particular facility?
10        A.    The East Smith is like a nationwide for
11   travel contracts.
12        Q.    And which hospital were you assigned to?
13        A.    Confluence Health.
14        Q.    Located where?
15        A.    Wenatchee, Washington.
16        Q.    And what is your current job title?
17        A.    Director of women's services, interim
18   director of women's services and pediatrics.
19        Q.    Thank you.  Is there anything that
20   you'd like to add or clarify to your testimony
21   today?
22        A.    No.
23             MR. FITZ:  Thank you for your
24        time this morning and I'll pass the
25        witness.
```

```
 1        MR. GHAFOOR:  This is the
 2   attorney for the witness.  I have no
 3   questions for re-direct.
 4        THE COURT REPORTER:  Does the
 5   witness want to review and sign the
 6   transcript or would you like to waive
 7   that and keep it as is?
 8        THE WITNESS:  No.  I'll waive
 9   it and keep it as is.
10        THE COURT REPORTER:  Counsel,
11   Ghafoor, would you like a copy of the
12   transcript?
13        MR. GHAFOOR:  Yes, please.
14        MR. FITZ:  I would like E-tran
15   please.
16        THE COURT REPORTER:  Sure.
17   Thank you.
18        (Whereupon, at 11:02 a.m., the
19   Examination of this witness was
20   concluded.)
21
22
23
24
25
```

LORI TOLOPKA
OCTOBER 04, 2025

JOB NO. 2035790

```
 1              E  X  H  I  B  I  T  S

 2

 3    PLAINTIFF'S EXHIBITS

 4
      EXHIBIT        EXHIBIT                   PAGE
 5    NUMBER         DESCRIPTION

 6                   (None)

 7

 8

 9                 I  N  D  E  X

10

11    DIRECT EXAMINATION                      PAGE

12    BY MR. FITZ                              6

13

14    CROSS-EXAMINATION

15    BY MR. GHAFOOR                           38

16

17

18      INFORMATION AND/OR DOCUMENTS REQUESTED

19    INFORMATION AND/OR DOCUMENTS        PAGE

20                   (None)

21

22

23        QUESTIONS MARKED FOR RULINGS

24    PAGE LINE    QUESTION

25                   (None)
```

```
 1                   CERTIFICATE OF REPORTER

 2

 3          I, DARA SANOFF, do hereby declare:

 4

 5              That prior to being examined, the witness
       named in the foregoing deposition was by me duly sworn
 6     pursuant to Section 30(f)(1) of the Federal Rules of
       Civil Procedure and the deposition is a true record
 7     of the testimony given by the witness.

 8              That said deposition was taken down by me
       in shorthand at the time and place therein named and
 9     thereafter reduced to text under my direction.

10     _____    That the witness requested to review the
                  Transcript and make any changes to the
11                transcript as a result of that review
                  pursuant to Section 30(e) of the Federal
12                Rules of Civil Procedure.

13     _____    Signature is waived.

14     _____    The changes made by the witness are appended
                  to the transcript.

15     _____    No request was made that the transcript be
                  Reviewed pursuant to Section 30(e) of the
16                Federal Rules of Civil Procedure.

17              I further declare that I have no interest
       in the event or the action.

18              I declare under penalty of perjury under
19     the laws of the United States of America that the
       foregoing is true and correct.

20

21        Witness my hand this 21st day of October 2025.

22

23

24     _____

25                DARA SANOFF
```

```
 1                  C E R T I F I C A T E

 2
       STATE OF NEW YORK        )
 3                              :  SS.:
       COUNTY OF RICHMOND       )
 4

 5          I, DARA SANOFF, a Notary Public for

 6     and within the State of New York, do hereby

 7     certify:

 8          That the witness whose examination is

 9     hereinbefore set forth was duly sworn and

10     that such examination is a true record of

11     the testimony given by that witness.

12          I further certify that I am not

13     related to any of the parties to this

14     action by blood or by marriage and that I

15     am in no way interested in the outcome of

16     this matter.

17          IN WITNESS WHEREOF, I have hereunto

18     set my hand this 21st day of October 2025.

19

20

21          _____

22                  DARA SANOFF

23

24

25
```

```
 1              ACKNOWLEDGEMENT OF DEPONENT

 2

 3      I, _____, do hereby acknowledge that

 4  I have read and examined the foregoing testimony, and

 5  the same is a true, correct and accurate

 6  transcription of the testimony given by me, and any

 7  corrections appear on the attached errata sheet

 8  signed by me.

 9

10

11  _____    _____

12    (DATE)                  (SIGNATURE)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LORI TOLOPKA
OCTOBER 04, 2025
JOB NO. 2035790

```
 1   ERRATA SHEET
     CHANGES IN TESTIMONY
 2   IMANI CHINDA v HSA ST. JOSEPH LLC.
     Lori Tolopka
 3   October 04, 2025

 4   Page  Line   From                    To

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24   SIGNATURE:_____DATE:_____

25           Lori Tolopka
```

**1**

**1/20/25** 11:5
**11:02** 38:18
**12** 13:25
**12:30** 13:25

**2**

**20** 34:20
**200** 20:10 21:12
**2024** 11:5,8,11,20 12:2 24:13,17
**2025** 12:3 36:14,23
**25** 22:2
**2nd** 36:19

**3**

**30** 13:13 36:8
**30-day** 36:1

**5**

**50** 22:1
**5:00** 22:6

**7**

**75** 22:3

**9**

**9/24/25** 7:19

**A**

**a.m.** 38:18
**Absolutely** 16:23
**accurate** 31:21

**add** 37:20
**adequate** 16:18
**aftermath** 31:7
**agree** 24:5
**agreement** 8:17
**ahead** 22:22
**allegations** 24:12
**alleged** 26:19
**anesthesia** 17:2,7
**Angela** 35:7,11
**answers** 6:16
**anytime** 29:15,16
**apologize** 19:6
**applies** 16:8
**appropriately** 9:9
**April** 11:9 12:3 36:9, 19,23
**area** 10:16 32:6 35:15
**areas** 10:8 11:23
**Asim** 6:24,25 7:22 8:1
**assigned** 37:12
**assume** 25:9
**attached** 23:7
**attempting** 7:24
**attention** 13:20
**attorney** 6:19 8:23 38:2
**attorney-client** 8:17
**attorneys** 7:24
**automatic** 13:21 14:13
**automatically** 13:14
**aware** 19:9,24 23:8 26:9,11 29:10 33:16

**B**

**baby** 35:21
**back** 8:9 11:10,11,20, 21 15:4,23 16:3 21:16 22:7 25:15 33:20
**background** 10:24
**bad** 31:2
**bankruptcy** 9:5 11:13
**basically** 7:21
**begin** 36:16
**beginning** 8:10
**birthing** 26:14,19 27:7 28:4,11 29:20
**bit** 19:17 25:25 26:22 31:20 34:18
**boat** 33:5
**break** 13:10 14:14 15:13,19 16:5 17:12,17 18:9 19:19,20
**breakroom** 17:10 18:5 19:16
**breaks** 13:14
**bring** 11:22
**brings** 17:2
**building** 18:14,16 19:3
**busy** 15:20
**button** 17:1

**C**

**cafeteria** 18:17,19, 23 19:16
**calendar** 10:25
**call** 7:11 17:5 21:8 30:21 31:5 32:10
**called** 5:11 20:23
**calls** 8:4 20:21 34:20

**Camra** 11:7
**card** 12:10 14:3
**care** 16:12,14,19,22 21:3,25 26:7
**career** 37:3
**caring** 14:11
**case** 8:8,11 36:10
**cc'd** 7:22
**center** 26:14,19 27:8 28:4,11 29:21
**chain** 15:7,25
**change** 19:19
**character** 31:1
**charge** 15:9,10,14,22 20:6 27:10,16,18,21 28:18
**check** 21:22,23 31:25 32:7
**checks** 21:2,12
**Chinda** 20:12,18 23:2 24:3,13,16 26:3,19 27:1,7 28:5 29:21 31:10 32:9,13,25 33:11,14 34:2 35:10,20
**Chinda's** 8:8,22 22:13 24:1
**circumstances** 35:22
**city** 5:20
**clarify** 36:21 37:20
**clear** 29:19
**clinic** 10:7,17 35:4
**clock** 9:10
**code** 17:1 18:20,21 19:2
**coding** 16:25 17:9,13 18:4
**command** 15:7
**communicate** 22:13
**communicating** 22:11

LORI TOLOPKA
OCTOBER 04, 2025

JOB NO. 2035790

community 30:11

company 12:22
23:18 30:14,17

complain 32:10 34:4

complained 32:13,
25 33:11,14 34:2,6
35:11

complaining 20:18

complaint 22:13

complete 6:16

completely 14:24

Complied 5:3

component 31:9

concluded 38:20

condition 19:19

conducted 24:11,
15,25 26:2

Confluence 37:13

contracts 37:11

conver 33:2

conversation 22:9
26:11

copies 12:13

copy 36:10 38:11

correct 6:20 8:14
14:19,20 25:3,8 28:13,
17 29:22 32:12,22

correctly 12:21,23
21:18 27:5 32:1

Counsel 5:25 38:10

counseling 10:10

COURT 5:1,4,14,19,
24 38:4,10,16

cover 15:15

covering 14:7,9

crossover 9:22

culture 30:14

current 37:7,16

## D

data 36:2

date 7:18 24:9 36:6,9

day 20:23

days 10:8 36:8

debacle 8:11,25
20:20

December 11:1

decision 23:1

declining 17:4

deducted 13:14

deduction 14:14

deleted 30:8

delivery 10:7,13

department 10:14,
16 11:18 21:6 25:20
34:17 35:18,20

departments 10:6

departure 35:23
36:13,22

dependent 13:19

depending 13:15

depose 7:25

deposition 6:10,25

desk 15:14

differently 34:18

DIRECT 6:1

direction 22:4

director 9:12 10:1,4,
19,24 11:17,21 12:1
20:9 23:10,20 30:18
37:17,18

disagree 18:25

disciplined 24:3

discuss 23:21

discussed 24:10

documentation
14:8

documented 25:8

duly 5:12

duties 10:3 19:23

## E

E-TRAN 38:14

early 36:23

easiest 21:14 36:24

East 37:8,10

eating 19:1

email 21:10,15 22:17
33:19 34:22,23

emails 30:1

Emily 27:15,22,23
28:3 32:16,24 33:4,5,11
35:3,18

employee 25:11,14
26:9 27:4

employees 10:10
21:12 27:4

employer 37:7

end 13:18

ensure 16:13,24

ensured 16:12

enter 12:21 22:7

entered 9:20,21
12:23

entering 13:18

entire 34:15

escalated 22:18

event 34:15

everybody's 22:16

exact 36:6,9

Examination 6:1
38:19

examined 5:13

excellent 16:19

expect 13:25 17:16
19:12

expected 16:21
17:13 18:10

expecting 12:24
20:9 37:4

explained 32:21

extremely 22:9

## F

Facebook 23:4,6,9,
14 29:6 30:5 32:10

facility 18:19 37:9

fact 30:22 32:21 33:22

failure 20:19

fair 19:18

fall 12:4

familiar 13:5,9

family 26:14,18 27:7
28:4,11 29:20

fastly 22:3

February 11:7 12:2

feel 15:8 23:21 26:21
32:15 33:2,3,4,7,17
36:18

felt 23:20 31:7 34:22

Fifty 22:2

fill 13:12 14:22,23 16:2

finally 30:8

find 16:4 36:25

fine 17:15,19 24:23

FITZ 6:2 37:23 38:14

fix 21:1

floor 17:17,23,24

focus 10:13,16,18
15:6 24:21

folder 36:4

follow 15:7,17,25
16:2 33:19

form 14:21,22,24
15:20

LORI TOLOPKA
OCTOBER 04, 2025

JOB NO. 2035790

**forwarded** 26:12

**found** 7:9 12:7,14
31:19

**frustrated** 22:10

**full** 5:15 6:16 33:1

**fully** 27:12 33:9

**funny** 31:1

### G

**general** 20:2

**generalized** 21:9

**Ghafoor** 6:25 7:7 8:8,
17,19 38:1,11,13

**give** 5:6 7:24 9:17
19:21

**giving** 6:16

**goal** 15:5 16:18

**God** 5:8

**good** 18:14

**goodness** 17:21

**gosh** 35:8

**Great** 37:2

**ground** 17:18

**group** 30:9

**guess** 11:6 18:15

### H

**hand** 5:2

**handle** 10:9 34:17,19

**handled** 33:25

**handoff** 19:21 20:3

**handoffs** 19:25

**happen** 27:24 28:9
37:4

**happened** 8:10,11
9:8,22 11:3 16:4 20:20,
22,24 21:4,17 24:9
26:18 27:7,25 28:12,13
33:8

**happening** 11:13
19:14 29:6,9

**happy** 8:2

**hard** 10:5 13:16 17:14

**Health** 9:3 11:14
37:13

**hear** 18:7 27:1

**heard** 18:23 28:7

**hearing** 27:6

**helping** 35:4

**helps** 17:25

**Herma** 35:9

**Hey** 12:16 15:19,23
24:8

**hire** 30:10

**hired** 11:20

**hold** 7:17 11:24

**honest** 26:1 33:10
34:1

**honestly** 14:4 18:20
27:17

**horrible** 35:8

**hospital** 20:2 34:16
37:12

**hospitals** 9:6

**hours** 13:22

**housewife** 17:11
18:7

**HR** 7:12 23:10,16,20,
24 24:15,19,25 25:1,13,
23 26:2,6,12 29:1,7,18

**HSA** 7:13 9:2,20 12:22
14:1,13,19 16:11,13,21,
24 18:3 19:24 20:19
22:14 33:15 35:23
36:22

**HSA's** 13:5,9

**human** 23:25 24:11
25:6,7,10,20

**hurry** 22:5

**husband** 20:24

### I

**Imani** 8:7,22 20:12
21:19 22:9,21 26:9
28:19 35:14

**immediately** 9:11
30:16 33:22

**implemented** 9:11
14:13

**important** 19:8

**incident** 7:25 26:13
28:5

**incorrect** 9:23,24
20:25 21:2,13 31:14

**individuals** 22:23

**information** 17:9
18:3 30:24 31:21

**inhibit** 6:15

**instructed** 14:23

**interim** 27:16,23
37:17

**investigate** 23:13,
15

**investigating** 24:1

**investigation**
24:12,16 25:1,8,11 26:2

**involved** 23:1,3 28:2,
19 29:2

**isolve** 12:17 14:15

**issue** 6:13 12:4 14:10
31:16 34:12

**issues** 9:5 25:4 29:11
34:14

### J

**Jamie** 7:12,19,22 26:6
29:9

**job** 9:25 10:3 18:20
30:12 37:16

**Joseph** 14:13,19
16:13,21,24 18:3 19:24
22:14 33:15 35:23

36:22

**Joseph's** 20:19 31:3

**July** 11:11

**June** 11:20

### K

**kind** 10:5,16 11:1,22
12:10 13:15 14:10 21:5,
22 22:4 30:4,10

**knew** 9:13 13:2

**knowing** 21:12 29:8

**Krono** 9:7

### L

**L-O-R-I** 5:18 6:5

**labor** 10:7,12

**late** 36:22

**lawyer** 6:22 7:3,7,10
31:5

**leader** 16:17 37:5

**leadership** 10:14
15:11

**leave** 11:19,20 18:16
36:2

**leaving** 35:24

**left** 10:24 11:7

**legal** 5:15 8:2

**letting** 15:18

**lie** 30:25 31:4

**link** 7:13

**Lisa** 27:20 28:11,15,
21,23 29:2

**located** 5:21 37:14

**long** 10:21 11:24 30:8

**looked** 26:5

**Lori** 5:17 6:5

**lot** 9:5 12:25 30:11
31:2

**lots** 11:23 26:23

**luckily** 11:21

**lunch** 13:24,25 14:21, 24 15:3,5,8,12,25 17:16 19:1

**lunches** 14:2 18:17

---

## M

**made** 16:15 32:3,11 35:1

**main** 11:2,17 15:6

**majority** 31:13

**make** 12:18 15:12 16:6,18 17:7 22:10

**making** 10:9

**Malvo** 7:12,15,20 8:5

**manager** 10:12,19 13:1 21:6 26:12 27:16, 23 30:18 35:2,6,7,13,14

**managers** 10:11,15 29:14

**Manning** 27:22 28:4 33:12

**manual** 12:23

**March** 36:8,14,23

**Mccorkle** 28:21

**meal** 13:9,14 14:14 16:9

**meet** 16:3

**meeting** 12:15,16

**meetings** 15:3

**members** 27:11

**mention** 12:25

**mentioned** 28:11

**message** 7:17

**met** 20:13

**midnight** 22:6

**million** 34:20

**minutes** 13:13

**misinformation** 30:20

**missed** 12:9 14:24 15:3

**mistreating** 26:10

**mistreatment** 26:13,20

**Mm-hmm** 14:17 16:10

**money** 22:21,24

**morning** 22:6 37:24

**Mother** 35:21

**mother/baby** 10:15

**mouthing** 31:2

**moved** 10:24 11:6

**multiple** 9:6 10:5,8 12:13 15:17 20:21 22:5 27:19

---

## N

**nationwide** 37:10

**nearby** 17:15

**needed** 14:7 21:10, 20,24 23:21

**news** 31:5,6

**NICU** 10:6,15 35:7,13, 14,17

**nightshift** 10:8

**Notary** 5:12

**notice** 12:3 36:1

**notified** 15:24

**notify** 19:18

**November** 8:13 9:1 24:13,16

**nurse** 15:9,10,14,22 17:12 18:9 19:8,15,18 20:5,6 27:11,17,25 28:10,12,18 29:2,20

**nurse's** 27:18,21 28:1

**nurses** 14:1 16:13,21

**nursing** 10:1,4 30:9, 11

---

## O

**oath** 6:8

**occur** 19:25

**occurred** 26:14,16 28:5

**occurs** 20:4

**offending** 31:20

**opinion** 19:17

**outcome** 25:10

**oversaw** 10:6,7,8,17

**oversee** 20:10

**overseeing** 11:16

---

## P

**paid** 9:23 30:16 31:18, 23,24 32:2,4

**paper** 9:13,19,20 12:4,10,11,19 13:12 14:21,24 34:14

**par** 11:22

**part** 30:19

**partner** 8:2

**pass** 37:24

**patient** 14:10,11 16:12,14,22,25 17:7,9, 13 18:4 19:22

**patient's** 19:19

**patients** 14:9

**pay** 9:23 13:20 14:2 20:19

**paycheck** 7:25 20:19,25 21:16 31:10, 12,14

**paying** 8:19

**pediatrics** 37:18

**people** 9:23 16:1 17:18,23 18:1,14,16,17, 22 20:10 21:24 22:1 23:6,11,18 27:19 30:10, 12 31:5,13,15 32:5,6

**people's** 21:1

**percent** 22:1,2,3

**perfectly** 24:23

**period** 13:13 14:3 16:12

**person** 8:1 13:22

**phone** 8:4 20:21 21:8 25:16 30:7,21 34:20 36:25

**phonetic** 7:12 11:7 28:22

**pile** 33:23

**place** 9:8,15,18 26:23 27:13 32:22

**plays** 18:24

**point** 9:22 28:25

**policies** 10:10 13:6, 10

**policy** 14:14,18 16:8 34:10,13

**position** 11:24,25 37:5

**positions** 30:13

**post** 23:14 29:9 30:13 31:8,9,22 32:5,10,16,17

**posts** 30:6

**present** 28:4

**Prime** 30:3

**print** 30:3 34:23

**prior** 17:4 33:4,8

**prioritized** 21:23 22:23

**prioritizing** 22:19

**priority** 21:21 33:24

**problem** 7:18 31:11

**proceed** 5:25

**process** 9:2 11:12
12:11 14:6,12 15:15,18
16:2,6 21:2 25:5,18,23
29:14 30:4 33:19 34:3,
10

**promptly** 16:25

**pronounce** 6:24

**proper** 15:25

**provide** 16:13,19

**provided** 28:25 29:3

**provider** 18:21

**providers** 17:6,25

**Public** 5:12

**punch** 12:9

**punches** 12:24

**purview** 12:5

**push** 17:1

**put** 9:17,18 12:2 16:22
20:8 30:1 33:23 36:1

___

**Q**

**quality** 16:12,14

**questions** 6:12 38:3

**quickly** 9:16

___

**R**

**raise** 5:2

**rapid** 17:4,5

**re-direct** 38:3

**reach** 7:15,23

**reached** 7:13 33:3

**reason** 15:16,21

**recall** 20:18

**receive** 22:24 31:10,
12

**received** 7:11 20:21,
22 22:21 31:14

**Recently** 7:8

**recollection** 28:22

**record** 5:16 6:4 9:9
12:8,18 29:19 36:21

**records** 36:10

**refer** 36:11

**referring** 27:22
28:15

**refresh** 28:22

**refuse** 25:22

**regular** 13:17

**related** 24:16 26:19

**relieve** 15:10

**relieved** 19:23

**remember** 9:16
12:14,21,23 14:1 20:12
21:18 24:22 26:22 27:4,
6,9,12,14,17,20 28:1,8,
13,19,24 29:1,7 30:5,15
31:22 32:1 33:1,2,6,9,
11

**REPORTER** 5:1,4,
14,19,24 38:4,10,16

**representation**
8:3,20

**represented** 6:19

**representing** 7:5

**require** 17:22

**required** 15:2

**resources** 23:25
24:11 25:6,7,10,20

**respond** 31:3

**responded** 16:25

**response** 17:5

**responsible** 23:25

**rest** 14:19

**return** 11:10 24:8

**review** 38:5

**role** 10:21 12:1 23:13,
15 31:1

**room** 17:3,6 18:2,9

**rude** 22:10

**run** 19:2

**runs** 17:3,6 18:20

___

**S**

**safe** 36:13

**screen** 23:7 30:19,25
31:4

**sees** 17:12

**send** 21:10 34:22

**sending** 23:6,22

**sense** 35:2

**services** 10:1,2,4
12:1 37:17,18

**shack** 20:6

**share** 23:9,24 31:20,
21

**shared** 23:19 25:11
29:7 31:8

**sharing** 23:16

**shot** 30:19

**shots** 23:7

**shotted** 30:25 31:4

**showed** 31:6

**shut** 9:6 13:3

**sign** 15:22 25:21,22
38:5

**sir** 6:23

**sit** 15:14

**situation** 25:24

**slash** 10:19

**Smith** 37:8,10

**solemnly** 5:5

**sorting** 21:17

**speak** 18:15 21:7,8
24:4,19 25:17,19,22
28:6,8 29:15 34:16

**speakers** 17:11 18:6

**special** 18:12

**spell** 5:15 6:4

**spent** 22:5

**spoke** 15:2 33:21

**spoken** 7:14 8:7
20:16 33:8

**St** 14:13,19 16:13,21,
24 18:3 19:24 20:19
22:14 31:3 33:15 35:23
36:22

**staff** 16:16 17:7,17,24
18:8 19:12 23:22 27:11

**staffed** 23:18

**staffing** 16:19

**standard** 12:11 14:6,
12 16:6 25:5,7,23 29:14

**staple** 33:20

**start** 21:17

**started** 10:23 22:19
30:18 31:5

**starts** 35:9

**state** 5:12,15,20 6:3

**stated** 19:4,8 31:9

**statement** 21:9
28:25 29:4,17,21,24
30:1

**states** 34:3

**steps** 15:2

**Steward** 9:3 11:14

**stuff** 11:23 26:11 29:5
33:22

**submit** 29:24,25

**submitted** 29:21

**sudden** 18:22

**superiors** 22:18

**supervisor** 10:19
35:4

**supervisors** 29:15

**supplies** 10:9

**supposed** 15:6,9,11
19:21

**surgery** 11:9,10

LORI TOLOPKA
OCTOBER 04, 2025

JOB NO. 2035790

**surrounding** 32:6

**swear** 5:5

**swipe** 13:17

**sworn** 5:12

**system** 9:7,18 12:8
13:2 14:16

---

**T**

**T-O-L-O-P-K-A**
5:18 6:6

**taking** 20:7 26:7
32:22

**talk** 16:11

**talked** 33:6

**talking** 30:18 32:19

**teach** 29:14

**team** 17:25 18:12,21

**technical** 6:13

**telling** 7:18 26:22
32:8

**tenure** 14:19

**terminate** 23:2 25:19

**terminated** 24:5
25:15

**termination** 24:1
36:5

**testified** 5:13

**testimony** 5:5 32:9
37:20

**text** 7:17

**thing** 9:15 11:3 17:3,5
21:5,19 22:11

**things** 11:22 23:4,5,8,
16 26:8,23 29:7,12,13
30:2

**thought** 28:23

**till** 32:10,20

**time** 9:9,17,22,25
11:16 12:8,10,18,24
13:2,18,24 14:3 15:11
16:12,16 22:7 24:14

27:16 29:7 30:8 32:14
37:24

**timecard** 13:13
33:20 34:14,15,23

**timecards** 9:19,20
12:19 30:3

**timekeeping** 13:5

**times** 15:17 30:11

**timesheet** 12:12

**timesheets** 9:13
12:4

**title** 9:25 37:16

**today** 6:8,17,20 37:21

**told** 14:2 21:19 23:23
26:6 27:14 34:25

**Tolopka** 5:17 6:3,6

**town** 37:5

**transcript** 38:6,12

**transition** 13:13

**transitioned** 14:14

**transitioning** 13:8

**transmitted** 17:10
18:4

**transpired** 32:5

**travel** 37:5,11

**traveler** 24:7

**truth** 5:6,7 32:8

**truthful** 6:16

**turn** 36:5

**turned** 9:21 29:18

**turning** 9:14

**type** 14:8

**typically** 25:1

---

**U**

**ugly** 27:10

**unable** 9:8

**underneath** 10:12

**understand** 6:7,12
7:23 8:22

**understanding**
28:3

**unexpected** 34:12

**unfortunate** 23:8

**unit** 19:11,12,13 26:10
27:25 29:11

**units** 12:13

**untrue** 30:24

**untruthful** 23:5

**upsetting** 32:7

---

**V**

**vacation** 13:1 35:3,6,
13

---

**W**

**waive** 38:6,8

**walk** 19:23

**wanted** 7:22 15:23
22:4,10 23:24

**Washington** 5:23
37:6,15

**week** 7:10,14,17

**weeks** 31:24 32:2

**Wenatchee** 5:22
37:15

**women's** 10:1,2,4,7,
17,23 12:1 35:1,4
37:17,18

**wording** 22:18

**work** 22:20 27:19
31:24 34:24

**worked** 13:23 18:18
33:22

**workers** 13:12

**working** 19:11,13
36:16

**write** 13:23 14:2 29:16

**writing** 25:11,17
29:13 34:11,13

**written** 8:16 23:4,5
28:25 29:4,17,18,21,25

**wrong** 12:12 21:11,
13,15,20 31:15

**wrote** 30:15,23 31:17

---

**Y**

**year** 8:13 9:1 11:4,5
27:18

**yell** 19:14

**York** 5:13